## UNIVERSITY OF DISTRICT OF COLUMBIA
## DEPARTMENT OF PUBLIC SAFETY
### INCIDENT / OFFENSE REPORT

**(PLEASE PRINT)**

| 1.DATE/TIME 092004 2139hrs. | 2.OFFENSE INCIDENT | 3.OFFENSE/ INCIDENT: WORD DISORDERLY CONDUCT | | |
|---|---|---|---|---|
| 4.MPD CCR # | 5.UDC IR # 04-0171α | 6.MPD NOTIFIED/TIME & DATE N/A | | |
| 7.LOCATION OF OFFENSE/INCIDENT BLDG#39 2ND FL. 4200 CONN. AVE. NW. WASHINGTON DC. 20008 | | OTHER (SPECIFY) LAW CLINIC | 8.MPD NOTIFIED(WAIVED) NO | |
| 9.UDC COMM OFCR.TIME NOTIFIED V. ROYAL      2139HRS. | | | 10.UDC.SUPERVISORS NOTIFIED: SGT. L. JOHNSON | |
| 11.RESPONDING MPD OFFICER (S): N/A        BADGE # BADGE # BADGE # BADGE # | | | 12.OTHER MPD OFFICIAL (S) TIME: a.   N/A b. | |
| | | | 13.MPD TRANSPORT VEHICLE #/TIME N/A | |

14.LAST PERSON TO LEAVE CRIME SCENE/TIME & DATE
N/A

PROPERTY DISCOVERED MISSING/DAMAGE: PERSON / DATE / TIME:
N/A

| 15.PERSON HAVING KEYS TO AREA: N/A | 16.PROPERTY LAST SEEN/DATE & TIME: N/A |
|---|---|

CODE: O-OWNER,C-COMPLAINANT,R-REPT'G PERSON,S-SUBJ. / SUSPECT / W-WITNESS

| NAME: LAST,  FIRST, MI  SS# | CODE | HOME ADDRESS | PHONE H &(W) |
|---|---|---|---|
| TSHITEYA, MIREILLE (UDC LAW STUDENT) | (C) | N/A | |
| GREEN, RANDOLPH (UDC STUDENT) | (S) | N/A | |
| | | | |
| | | | |

DETAILS OF OFFENSE / INCIDENT (WHO, WHAT, WHEN, WHERE, HOW AND WHY):

ON SEPTEMBER 20. 2004 AT APPROXIMATELY 2139 HOURS. OFC. PATTERSON AND SGT. L. JOHNSON WERE DISPATCHED TO RESPOND TO THE UDC LAW CLINIC CONCERNING A DISRUPTIVE STUDENT. UPON OUR ARRIVAL. WE OBSERVED MS.T. MIREILLE WITH HER BOOKS STANDING AT THE FRONT DESK OF THE LAW CLINIC AND. MR. R. GREEN WAS SEATED AT THE OTHER END OF THE ROOM TYPING. MS. T. MIREILLE STATED THAT SHE ASKED MR.R. GREEN FOR HIS STUDENT ID CARD WHICH. MR.R.GREEN REFUSED TO PROVIDE. MR. R. GREEN STATED THAT SHE WAS NOT IN CHARGE AND HE DID NOT HAVE TO SHOW HER HIS STUDENT ID. I SPOKE WITH MR. R. GREEN TOLD HIM YOU MUST BE A UDC LAW SCHOOL STUDENT IN ORDER TO USE THE LAW CLINIC AND HAVE UDC LAW SCHOOL ID. I ALSO EXPLAINED THAT IF HE DID NOT HAVE ADEQUATE ID. THAT HE WOULD HAVE TO LEAVE THE LAW CLINIC. SGT L. JOHNSON ALSO SHOWED MR. R. GREEN WHERE THE NOTICE WAS POSTED ON THE LAW CLINIC DOOR. MR. R. GREEN GATHERED HIS PAPERS AND BOOKS AND PREPARED TO LEAVE. MR. R. GREEN WAS VERBALLY UPSET SHOUTING OBSCENITIES. AND SGT. L. JOHNSON WARNED HIM ABOUT THE USE OF HIS LANGUAGE AS WE ESCORTED HIM FROM THE CAMPUS. SGT. L. JOHNSON AND OFC. PATTERSON RETURNED. TO THE B-LEVEL LIBRARY TO LOCATE MS.T. MIREILLE TO TAKE HER STATEMENT. HOWEVER. THE LIBRARIAN STATED THAT MS. MIREILLE WENT HOME. NO FURTHER INFORMATION IS AVAILABLE TO REPORT AT THIS TIME.

Defendant's Exhibit No. 1
CA No. 05-1097 RWR

PROPERTY CODE: UP-UNIVERSITY PROPERTY ,   PP-PERSONAL PROPERTY

| DESCRIBE PROP.STOLEN | CODE | SERIAL NUMBER | VALUE | MODEL,MAKE ETC. |
|---|---|---|---|---|
| N/A | | N/A | | N/A |
| | | | | |
| | | | | |
| | | | | |

17.DESCRIPTION OF SUSPECT (IDENTIFYING MARKS/CHARACTERISTICS/NICKNAME ETC.
N/A

INJURY CODE: S-STAFF,US-UNIVERSITY STUDENT,F-FACULTY,V-VISITOR,UNK-UNKNOWN

| 18.NAME(S) OF INJURED: | STATUS | NATURE OF INJURY | HOSPITALIZED | FIRST AID |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |
| | | | | |

| 19. AMBULANCE NOTIFIED TIME:     N/A | 20.AMBULANCE ARRIVAL TIME:     N/A | 21.HOSPITAL REFERRED TO: N/A |
|---|---|---|

| 22.FD # /TIME     N/A | 23. FD. ENGINE #/ TIME     N/A | 24.UDC.OFFICIALS RESPONDING a.OFC.PATTERSON . |
|---|---|---|

25. REPORTING OFFICER (UNIVERSITY POLICE) :   b.SGT. L. JOHNSON
    JAMES PATTEWRSON#621                      c.

26.COMMENTS OF UNIVERSITY POLICE SUPERVISOR APPROVING REPORT:

_Jay John_                    9/21/04
REVIEWING OFFICIAL SIGNATURE     DATE

**Investigative preliminary details:**

_See attached supplemantas report_
_dated 10-19-04_

_LT Stephen M Young_          16-19-04
INVESTIGATOR SIGNATURE         DATE

REV.PHM-8/98

```
103 Personal Data                          GREENE, RANDOLPH

Screen: ___  SID: 579585629  Course: _____  Term: 04F

Name: GREENE, RANDOLPH                Spec Name Flag: _ Suppress Name Roll: _
Str Line 1: 4203 4TH STREET SE #9          *** Permanent Address ***
Str Line 2: _____  Address Usage: P
       City: WASHINGTON          State: DC Foreign Prov: _____
  Postal Cd: 20032        Rte: ____  Country: US Phone: 202-561-4503
Residence Dates - From: _____ To: _____ Addr Status: A Phone Pref: _

Str Line 1: _____  *** Local Address ***
Str Line 2: _____  Address Usage:
       City: _____ State: __ Foreign Prov: _____
  Postal Cd: _____ Rte: ____ Country: __ Phone: _____
Residence Dates - From: _____ To: _____ Addr Status: _ Phone Pref: _
------------------------------------------------------------------------------
Birthdate  Sex  Ethnicity  Marital  Disability  Rel Alum  Religion
03-17-1947  M      B          _         _          _        __
Previous Name: _____
            State   County   ---- VISA ----   -- VETERAN --   CWID        PIN
Citizenship Origin  Origin   Type  Exp Date   Code  Benefit   Notify  PIN  Asg
  US Fgn: __   DC            ___   ____   _____   __    __       _   031747  _
```

```
109 Student Schedule    SR   BPA BBA BSMG   GREENE, RANDOLPH

Screen: ___  SID: 579585629  Course: _____  Term: 04F  Printer Code: __

S                      FALL 2004
T Course        Cred GT Title                Days    Times     Bldg Room
  MAIN CAMPUS           NORMAL ACADEMIC TERM  08-25-04 to 12-17-04
E 2227-304-02   3.00    INTRO. TO MKTG. MGMT. MW     0530-0650PM 52  000315
                3.00 Total Registered Hours
```



**University of the District of Columbia**
*Department of Public Safety and Emergency Management Services*
Office of the Vice President
Building 39, Suite 301K
4200 Connecticut Avenue, N.W.
Washington, D.C. 20008
Office (202) 274-5148   Fax (202) 274-5344

# FILE COPY

**Report Supplemental**

Reference UDC case # 04-0171 (Informative) filed on 09-20-04

Prepared by: Stephen M. Young, Lieutenant

Date Prepared: 10-19-04

Interview Location: Law Library B-level – Professor Brian Baker, Director
                                        Helen Frazer, Head of Public Services
                                        William Thomas, Employee
                    Bldg. Room C-04 –Randolph Greene, Student
                                        Robert Patterson, Student
                                        Sergeant Larry Johnson
                                        Officer James Patterson
                                        Officer Virgil Royal
                    Room 301K – Mireille Tshiteya

This memorandum shall serve as a supplemental investigative report to the above referenced Incident Report.  In the aforementioned report submitted by Officer James Patterson, it is indicated that on September 20, 2004 at approximately 2139 hours, that he and Sergeant Larry Johnson were dispatched to respond to the Law Library on the 2nd floor of Building 39 to a report of disorderly conduct.  Upon their arrival at the scene of the incident, Sergeant Johnson and Officer Patterson ascertained from Ms. Mireille Tshiteya, a law student that another student, who was not authorized, was using the computer in the aforementioned location. This student was identified as Mr. Randolph Greene, who was not a law student.  It is additionally indicated that Mr. Greene became verbally upset and began shouting obscenities, at which time he was warned with regard to the use of his offensive language and was escorted from the campus.

A complaint was subsequently received by Robert T. Robinson, Vice President for Public Safety from Ms. Mireille Tshiteya on September 21, 2004, with regard to the incident (see attached). The aforementioned complaint contains a variety of allegations. It is indicated in the complaint that Ms. Tshiteya observed Mr. Greene seated at a computer which she desired to use, in an area located in the Law Library of which his presence was not authorized pursuant to established protocol. The complaint further indicated that as Ms. Tshiteya did not recognize Mr. Greene as a "familiar member of the student body" she inquired of him as to whether he was a law student. Mr. Greene then allegedly replied, "None of your damn business. You have no right to ask me that question."

Ms. Tshiteya further states that Mr. Greene continued to use other profanities and at that point, she responded that only law students could use those computers and that she pointed to the signs which indicated this directive. It is also stated that Ms. Tshiteya identified herself as a second year law student and reiterated her need to use the computer which Mr. Greene was using. Ms. Tshiteya then indicated that Mr. Greene continued further in his use of insults, profane and abusive language toward her to allegedly include calling her "a whore."

Ms. Tshiteya indicated that she subsequently contacted the Police Communications Office for assistance about two or three minutes prior to the incident at approximately 9:40 p.m. Ms. Tshiteya then indicated that she further alleged that as a result of the inordinate length of time that it took for the campus police to arrive, that she contacted the Police Communications Office a second time. Upon placing the second call, Ms. Tshiteya indicated that she re-identified herself, stating that she was the law student that had called earlier. She also indicated that she "needed security to get there quickly". She then stated that the officer responded "you're not in charge of the police officers, you can't tell the police what to do!" Ms. Tshiteya then indicated that the officer repeated his comment about her, trying to "order the police!" She also stated that she inquired as to how long it would be before the police arrived.

She then stated at that point she advised the officer that she wanted to make a report of this incident. The officer then requested that Ms. Tshiteya spell her name. She replied that Mr. Greene was being verbally abusive and acting in a manner that was frightening to her and therefore she did not feel comfortable spelling out her name in his presence. She then indicated that she spelled out her name six times and that the officer repeated it incorrectly all six times. She subsequently admitted that she has a foreign accent which intensifies when she is frightened or upset. In addition, she stated that "he hung up on me".

While pending the arrival of the campus police, Ms. Tshiteya requested another student who was identified as Robert Patterson that she mistakenly perceived as a "work study" student to ask Mr. Greene to display his identification. At this

time, Mr. Patterson did ask Mr. Greene to display his identification with which request Mr. Greene refused to comply.

Ms. Tshiteya then indicated that she stated that after Mr. Greene refused to present his identification to Mr. Patterson, that it "didn't appear safe to pursue the matter directly with him" at which time she "told the work study student to discontinue his attempts to resolve the problem." Ms. Tshiteya further stated that she became offended and frightened by Mr. Greene's behavior.

Ms. Tshiteya further alleged that upon Sergeant Larry Johnson and Officer James Patterson's arrival at the scene of the incident, that they did very little to correct the situation. Ms. Tshiteya then indicated that after at least eight minutes of hearing Mr. Greene screaming obscenities at her, that one of the officers finally stated something in an attempt to end Mr. Greene's dialogue. She further indicated that the officers escorted Mr. Greene from A-level. She then stated that she subsequently proceeded to B-level because she wanted to ask Mr. William Thomas to identify Mr. Greene. She then indicated, once she was able to identify Mr. Greene that her intention was to proceed to the Police Communications Office to file a report.

Upon her arrival to B-level, Ms. Tshiteya indicates that she observed Mr. Greene, Mr. Thomas, and the two officers present. She then alleged that she departed the elevator adjacent to the entrance of the Law Library. She further alleged that Mr. Greene had called her a "fucking bitch" and other derogatory insults. She then stated that the older, tall officer, stated in a threatening manner, "Why are you instigating?" Ms. Tshiteya then indicated that she stated loud and clear "I am here because I want to make a report!" Ms. Tshiteya then indicated that the officers stated to Mr. Greene "something like c'mon man, let's discuss this somewhere else". She also indicated that Mr. Greene stated "you fucking fat bitch, you'll think twice next time before asking someone if they are a law student!", "you fucking fat bitch", "you ugly fat girl" repeatedly hurling insults at her. At this time, Ms. Tshiteya indicated that she almost literally ran to the Metro.

On September 30, 2004, I interviewed Professor Brian Baker, Director of the Law Library, from approximately 1345 hours until approximately 1400 hours, relative to the incident. During the interview of Professor Baker, the following statements were made, questions were asked and responses were received:

Professor Brian Baker indicates that as a result of deficient funds, no student worker was assigned to the Clinic Law Library on Monday, September 20, 2004, at the time of the incident.

"When asked if Mr. Greene admitted the accuracy and culpability of Ms. Tshiteya's allegations, Professor Baker replied that Mr. Green admitted to culpability of all the allegations contained in the aforementioned complaint, except calling her a whore."

Upon inquiring of Professor Baker whether Mr. Greene indicated whether or not the Campus Police were present during the incident when shouting, profane and abusive language were used, he stated "I kind of got that impression."

When Professor Baker was asked whether Mr. Greene specifically stated the Campus Police were present during the time that shouting, profane and abusive language was employed, he replied "I did not ask him that question specifically."

On September 30, 2004, I interviewed Mr. William Thomas, employee of the Law Library, from approximately 1417 hours until approximately 1430 hours, relative to the incident. During the interview of Mr. Thomas, the following statements were made, questions were asked and responses were received:

Upon inquiring of Mr. Thomas how much of the incident did he witness, he replied "I only saw about 15 minutes, the last part of the incident. The officers brought Mr. Greene down from the law clinic to take him out of the situation. After being down there for about 2 or 3 minutes, the alleged victim came down and Officer Patterson asked her did she come down to antagonize him (Mr. Greene). Once Mr. Greene saw the alleged victim he started calling her names, fat woman, fat bitch, everything but a whore. Then the officers told him he would have to leave and escorted him out of the building and he continued to call her names".

When asked whether Mr. Thomas was present when the officers arrived, Mr. Thomas responded "No, I was here in the Law Library and the incident occurred on the 2nd floor in the law clinic."

Mr. Thomas indicated that the officers did what they were supposed to do and that Ms. Tshiteya came and put herself back in the situation.

On September 30, 2004, I interviewed Ms. Helen Frazer, Head of Public Services, from approximately 1500 hours until approximately 1527 hours, relative to the incident. During the interview of Ms. Frazer, the following statements were made, questions were asked and responses were received:

When asked how you became aware of the situation, Ms. Frazer responded "I read the complaint in the e-mail. I saw her before the incident and she kept talking about the pain she had with her teeth and not being able to sleep.

When asked what bearing or impact did this incident have which resulted in pain, she responded "None. She wasn't assaulted. She classified the verbal abuse as an assault."

"I also saw Mr. Greene that afternoon before the incident around 5:00 pm he was in the Law Library about the circulation desk and he is a UDC student.

undergraduate and has completed a paralegal certificate. He does pro bono paralegal work for prisoners. He was here preparing a motion for a prisoner that had to be filed in court by midnight. He was anxious. He was trying to meet that midnight deadline when he met Ms. Tshiteya upstairs. Mr. Green came to my office the next day and told me what happened."

"He told me from his perspective that she antagonized him and that she wanted to use the computer that he was using instead of the computer that Mr. Patterson had offered her and didn't want him in there."

When asked whether Ms. Frazer had any additional information that she felt would be relevant to this case, she responded "No, I don't know anything else".

Ms. Frazer also stated that Mr. Greene has been using the Law Library for about 5 years and no one has ever told him that he couldn't.

On September 30, 2004, I interviewed Mr. Robert Patterson from approximately 1330 hours until approximately 1413 hours, relative to the incident. During the interview of Mr. Patterson, the following statements were made, questions were asked and responses were received:

"What I heard first is a man come in and he was asked by the library clerk if he was a student of the Law Library. There was me and two other people there. There was a lady asking the man some questions. She asked him if he was a student of the Law School. After the lady asked him if he was a student, he said don't worry about it, none of your business, leave me alone, or something of that nature. She then asked him what he was doing there. He said he was doing pre-legal or something like that. She then told him that was no excuse if you don't belong here you gotta go. Then she said she was going to call security. Then she asked me to go and ask him for his ID and I go over there and he said something like he don't have to show it to me and he didn't show it to me. The library clerk wanted to get on the computer and connect with Nexus/Lexus so I offered her the computer that I was using. She then said no, she didn't want my computer, and she wanted that computer. It was just a bunch of arguing going on. The guy seemed like he just wanted to come in and do some work and at first she wanted to see his ID and then it changed to her using the computer where he was sitting. I didn't hear anybody call anybody anything out of their name or make threats. I was not threatened by this guy. I didn't feel like she seemed threatened by this guy and argued with him for how long before she called security. The dude seemed like he just wanted to get his work done. I didn't feel like it got to the point where I had to step in."

On October 1, 2004, I interviewed Mr. Randolph Greene, from approximately 1425 hours until approximately 1527 hours, relative to the incident. During the interview of Mr. Greene, the following statements were made, questions were asked and responses were received:

- 5 -

At approximately 10:00 p.m. I entered the computer lab, Building 39, 2nd floor. When I entered the lab I walked past a black female sitting at a desk, talking on a cell phone. I walked to the opposite end of the computer lab and sat down at a computer terminal and when I did so this female at the opposite end of the computer lab stood up and asked me, she didn't ask, she hollered "Are you a Law School student? Do you have Law School ID?" I told her none of her God damned business! She said "Well I'm calling security" and I said "I don't care who you call, I have legal work to do which has a time limit on it! I've been given permission to use the Computer Lab! A male Law School student trying to back this female's play came in close proximity to me asked me in an arrogant, demanding, angry tone of voice "Let me see your Law School ID!" "I told him to get the fuck out of my face!" As he was going to sit down he offered Jane Doe the use of his laptop. She said no! I'm calling security. When security came, it was two officers that I'm half way cool with and they were escorting me out of the building, but they changed and went down to B-level where the Law Library was and the three of us were talking to the library technician when the female came down to B-level where we was at and became very talkative. And that's when Officer Patterson asked was she trying to agitate and then she left.

When asked whether Mr. Greene called her a fat bitch, Mr. Greene responded "I called her an ugly, fat bitch".

On October 4, 2004, I interviewed Mr. Randolph Greene, from approximately 1329 hours until approximately 1400 hours, relative to the incident. During the interview of Mr. Greene, the following statements were made, questions were asked and responses were received:

When asked whether Ms. Tshiteya politely asked him whether he was a law student, Mr. Greene responded "No".

Upon inquiring of Mr. Greene as to how she asked that question he responded that Ms. Tshiteya responded in an arrogant, belligerent tone of voice, loud and offensive, and if she says she asked it in any other way, she's a liar.

When asked how Mr. Greene responded when asked if he was a law student by Ms. Tshiteya, he responded "None of her God damned business."

When asked whether Mr. Greene called Ms. Tshiteya a whore, Mr. Greene responded "No".

When asked if he stated that all law students, including Ms. Tshiteya only get drunk and fornicate on the premises or anything to that effect, Mr. Greene responded "No".

When asked whether a work study student requested that he display his identification, Mr. Greene responded "Nobody identified themselves to me as a work study student. No."

When asked if Mr. Greene continued to use various profanity and language to that effect, Mr. Greene responded "I don't have a clear recollection of what happened after that. I deny it".

"It was alleged that during this period that you kept getting up, sitting down, walking to bookshelves, pulling books out angrily and putting them back, standing up and sitting down, waiving your arms and acting very enraged. Is that accurate?"

Mr. Greene responded, "No, I sat down in a chair and that was the end of it."

At this point, Mr. Greene became upset and shouts "I don't recollect anything else! If they don't want me at this school anymore, give me back my fucking money and let me go! I have other things to do!"

I then attempted to persuade Mr. Greene to complete the interview, however, he replied "I don't have no beef with you, but I gotta go!" and he departed my office.

On October 8, 2004, I interviewed Ms. Mireille Tshiteya, from approximately 1007 hours until approximately 1023 hours, relative to the incident. During the interview of Ms. Tshiteya, the following statements were made, questions were asked and responses were received:

"You stated that you had worked with the work study student last year, is that correct?"

Ms. Tshiteya responded, "I had worked with him last year but I couldn't remember his name."

"You indicated that you had asked the subject politely for his ID. Please reiterate the precise manner in which you made this request."

Ms. Tshiteya responded, "First I did not approach him and then I did, stating, Sir, are you a student here, to which he responded none of your damned business."

"I understand that you were offered the use of a computer by Mr. Patterson. Was there a specific reason why you needed to use the computer being used by Mr. Greene?"

Ms. Tshiteya's response was "That was way after the incident had evolved."

- 7 -

On October 18, 2004, I interviewed Sergeant L. Johnson, from approximately 1702 hours until approximately 1815 hours, relative to the incident. During the interview of Sergeant Johnson, the following statements were made, questions were asked and responses were received:

"What time did you become aware of the incident involving Ms. Mireille B. Tshiteya and Mr. Randolph Greene which occurred in the Law Library on September 20, 2004?"

Sergeant Johnson's response was "I believe it was approximately 2131 hours".

"At what time did you respond to the scene of the incident?"

Sergeant Johnson's response was "At approximately 2145 hours".

"What did you observe upon your arrival to the scene of the incident?"

Sergeant Johnson's response was "When I arrived there the young lady was standing near the entrance of the little area where the computers are and Randolph Greene was sitting at the computer desk. After that, she stated that he was not a student and that he shouldn't be on the computer because a sign stated that only Law School students are to use the computers. That's when Officer Patterson and myself proceeded to talk to Mr. Greene."

"What did Mr. Greene state in your presence?"

Sergeant Johnson's response was "He stated that Mr. William Thomas gave him permission to go upstairs and use the computers and stated that he had used the computers before and no one asked him for an ID."

"Was Mr. Greene profane and abusive toward Ms. Tshiteya in your presence?"

Sergeant Johnson's response was "There were some words passed between both of them."

"Did Mr. Greene appear to be hostile in your observation?"

Sergeant Johnson's response was "He appeared to be agitated because he only needed a few more minutes to complete his work."

"Did you hear Officer Royal answer the telephone when Ms. Tshiteya contacted the Police Communications Office about the incident?"

Sergeant Johnson's response was "Yes."

"How did Officer Royal respond to her?"

- 8 -

Sergeant Johnson's response was "He answered the phone and the dialogue was she was questioning him as to who the officers were on the second floor."

"What occurred after you learned from Mr. Greene that he only needed a few additional minutes to complete his work?"

Sergeant Johnson's response was "That is the time that he became more agitated and Officer Patterson and I escorted him to the Law Library on B-level."

"What occurred on B-level?"

Sergeant Johnson's response was "That is the time he continued being agitated and wanted to know why he couldn't complete his work and only needed 5-10 minutes to do it because it needed to be in my midnight."

"Did you observe Ms. Tshiteya present while at the location?"

Sergeant Johnson's response was "She arrived later on. She said some words to him and Officer Patterson asked her why are you agitating this man. Officer Patterson then requested that she depart the area while we were speaking with Mr. Greene."

"What final action was taken with regard to Mr. Greene?"

Sergeant Johnson's response was "Officer Patterson and I escorted Mr. Greene off-campus?"

On October 18, 2004, I interviewed Officer Virgil Royal, from approximately 1855 hours until approximately 1920 hours, relative to the incident. During the interview of Officer Royal, the following statements were made, questions were asked and responses were received:

"At what time were you contacted by Ms. Tshiteya relative to the incident that occurred in the Law Library?"

Officer Royal's response was "I can't remember."

"How many times were you contacted by Ms. Tshiteya?"

Officer Royal's response was "I know at least three times."

"What information was related to you the first time she contacted you?"

Officer Royal's response was "She stated that an unauthorized person was in the library and she stated that she was a second year law student and that she wanted to report it because he wasn't a student of the Law School.  Then I asked her who was in charge of the library and she stated that he wasn't the one in charge because he shouldn't have been there."

"What did Ms. Tshiteya state the second time she contacted you?"

Officer Royal's response was "I tried to get her name and she wouldn't give me her name and she wouldn't give me her name because she didn't want him to hear her talking."

"Did you ever state to Ms. Tshiteya "You are not in charge of the police officers, you can't tell the police what to do?"

Officer Royal's response was "I told her that police officers have to handle these things in the way they see fit and I tried to get her name again and she still wouldn't give it to me."

"What did Ms. Tshiteya state the third time she contacted you?"

Officer Royal's response was "She was still talking about the officers getting there and I asked her to hold because I got two other phone calls and I asked her to hold and she accidentally got cut off."

"Did you ever ask her to spell her name?"

Officer Royal's response was "She never game me her name."

"Did Ms. Tshiteya state that she wanted to make a formal report?"

Officer Royal's response was "Later on she came back and said that."

On October 18, 2004, I interviewed Officer James Patterson, from approximately 1927 hours until approximately 1955 hours, relative to the incident.  During the interview of Officer Patterson, the following statements were made, questions were asked and responses were received:

"What time did you become aware of the incident involving Ms. Tshiteya and Mr. Randolph Greene that occurred in the Law Library on September 20, 2004?"

Officer Patterson's response was "It was about mid-evening, I don't have my notes to recall."

"Upon your arrival to the scene of the incident, what did you observe?"

Officer Patterson's response was "I observed a young lady standing by the door with her books and at the other end of the room, Mr. Greene was sitting down at the computer, typing."

"What type of behavior was attributed by Mr. Greene?"

Officer Patterson's response was "When we walked in at that time, his behavior was calm, but when the young lady said he didn't belong there he responded by saying that he needed ten minutes to finish what he was doing. She said something else which provoked his anger and at that point Sergeant Johnson and I told him he would have to stop what he was doing and leave."

"What action was taken next?"

Officer Patterson's response was "Sergeant Johnson explained to him that signs were posted stating that only Law School students were permitted to use the law clinic. After that he acknowledged that and stated that he would leave but would like to have time to complete his work. However, we insisted that he leave the clinic. Mr. Greene began to put his belongings together to leave. I did feel the hostility between the two people."

"He was then escorted to B-level?"

Officer Patterson's response was "He was escorted to B-level because the law librarian said he could use the clinic to type out his work."

"Did Mr. Greene become profane and abusive to Ms. Tshiteya in your presence?"

Officer Patterson's response was "Yes."

"After you arrived to B-level, did you observe Ms. Tshiteya present at any time?"

Officer Patterson's response was "She came down after about ten minutes talking to the librarian and when she arrived she made a comment about him which enflamed the situation."

"What statement did Ms. Tshiteya make?"

Officer Patterson's response was "Something dealing with a religious statement. At that time, we escorted him out of the library and off the campus."

"Did you at any time exhibit conduct toward Ms. Tshiteya which could be perceived as threatening?"

Officer Patterson's response was "No, I didn't say anything that was threatening to her."

- 11 -

In view of the fact that no incident report was completed and that no reference was made to this incident on the Pass On for September 20, 2004 of the 3rd Shift, or that no notification was made with regard to the incident, I recommend that a Written Notice be issued to Sergeant Larry Johnson, 3rd Shift Supervisor.

It should also be noted that although Mr. Randolph Greene was not a law student, neither was Mr. Robert Patterson a law student or a work study student. In view of the foregoing, I recommend that if exceptions to the directive that "only law students are authorized to use the computers" in the Law Library, then written documentation should be issued to the individual to prevent a similar occurrence in the future.

In view of the fact that sufficient evidence exists as a result of corroborated information received from Sergeant Larry Johnson, Officer James Patterson and Ms. Shuteye to indicate a violation of the Code of Student Conduct on behalf of Mr. Randolph Greene, I also recommend that this case be further referred to the Office of the Vice President for Student Affairs.

## Young, Stephen

**From:** Robinson, Robert T.
**Sent:** Tuesday, September 21, 2004 9:41 AM
**To:** Stewart, Terri A.; Morton, Phillip; Young, Stephen; JOHNSON, LARRY D.
**Subject:** FW: Report of Incident 9/20/04 at 9:30 pm and Complaint about Security's Conduct

Report of Incident
at UDC Clin...

            Sgt. Johnson, I will need to see you concerning this incident
      And what was done and not done, and while. Please prepare
      A response in writing. I want to see you today.  Thank for your
      Prompt attention chief.

-----Original Message-----
From: Mireille Tshiteya [mailto:mireilletshiteya@hotmail.com]
Sent: Tuesday, September 21, 2004 5:48 AM
To: Broderick, Shelley; Jolly, Ernest; Robinson, Robert T.; Baker, Brian L.;
hleskovac@lycos.com; Frazer, Helen
Subject: Report of Incident 9/20/04 at 9:30 pm and Complaint about Security's Conduct

Please see the attachment - the document is a detailed account of the incident.  I am
mentally and physically exhausted.  I am drained. I am in severe pain from negligent
dental surgery (a bone was broken, gum cut, and a tooth extracted so negligently that my
whole body aches constantly.  I have a dry socket - open wound that won't heal situated
next to two infected wisdom teeth, and I have a dying tooth in the front of my mouth.  I
had surgery on Friday September 10, the pain was so severe I had to go for painful follow
up surgical treatment on Thursday September 16, and I am scheduled for 3 extractions on
Friday September 24, 2004.  I have to take medication to sleep and then medication to stay
up through the pain that shoots through my entire body, from my right jaw, to my eyes,
nose, ear, like a ping pon ball.  I'm feeling that sick and now I have added stress due to
that incident.  I will try my best to come to school early tomorrow, but I never stopped
writing since 10:10 pm! I'veyet to go to sleep since the incident! And I'm in so much
pain, and so stressed by what happened I doubt that I'll be able to rest.

You are welcomed to contact me at home.  I will come to class, I just don't know how early
I can make it to school.

Born Again in Christ,
Mireille B. Tshiteya

Don't just search. Find. Check out the new MSN Search!
http://search.msn.click-url.com/go/onm00200636ave/direct/01/

1

| THE UNIVERSITY OF THE DISTRICT OF COLUMBIA |
|---|
| *Department of Public Safety and Emergency Management* |

4200 Connecticut Avenue – Building 39, Room A-13
Washington, D.C. 20008
(202) 274-5050

# STATEMENT

| INCIDENT/OFFENSE | INCIDENT/OFFENSE NUMBER |
|---|---|
| STATEMENT OF: (LAST, FIRST, MIDDLE) | DATE, TIME AND LOCATION STATEMENT WAS TAKEN |

| INVOLVEMENT (COMPLAINANT, VICTIM, WITNESS, SUSPECT, OTHER) | STATEMENT DURATION |
|---|---|
| | START TIME:          END TIME: |

MIREILLE B. TSHITEYA

| HOME ADDRESS  MIREILLE TSHITEYA @ HOTMAIL.COM | HOME PHONE |
|---|---|
| 671 Audrey Lane #302 Oxon Hill MD 20745 | 301-749-6627 |
| NAME AND ADDRESS OF EMPLOYER | WORK PHONE Please don't call |
| The Honorable Judge Dixon, Sup Ct. | 202-879-4808 |

I HAVE READ THIS STATEMENT GIVEN BY ME OR I HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND I CERTIFY THAT THIS IS TRUE AND CORRECT STATEMENT, TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. *MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES (D.C. CODE SECTION 22.2214).*

| SIGNED | DATE: |
|---|---|
| WITNESSED BY: | DATE: |
| INVESTIGATING OFFICER: | ASSIGNMENT: |

Form Revised:  11/10/03

Monday, September 20, 2004

From:  Mireille Tshiteya, UDC-DCSL Class of 2006
       301-749-6627

To:    Dean Shelley Broderick, Dean of the David A. Clarke School of Law
       Professor Brian Baker, Director of the Law Library
       Ms. Helen Frazier, Head of Public Services
       Mr. Ernest Jolly, Vice President of UDC
       Mr. Robert T. Robinson, Vice President for Public Safety & Emergency Management.

Re:    **Report of Incident in Clinic Library**
       **Complaint regarding the Security Officers handling of the Incident**

       I began recording the incident at 10:07 p.m. while waiting for the Metro, and I continued
writing while I was riding the metro and bus home. I specifically did this because I wanted a
record of this incident to be preserved. I was catching the Red line at the UDC Metro Stop, and
then I switched to the green line to Branch Avenue, and caught the D12 or D14 bus to my home.
I wrote the entire time continuously and only stopped to get on or off and to sit down and situate
my book-bags. I resumed writing the account between 11:10 and 11:15 when I called UDC
Security for the last time that evening to express my outrage and how upset I was with the way
they handled the incident; and also to get the names of the security officers involved and to
inquire as to whether any report had been made of the incident by either of the officers involved
as of that time. I was told by Officer Larry Johnson that none had been made. He asked me if I
would come on Tuesday morning to make the report then, because both he and Officer James
Patterson, one of the other two Officers involved, would be present at that time. I advised him
that I would send an email to all UDC and UDC-DCSL Officials that needed to be alerted about
the incident and the security officers conducts, and that if these officials advised me to go down
and make a report, I would do so then. I said more to this officer, but I will give further details
after I've finished recounting the facts relating to the incident.

       The first part of the incident took place between 9:30 p.m. and 9:40 p.m. (I was
monitoring the time on my laptop because I didn't want to miss the last bus home – I have to
switch two Metro lines and catch a bus). I was doing research for my Moot Court Class and I
began to experience problems trying to download the Maryland Court Rules for the MD Court of
Appeals.

       As a matter of fact, at 9:25 pm I succeeded after several tries in printing the Listing of a
selected range of Rules and the print out has the time on it. But when I tried to download those
rules Rules 8-101-611, my laptop's system got stuck and I started to get a number of errors
message. Prior to that time, a work study student had come in and was seated at one of the only
two computers available to Law Students. I guess he was assigned to the area at the time, a fact
that I confirmed with him later on, when the incident evolved. I'm not sure what his name was,
but I have worked with him before, last year when I was a work-study employee for the Law
Library. I had previously worked with him (the work study student) in the Clinic and Main Law
Libraries. But I had never really spoken to him, except the first time he came in at the Clinic

Library last year, and I observed him using the computer while I was working there and I asked him for his ID because I didn't know him. We have worked in the past less than 5 times at the same locations, but we have never really talked so I never got to really know him nor did I retain his name, but I know his face. I think his name is Richard but I'm really not sure. He is a witness to part of the events that took place.

I decided to move to the only other computer available to students in the Clinic Library. But I didn't want to leave my two book-bags, lunch bag, and laptop with at least 5 accessories to detach and pack up unattended. So I began to pack up my belongings to move to the open computer so that I could get on LEXISNEXIS get the Rules, print them and leave before 10 p.m. so I wouldn't miss my bus.

Approximately between 9:25 p.m. and 9:30 p.m., while I was finishing my packing to go to the computer (located next to the exit of the Clinic Library that's closest to the ladies and gents bathrooms) an unknown man entered the clinic library and proceeded towards that computer. I instinctively realized that he was going to sit at the computer that I needed and also I noticed at the same time that he wasn't a familiar member of the student body. However, immediately after it became clear that he was indeed taking a seat at the only other computer that I could use on the premises, I asked him politely whether he was a law student. I did not recognize him as part of our student body. His answer to me was a loud and rude statement that it was "none of my damn business." He added, "You have no right to ask me that question." He also used other profanities, and at that point, I responded that only law students could use those computers, I read and pointed him to the signs that said so, and I told him that I needed to use the computer. I also told him that I was a former employee (I told him that I worked there last year as a work-study student) and I identified myself as a 2L and reiterated that I needed to use the computer. When he became more belligerent, he cursed me out, called me a "whore" among other things, he said that I thought that I was better than UDC Students, that he had a legal document due the next day, and who was I to ask him anything anyhow... and on and on... and on... then he added that all the law students, myself included, only get drunk and fornicate on the premises and no one stops them, so who was I to question his use of the computer. I told him to read the signs but he kept on cursing me out. I repeated one last time that I needed to use the computer and then I advised him that I would call security. He told me to go ahead, as though he knew nothing would be done about his behavior and what he was doing. Needless to say, I was first shocked and then angry and disturbed by the man's behavior.

Prior to 9:40 p.m., approximately 2 or three minutes into the incident (I'm guessing because I did not have a watch nor could I monitor time on my laptop because at that point I had already shut it down, and I don't wear a wrist-watch) I called security. An unidentified and totally unconcerned security officer answered the call. I identified myself and represented to him that I was a 2L, 2ND Year Law Student, I told him where I was (at the Clinic Library), I told him that I was also a former employee of the Law Library, and so on... then I recounted to him what had just happened. I was excited while I was recounting the incident, because I was understandably upset at what had just happened. His only response to me was "we'll send someone." The tone of his voice showed no concern whatsoever, even though it was late in the evening, I am a female calling, saying that there's an unknown man being belligerent with me on school property where it is become clear he is not authorize to be. This officer never asked if I

was alone with the man, if anyone else was there to make sure that I was safe, nothing, his tone of voice showed annoyance at my call. I was agitated and he simply acted like I was reporting some unimportant trifling matter.

    At that point, I went to the work-study student, and I asked him if he was first working there tonight, and then I asked him if he could ask the man at the computer for his ID because if he wasn't a UDC-DCSL then I would need access to that computer. The work-study student went to the man and requested the man's ID, and also pointed out the notices on the wall that the computers were only for Law Students. The man refused to show his ID and said "William told me that I could come up here and use the computer." When the work-study student continued to insist that the man remove himself from the computer, the man started back cursing me out. He used the same obscenities and profanities he had used before. I was observing his mannerism and it just didn't appear to be safe to continue to pursue the matter directly with him, so I told the work-study student to discontinue his attempts to resolve the problem because I had called security and I was going to call them again. At that point the man became 10 times more belligerent towards me. He was cursing me out, he was getting louder and louder, and when he wasn't cursing me out, he was repeating his previous accusations and allegations against UDC-DCSL law school students, and myself included. I was so offended and frightened by his behavior at that point, I was so shaken that my next instinct and move was to call security again. I didn't want to leave the work-study student there alone and I didn't want the man to get away before a report of the incident was made by security officers either.

    The security officers appeared to be taking a long time to get there, every minutes count when situations escalate and people become verbally abusive and physically agitated. The man kept on getting up and sitting down at that point. He was walking to book shelves, pulling books out angrily and putting them back. He kept on standing up, and then sitting back down, waiving his arms, he was acting very enraged. At that point, I called security for the second time. I advised the man that I was calling security again. He continued his cursing me out. He made no attempts to leave the premises, but simply continued cursing me out and then sat back down once more in complete and total defiance to the rules regarding the usage of the computers. When I called the second time, I asked for the officer's name, I think he repeated it twice, but I was so upset, shaken, and trembling that I couldn't catch his name. I asked him to spell it, and instead he cut me off and asked me what I wanted. I re-identified myself, stated that I was the law student who had called earlier. I asked very excitedly where was the officer he had said he would send? I stated that I needed security to get there quickly! His response to me was "you are not in charge of the police officers, you can't tell the police what to do!" He made that remark three times. He made it then, and when I told him specifically that I was afraid of the man, that the man was "verbally assaulting" me (I couldn't put it any other way at first, but then as the call continued, I did add that the man was verbally abusive and very belligerent to me), that the man was acting in a manner that was frightening to me, the officer repeated his comment about me trying to "order the police!" I asked him how long it would take for them to get there, and he repeated the aforesaid comment again! At that point, I said "I want to make a report of this incident." He then asked me my name and asked me to spell my name. Meanwhile the man is still at the computer and he can overhear my conversation because I am upset and my voice was loud enough for him to hear. I told the security officer on the phone that I did not feel comfortable spelling out my name out-loud in the presence of the belligerent man, and that my

name is so unique that it wouldn't be difficult for the man to find my address and possibly harm me, because at that point, the man was simply acting like he had lost is rational mind. The officer interrupted me while I was speaking, ignored what I said, and then insisted on me spelling my name. I complied, I spelled it 6 times, and the officer repeated it back to me wrong all 6 times! While this is going on, the man is still being belligerent towards me. I got tired of the nonsense and stated that I had my student ID and that I would make sure my identity was checked and confirmed when the officer would arrive at the scene... and at that point, I became more disturbed by the security officer's conduct towards me. I realized that I had a foreign accent (which intensifies when I'm frightened or upset or stressed out) and a name that he couldn't pronounce and after he asked me to spell my name the first time his entire behavior changed from rude to simply disrespectful and condescending. I then stopped and asked for his name again AND HE HUNG UP ON ME!

I then realized that what was going on and reassessed the situation the best that I could under the circumstances, and I became more disturbed at the thought that in the event this man would turn violent I would have no protection. I certainly did not count on the work-study student to protect me, so I hurried up with my packing so that I could leave and go to the security office, the realization hit me like a tone of bricks, and my heart sunk in my chest because I'd just realize that I was in the Clinic Library without any real protection, frightened by an unknown man, calling security for help, and while I was attempting to make a report of the incident, during my second call for help, and after I had made it clear that I felt unsafe, the security officer HUNG UP ON ME! At that point, I still didn't know the officer's name and I wasn't sure anymore whether someone was really coming, and I never felt so distressed about carrying so many books, I didn't just want to run out and show the fear that I was feeling, but as I started towards the door to exit and see if the security officer was coming without my belongings, two officers show up. A tall older black male and a short and thin black male who appeared younger. The man at the computer was still cursing me out the whole time, he never stopped, and he was a short old black male, thin in built. I don't know if he was intoxicated, I didn't approach him, I wanted to keep a safe distance. Anyhow, the older tall black security officer approached me, while the younger one went straight to the man. I told the officer who approached me that I had an ID, I proceeded to look for it, I showed and gave it to him, and then I told him what was happening. He barely stopped to listen to what I had to say, gave me back my ID, never acknowledged the fact that I had said I wanted to make a report, never asked me not one question, didn't tell me to stay there while they handled the man, never told me to wait for him, never said anything whatsoever and gave no indication whatsoever that he was listening to me, going to take my report, or even acknowledge that he had heard anything I had said or that he would act on my request to make a report. I had specifically stated to that officer that the man had cursed me out (and he was still doing it in their presence), that the man was being "belligerent" and verbally abusive towards me, and the officers did nothing to stop him from cursing me out. I stood there feeling humiliated while that man called me an "F...ing whore" and other things, and observed these two officers only say "we know, we understand..." to the man who was cursing me out, as though he was right! He was also making comments about the Law School and UDC, that we take money from UDC, that we are not UDC students, and all the other things I described before, he repeated them over and over again in the presence of the officers. After 4 minutes of hearing that and seeing that the officers were not even attempting to ask him to be quiet and stop cursing me out I spoke out.

I stated "I am an elder at a church. I am not a whore. You, (the man) have been verbally abusive to me and you have insulted a church elder. God will repay you for what you have done." And then I told the officer, the older tall one "I want to make a report." That officer responded to me "for what?" I said something to the effect that the man had been belligerent with me, cursing me out, being verbally abusive and so on… and I emphasized that he was still doing it in their presence! Well, that officer NEVER acknowledged my request to make a report! He just turned around and continued to half-heartedly explain to the man why he had to leave. They were in fact "choosing sides" and sympathizing with him, that's what it looked like to me and that's what their behavior indicated to me: "JUST SHUT UP YOU DUMB FOREIGN WOMAN YOU DON'T HAVE THE RIGHT TO MISTREAT THIS POOR BLACK MAN" I was being treated like I was doing something wrong, not so much in words, but in the officers actions and the way they dealt with the man being patient, listening to his ramblings, and walking away while I would attempt to explain what had happened!

The man said something to the effect that a William downstairs had told him that he could use the computer. The younger officer responded, that "William was wrong" and explained the policy to the man, and pointed out the rules to him – the notices on the wall. The man continued to plead with them, and then in between his pleading with them, would resume his cursing me out! It got so bad, that after at least 8 minutes of his screaming obscenities at me, one officer, I don't recall which one, finally said something to the effect that "don't make accusations you can't prove" to the man, and only after I mentioned suing somebody and started using the terms defamation of character, libel, and so on… mind you that at that point the man switched his insults as being directed to "Law Students" in general, but made it clear that I fitted the category and then reverted back to cursing me out! I have never felt so humiliated, disrespected, dehumanized, and abused in my life! I got so stressed out I was shaking so bad, I couldn't stop my body from trembling. Finally, the younger officer told the man "let's discuss this downstairs" or something like that. They left, and I went up to the computer to see if by any chance there was any information left by the man there that I could use to identify his name. I found none, he had closed out the programs he was working on. I did check the time though, it was 9:50 p.m. The whole time that the officers were there, but I couldn't see him because of where the computer he was seated at was located. Anyhow, almost immediately after the officers left with the man, the work-study student got up to leave and I told him to wait for me, because I didn't feel safe and I didn't want to stay there by myself. I finished packing up and we both walked out together. We took the elevator together, he got off at the 'A' level and I got off at the 'B' level, because I wanted to go ask William who that man was, if he knew him, and go back to the Security Level A and make my report.

When I got there, I saw the two officers, the man and William. I got off the elevator that's actually immediately next to the entrance to the library. I entered the library and listened, because it did not appear to me that any report was being made. The man was cursing, saying the same thing he was saying upstairs, talking about African-Americans who were just UDC students being treated differently than the Law School students, and he began to make his offensive and obscene comments again. He was cursing like I have never heard it before. I stood there as long as I could silent, and then I became even more revolted, because as soon as he saw me standing there, he began cursing me out again! And the security officers made no

effort whatsoever to ask him to stop cursing me out, he was being so profane, I had to say something. I stated I pay for my education, that I was a "UDC" student, and that I was tired of him calling me a whore, that I was an elder at a church, and that I would take further action regarding his behavior towards me. At that point, the older tall security officer, who said nothing while I had been cursed out non-stopped, called an "F...ing B.tch" and other derogatory insults, for over 20 minutes at that point, he turns and says to me "why are you here, are you instigating?" he said it in a threatening manner as though he was saying, if I said another thing, I would be the one in trouble! I then stated loud and clear "I am here because I want to make a report!" Just like he had done upstairs, he turned his back to me, the other officer was already stepping out of the library, both of them saying something like 'c'mon man, let's discuss this somewhere else." But not before the man began to call me (please excuse my language, I don't curse, but this is what he said "you fucking fat bitch, you'll think twice next time before asking someone if they are a law student!", "you fucking fat bitch", "you ugly fat girl" and kept on until they stepped into the stairways, but not before he had cursed me out for at least 3 or more minutes. I was so humiliated and shaken that I said the only thing that I could think of saying, which was "you have just cursed an elder of a church, may the Lord repay you for what you have done!" Neither of the officer's bothered to say anything to me, not anything, nothing... not "mam, wait here while we deal with this man... or mam we will be back to take a report or anything at all!" I turned to William and I said I am going to report this, he told me "you are right, go home and report it in the morning" and he also stated several times something to the effect that "the man's behavior was uncalled for." At that point, I just felt sick to my stomach and fear gripped my heart again, because I realized that these security officers would do nothing, and if they released that man while I was still there, something worst could happen to me and the time of my last bus connection was approaching.

So I almost literally ran to the Metro, and while I did, I could hear the man cursing, I looked back and it appears that they had just taken him outside by the side of the building, and I don't know what they were doing, but it didn't look to me like they were going to do anything to him, at least not anything that would make me feel safe enough to remain in the area any longer. When I got down to Metro, I was so shaken up that I didn't even realize that I was expressing what had just happened verbally to myself, and two women were staring at me because I appeared so distraught. So then I told myself, take a piece of paper and write. At first I was so upset and shocked that I pulled two pens, a blue and a red one, and then I just held them in my hands while I was just telling myself I can't believe what just happened and still expressing what I was feeling orally. One of the two women who were starring at me when I first got there, and then were talking, stopped talking and kept on starring at me, because I was pacing nervously around my book-bag, expressing myself verbally (not cursing- just shocked at what had just happened to me. I was so angry and revolted that I was still shaking). I was rubbing my head, and then I realized that I had the pens in my hand and no paper. Anyhow, I got the paper from my book-bag and I started writing, because I was so angry, so humiliated, so distressed that at that point I had to do something, and writing what happened seemed to be the only thing I could do right then.

I didn't stop writing until I got home, at approximately 11:10 p.m. At that point my nerves were a wreck! I got so upset thinking about what had just happened that I couldn't just write anymore and then I realized that I didn't have any names! So I called the UDC Security,

and the same rude officer answered. I asked for his name, but it's almost as though he purposely said it so quickly that I couldn't catch it. I straightforwardly told him that I wanted to know the names of all of the officers involved, including him, in the incident that had taken place in the Clinic Library this evening, that I was the Law Student who had been involved, and that I wanted to know if any report had been made. He acted like he couldn't understand me, and without really acknowledging any of my inquiries, I just heard him say "Larry!" he walked away from the phone, and "Larry" got on the phone in his place. I re-identified myself, and I made my requests known. Larry stated first that no report had been made, and after I expressed my outrage, he gave me some lame excuse that the other officer had thought that I was going to wait for him to get back and take my report. I asked him what would make them think that I would know to wait when neither of them expressed or acknowledged my request to make a report, never said anything remotely resembling "please wait here mam, we will be back to make a report with you", but instead indicated by their conduct that they felt the situation was not worth reporting, as a matter of fact, the officer's threatening conduct towards me when I did attempt to make the report (I'm referring to the incident at the library downstairs, when the older tall officer moved towards me, leaned forward authoritatively with his hands on his hips as though he was getting ready to arrest me, while saying 'are you instigating' – it was an implied threat to me that if I said another word, I would be facing an arrest or something of that nature. He was absolutely threatening to me and NEVER used those words or body language towards the man who had been screaming obscenities at me in his presence for a significant period of time, at least 20-25 minutes at that point. That officer made that remark to me even though I was clearly within my rights to defend myself, my reputation, which I was attempting to do with words that were not obscene while the man was cursing me out like I have never been cursed out before in my entire life! **Neither officers made any efforts to chastise or even tell the man to be quiet, they didn't threaten him of "instigating," they did absolutely nothing. I repeat, these officers made no efforts to stop this man from being verbally abusive towards me**). Officer Larry then gave me the names of all involved, he was one of them, he was the one I referred to as the "younger officer" and his name is Larry Johnson. The older officer was named "James Patterson" and the officer who had answered the phone was named "Virgil Royal" according to officer Larry.

I reiterated to officer "Larry" that I was very upset, at that point I became very loud, I just exploded… , my voice was shaking, and I just expressed and pointed out the following:

I told him that I was extremely offended at the way I was treated both by that man and him and the other two officers. I told him that I was sending an email to a number of Officials at UDC and UDC-DCSL, that someone would loose their jobs over this incident, and that I had never in my entire life have experienced anything like this before. I told him that had it been his sister or mother or that of the other officers, I am certain they would have behaved differently. I made it clear that their inaction was just as offensive to me as that man cursing me out like he did. Their total disrespect of me as a student, as a black woman who is trying to better herself (and I only mentioned race and gender because they appear to be part of the reason why they treated me that way, along with my origin), was absolutely unacceptable. I said that I have paid over $100,000.00 for my education (undergrad, graduate, post-graduate, and law school) thus far, that I have been celibate for well over 9 years (since 1996 when my ex-husband abandoned me), that I had had no relations with any other man, that I had only known one man my entire life and

I was married to him, that I am an elder in a church, that my holiness to the Lord and vowel of holiness that I have with Christ means more to me than anything else, and to be called a "whore and bitch," especially in the presence of four men, and for not one of them to act as though this is wrong, their failure to acknowledge that sort of language is unacceptable, not once while the incident was going on, and then for one of them to turn around and tell me I'm going to get in trouble after I correct the belligerent man because the level of obscenities being thrown at me is escalating, and for the security officer to hang up on me while I'm making a distress call, I told him that for this someone needs to lose their job. I felt their behavior was so unprofessional! I'm sick to my stomach right now! He never apologized, he only expressed a fraction of an iota of concern when I recounted being hung up on, and that was for a "split-second!" No promises of redress, or a simple "I'm sorry, about the way we handled the situation" or even "Sorry you feel that way" however rude I think that comment normally is in the face of traumatic experiences, but something, ANYTHING remotely apologetic would have been better than NOTHING. Their conduct was shocking, wanton, willful, egregious, and they demonstrated a total disrespect or lack of respect or care for me or my best interest, period. This has been one of the most emotionally taxing, painful, infuriating, and mentally distressing events I have ever experienced.

I can't believe they just disrespected like that! My nerves are wrecked! I don't need that kind of treatment! I told the officer that I have struggled to rebuild my life over for the past 9 years, I had lost everything, I have been homeless, without food, lost my home, my car, everything that ever meant anything to me, I have suffered and continue to suffer to "better" myself, struggling to make ends meet, who on earth are they to simply take it upon themselves and assume that someone like me looks down on someone like them, and then disrespect me accordingly, as though they were justified for acting that way towards me? The irony is that they treated me without cause with the very lack of dignity and humanity that they wrongfully accused me of using against them (when I say they, the behavior of the security guard was not different than that of the belligerent man, his was simply verbally expressed at an unrestrained level – they were all in essence treating me like I was lesser than a female dog.) As far as I'm concerned they treated me like I aw the scum of the earth! For someone to call somebody like me "a whore" it's worst than calling me a "nigger" because there is nothing that I prize more than my chastity, nothing gives me more sense of worth, than my faith in Christ which I for one show through my chastity towards him. I am not a "prude," I am a broken soul to whom Christ gave back Dignity, Self-respect, and Self-Esteem, and I will die before I let anyone tear down what He has rebuilt in me. You take away my dignity AND I HAVE NOTHING… I know I AM WORTH something as a human being, I AM PRECIOUS and no one has the right to tear that part of me down, NO ONE.

I grew up with low self esteem and a father who called me "bitch" and a "whore" from the time I was 1 years old until I left his home. But even his cursing was nothing like what that man said to me! I had a mother who beat me until she drew blood from my nose and my mouth, from the age of 1 ½ to 17 years old. I had a husband who was abusive to me, took all that I could give, used me up until I was drained and then left me. After all of these experiences, I have never felt as revolted as feel tonight. I took abuse that most wouldn't dream about taking or talking about, you have no idea. But through it all the one thing I have consistently prized, especially when I couldn't love myself as God loved me, was the fact that I never was that

"whore" or that "bitch." I remained a virgin until marriage and I have only been intimate with my husband. I have never had any other relationship, EVER. Not because I have had the opportunity, but simply because I made a choice to live for Christ, and even nine years after my husband abandoned me, I have remained chaste, not for him, but for the Lord. I trust that if the Lord has someone for me, than I will be given to that husband, but if not I will remain the Lord's, either way, I cherished being kept *undefiled*.

I don't drink, I don't smoke, I don't fornicate, and I don't take part in many things, not because I'm judgmental of other peoples' actions, but simply because I neither desire to do it nor do I have to do those things. I understand that I am saved only through grace by faith in Christ and his grace and mercy make the only difference. I extend that kindness to anyone, I hate no one, but I do hate pure acts of hatred, disrespect, and abuse regardless to whom they are directed and for what reasons they are done. I know that I'm not saved because of what I don't so I don't walk around condemning anyone or trying to condemn any, we are all free moral beings. I don't expect special treatment because of the choices I've made in my life, my faith in Christ – religious belief, or hardships I have experienced. **But I do expect to be treated with human dignity and respect.** For someone, anyone to make any comments, or inferences that go to the heart of what I stand for, to simply humiliate me while others are watching and doing nothing to stop it, is… I don't even know how to express the distress that I am experiencing right at this moment! This is happening, this incident is happening, after I have undergone two surgical procedures, and have been injured during one procedure, so not only am I in physical pain, but then I get mental anguish and distress added to that!

I want something done about this! I want to be told what is going to be done about this! And even if I was wrong for telling the officer that someone was going to be fired over this, because in my heart I don't seek revenge, something still needs to be done! I want apologies, I want reassurances that this will never happen to me or to anyone else at this school again! I won't feel safe being there at night any longer, especially knowing that the belligerent man could return at any time, and I have no idea who he is or even if he could be stopped, because I doubt those officers took down his name! I want to know exactly what concrete steps are going to be used to remedy this situation. I demand verbal and written apologies from all of the officers involved. I want those apologies to be made in public, since I was verbally abused "publicly" and had to suffer that humiliation while they witnessed it and did nothing about it. **I don't ask that any of them be fired.** I've been without work, I have had to struggle for years, I don't have any children, thank God, but I don't want their wives and kids, if they have any, to suffer because of their conduct. I will do, that which only Christ in me allows me to do, which is show these men the human compassion, grace, mercy, and respect that somehow they were too blind to show me. But I want to make it clear that the dehumanizing, hateful, abusive, humiliating, mentally distressing, shocking behavior by the unknown man should have never been allowed to continue and go unpunished once these officers observed the behavior, not once, not twice, and not for short period of time, but repeatedly for close to or over 25 minutes altogether.

I told officer Johnson that they had chosen the wrong woman to do this to, because everyone in the law school knows my reputation as a devout Christian woman, and if nothing else indicates my "separation and holiness unto the Lord" the big white (sometimes black) prayer cloth on top of my head should indicate to any soul, whether Christian or not, that there is some

sort of religious observance taking place in my life. But even if I wasn't a Christian woman, even if I was, God forbid, a "prostitute on 14th street" that doesn't give anyone, I mean anyone the right to dehumanize, humiliate, abuse, and be belligerent towards me. All human beings are entitled to human dignity and respect by the sole virtue of their birth into the human race. This fact is not dependent on whether they know it or not, whether they acknowledge it or not, or whether others agree with it or not, THERE IS NO CHOICE INVOLVED IN THE MATTER, TREAT OTHERS THE WAY YOU WOULD WANT TO BE TREATED is the message, and dignity is something I have earn by virtue of being a member of the human race, period. I demand to be treated with respect and dignity, and I should not, cannot, shall not, will not settle for anything less, whether I am the one subjected to dehumanizing treatment or someone else is. It's not a matter of politic, religion, race, culture, social status, education, finances, or anything else. I will not stand for anything less. I don't look down on anyone, period. I hate abusive behavior, I have been victimized by it, and I am tired of sitting back and letting things of this nature happen to me without fighting back. I may not agree with every "wind and doctrine," with all the ways I observe, or everything that happens to me, but I don't take it upon myself to dehumanize, insult, abuse, disrespect, or mistreat people, and God knows, if I even get the inclination that I might have hurt someone, I will quickly apologize and try to correct it, "for the first fruit of Christ's spirit is love".

All this said, I find myself having to pray for the strength that I need at this moment to deal with this situation, and to forgive quickly as Christ forgave me.

May the Lord have mercy on that man's soul for what he did to me, and on those three officers for their conduct; but please don't mistake my expression of Christian forgiveness and love as a statement that everything is alright, because it isn't. **Words once uttered, cannot be unsaid.** Who will take up my cause and defend me? I spent my entire life seeking "protection" from my parents, from my ex-husband, from mean and evil people who just are so hateful they will harm anyone, and I decided to become a lawyer to make sure that there will be some justice and compassion in the administration of justice when I become a Judge, but tell me, how do I gain faith in the Law, when those who represent it, even if at a level not equal to others, act in ways that are so unjust, it's just beyond comprehension? How much would it have taken for any of these officers to simply tell the man to "be quiet?" or to "stop!" – what if it had been their sister, mother, niece, wife, daughter?

I just can't believe it! I simply just can't believe it!

Please do something about this. Thank you.

Respectfully,
Mireille Tshiteya

**Johnson, Larry N.**

| To... | Young, Stephen |
|---|---|
| Cc... | Johnson, Larry N. |
| Bcc... | |
| Subject: | |
| Attachments: | |

On September 20,2004 at approximately 2131 hrs. communication Officer V. Royal call J. Patterson

by radio to response to bldg. 39 2nd floor law School area. J. Patterson, L. Johnson arrived at that

location. A female Law School students  stated to J. Patterson that a male student was using a computer

and the student was not a law school student. J. Patterson walk over to the male student and explain to him

that  the computers in that area are only for Law School students. Mr. Green stated that he only needed

about 15 min. to complete his  work. Mr. Green stated that Mr. Williams gave him the okay to used the

computer on 2nd floor bldg. 39. Mr. Green continues to ask J. Patterson why he could not complete his

work and that he has used that computer in the pass.   J. Patterson  and  L. Johnson escorted Mr. Green

to B-level of bldg. 39. Mireille, Tahiteya walk in to the Law School Library where J. Patterson , L. Johnson

was explaining to Mr. Green that he would not be able to complete his work on 2nd floor bldg. 39.

J. Patterson ask her to step out while we escorted Mr. Green off  UDC Property. J. Patterson, L. Johnson

advised Mr. Green that if he was doing legal work then he should see the Dean of Law School. J. Patterson,

L. Johnson returned to 2nd floor bldg. 39 to interview Mireille, Tahiteya she has departed from that area.


L.  Johnson

Incident in the Law Clinic


On Monday Sept. 19, 2004 at about 10:00pm two University of the District of Columbia police officers escorted an undergraduate by the name of Randolph Green to the Law Library. The officers stated that Mr. Green and one of the second year law students had just had a confrontation in the law clinic. While the officers were trying to calm Mr. Green down the law student got off the elevator and entered the law library. As soon as these two seen each other it was on again both of the student were out control. The officer was trying to keep them apart. The law student just didn't want to let it go she continue to say that Mr. Green didn't belong there. The campus police finally got Mr. Green out of the building.


William T. Thomas

**THE UNIVERSITY OF THE DISTRICT OF COLUMBIA**
*Department of Public Safety and Emergency Management*

4200 Connecticut Avenue – Building 39, Room A-13
Washington, D.C. 20008
(202) 274-5050

## STATEMENT

| | |
|---|---|
| INCIDENT/OFFENSE<br>*Disorderly Conduct* | INCIDENT/OFFENSE NUMBER<br>*04-0171* |
| STATEMENT OF: (LAST, FIRST, MIDDLE)<br>*Greene, Randolph* | DATE, TIME AND LOCATION STATEMENT WAS TAKEN<br>*10-1-04  1510 hours* |

| INVOLVEMENT<br>(COMPLAINANT, VICTIM, WITNESS, SUSPECT, OTHER)<br>*Verbal harassment by female law school student* | STATEMENT DURATION | |
|---|---|---|
| | START TIME:<br>*1510 hours* | END TIME:<br>*1528 hours* |

| HOME ADDRESS<br>*P.O. Box 6703 Washington D.C. 20020* | HOME PHONE<br>*(202) 561-4507* |
|---|---|
| NAME AND ADDRESS OF EMPLOYER | WORK PHONE<br>*N/A* |

*On 20 September 04, about 10 p.m., I entered the law school computer lab to complete pleadings for filing in the U.S. Court of Appeals, for the D.C. Circuit. As I did so, I walked past a female, sitting at a desk, talking on a cell phone. I walked to the opposite end of the computer lab and sat down. After I sat down, the female at the opposite end of the lab, with the cell phone in her hand, hollered down to me, "Are you a law school student?"*

I HAVE READ THIS STATEMENT GIVEN BY ME OR I HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND I CERTIFY THAT THIS IS TRUE AND CORRECT STATEMENT, TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. *MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES (D.C. CODE SECTION 22.2214).*

| SIGNED: | DATE: |
|---|---|
| WITNESSED BY:<br>*LT Stephen M Josey* | DATE:<br>*10-1-04* |
| INVESTIGATING OFFICER:<br>*LT Stephen M Josey* | ASSIGNMENT:<br>*10-1-04* |

Form Revised:  11/10/03

The University of the District of Columbia – *Department of Public Safety & Emergency Management*
## Statement Continuation Form

"do you have law school I.D." The tone of voice was arrogant and belligerent and I was very offended. This student did not have a legal right to ask me for my identification. Especially in the tone of voice she used. A male law school student who was present offered the female the use of his lap top but the female turned him down and said that she was calling security. Security escorted me from the 2nd floor to B-level where we were talking with library personnel when the female came down there and again began to run her mouth. Finally, Officer Patterson asked the female was she "trying to goad this man" and she left. Supreme Court judicial opinions prohibit law enforcement officers from asking citizens for ID (will supplement later)

I HAVE READ THIS STATEMENT GIVEN BY ME OR I HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND I CERTIFY THAT THIS IS TRUE AND CORRECT STATEMENT, TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. *MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES (D.C. CODE SECTION 22.2214).*

SIGNED: *Randolph L. Greene*    DATE: 1 October 04

WITNESSED BY: *T. Stephen McKoy*    DATE: 10-1-04

INVESTIGATING OFFICER: *T. Stephen McKoy*    ASSIGNMENT: 10-1-04

Revised 11/10/03

To: LT. Young
Fr: Randolph Greate

### ADDENDUM

I have a AAS degree in paralegal studies. From time to time, I use the UDC law library and computer lab to do legal research and prepare documents for filing in court. I was so occupied in September 04. The professors in charge of the law library and computer lab know of my activities. I have never abused this privilege. Most of the time, I use the facilities late at night and on the weekends when law school students are few in number. On 20 September 04, I entered the computer lab about 10 p.m. and as I did so, I walked past a desk where a obese female of negroid descent (hereinafter referred to as "Jane Doe") was sitting, running her mouth on a cell phone. I came to use the computer which was at the opposite end of the lab where Jane Doe was talking on the cellphone. As I entered the lab, I could see that the computer was empty and so I preceded there. When I arrived there and began to sit down, Jane Doe stood up and hollered down to me in an arrogant and belligerent tone of voice "Are you a law school student"; "Do you have law school ID". Jane Doe is not a UDC law school employee. Jane Doe is not a law enforcement officer. When Jane Doe asked to see my ID she was exercising police powers synonymous to those referred to in <u>Kolander v. Lawson,</u> 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). In <u>Lawson, supra,</u> a suit was brought challenging a statute requiring persons who loiter or wander on the streets to provide a "credible and reliable identification and to account for their presence when requested to do so by a peace officer under circumstances that would justify a stop under the standards of <u>Terry v. Ohio,</u> 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), <u>Id.</u> At 353. A federal district judge heard the case and agreed that the

2

ordinance was overbroad because "a person who is stopped on less than probable cause cannot be punished for failing to identify himself. Id. at 354. The State appealed that ruling all the way to the United States Supreme Court. The Supreme Court held that under the circumstance, Lawson did not have to identify himself. Id. at 361-62. When I walked into that computer lab and sit down at an un-occupied computer terminal, Jane Doe did not have any authority whatsoever to ask me who I was or whether or not I was a law school student. In so doing, Jane Doe, invaded my rights to privacy and dignity as protected by the fourteenth amendment to the constitution of the United States. If a cop, in a uniform does not have a right to ask a person for identification, then a student certainly does not have any right to ask another student for identification as Jane Doe did me. When Jane Doe asked me for identification that was similar to her going into a crowded theater and shouting "fire". The panic that such speech would cause under those circumstances caused a similar panic in my psyche.

But wait. There is more.

Jane Doe is supposed to be a law school student. Law school students are *required* to have their own lap tops. Furthermore, another student in the computer lab at the time offered Jane Doe the use of his lap top. Jane Doe declined that offer stating that she was calling security. Campus police officers did arrive and escorted me from the computer lab to the B-Level law library where the Technician on duty at the time confirmed that he did authorize me to use the computer lab. During this colloquy, Jane Doe left the computer lab on the second floor and came downstairs to the law library where I was in the presence of two campus police officers and began

to run her mouth until one of the campus police officers asked her was she trying to goad this man and with that Jane Doe left the facility.

I should not have been required to leave the premises.  I was there to prepare a two or three page document for filing in the U.S. Court of Appeals for the District of Columbia Circuit, explaining why the appellant could not file twelve (12) additional copies of a petition for rehearing and suggestion for rehearing *en banc* by midnight.  All I needed was about ten or fifteen minutes.  If Jane Doe had asked me politely to use the computer terminal before me I would have gladly allowed her to do so even she was at the opposite end of where the computer was at when I entered the lab.  In requiring me to leave while I was engaged in a legitimate activity, the campus police officers acted in an arbitrary and capricious manner similar to police actions in City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).  In Morales, supra, a city ordinance had been enforced for three years which prohibited criminal street gang members from loitering with one another or with other persons in any public place. Id. at 45-48.  The police had issued over 89,000 dispersal orders and had arrested over 42,000 people for violating the ordinance. Id. at 49-50.  Two judges had upheld the ordinance while eleven (11) other judges held that it was invalid.  Id.  One of the eleven judges held that the ordinance encouraged arbitrary and capricious enforcement by the police.  The U.S. Supreme Court agreed.  Id. at 51-52.  In fact, the High Tribunal held, in relevant part that "freedom to loiter for innocent purposes is part of the liberty protected by the due process clause of the fourteenth amendment. Id. at 53-54.  The computer lab is a public place just like the street and I should not have been required to "move on"

4

just because I was not a law school student.  I am a UDC student, majoring in Business Management.  I was not loitering in the computer lab.  I was using the facility for its intended purpose.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RANDOLPH J. GREENE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action # 05-1097 RWR |
| | : | |
| WASHINGTON, DC, | : | |
| | : | |
| WILLIAM L. POLLARD, President | : | |
| | : | |
| CLEMMIE SOLOMON, Vice President | : | |
| | : | |
| BRIAN BAKER, Professor | : | |
| | : | |
| and | : | |
| | : | |
| WILLIAM THOMAS, Library Technician | : | |
| | : | |
| Defendants. | : | |

## DECLARATION OF BRIAN BAKER

1.      I, Brian Baker, am an adult employed by the University of the District of Columbia

David A. Clarke School of Law as Professor and Director of the Charles and Hilda Mason Law

Library (hereinafter, "Law Library").

2.      While the Law Library is maintained and operated primarily for the School of Law

students and faculty, it is generally open to the public so long as the public's  use does not

interfere with use by the law school students and faculty.  Law Library rules are few and are

based on the principles of courtesy, common sense and equity.

Defendant's Exhibit No. 2
CA No. 05-1097 RWR

3.     On September 21, 2004, I was made aware of Randolph Greene's appalling behavior the night before in the Law Clinic Library and Resource Center, a facility operated by the Law Library exclusively for law school students three floors above the general Law Library reading room that is open to the public.

4.     I advised my staff that I did not want Randolph Greene in the Law Library again. Mr. William Thomas heard my instruction. I took no steps to formalize the instruction, such as writing and posting a memo. I did not ask University Campus Police to bar Mr. Greene, a step which could have resulted in his being arrested for trespass if he had returned.

5.     I did not know that Mr. Greene had ever returned to the Law Library until I was served with his summons and Amended Complaint herein.

6.     About five years ago, a homeless couple availed themselves of the Law Library general reading room for several hours every day. Gradually they started leaving piles of newspapers and other personal effects in the study carrels they used. I advised them they could not camp here and asked them to leave. They subsequently sued the University because they were ejected from a computer lab where they had tied up the network printer for hours and then trashed the output and started the run again while several students were waiting. The United States District Court agreed with the University that being a public university does not give the public access to its facilities. Use of University facilities is a privilege.

7.     We tend to be pretty tolerant at the University, and especially at the Law School. But we do not tolerate abuse of our students or our facilities by anybody. Mr. Greene took advantage of our good nature by presuming to use the clinic resource center and he was abusively rude to a female law student who legitimately challenged his right to be there.

2

8.     There is no procedure for a member of the public to appeal being banned from a
University facility.


I declare under penalty of perjury that the foregoing is true an correct to the best of my
knowledge and belief.

9 / 14 / 05
_____                    _____
          Dated                                      Brian Baker