UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

RANDOLPH J. GREENE,                    Civil Action #05-1097(RWR)

      Plaintiff

    v.

DISTRICT OF COLUMBIA; et al.,

      Defendants.

## PLAINTIFF'S LIST OF EXHIBITS

"C" (Affidavit by Randolph J. Greene)

"D" (A.A.S. degree)

"E" (Affidavit by Mr. Brian Baker)

"F" (Statement by Ms. Mireille B. Tshiteya)

"G" (2004-2005 UDC Handbook)

"H" (Statement by Mr. Robert Patterson)

"I" (Statement by Mr. William Thomas)

"J" (Statement by Sergeant Larry Johnson)

"K" (Supplemental by Lieutenant Stephen M. Young)

"L" (UDCs 103 Personal Data computerized printout)

"M" (UDCs 109 Student Schedule computerized printout)

RECEIVED

NOV 1 3 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**PLAINTIFF'S EXHIBIT "C"**

<u>**PLAINTIFF'S EXHIBIT "C"**</u>

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**


**RANDOLPH J. GREENE,**

        **Plaintiff**                      **Civil Action #05-1097(RWR)**

    **v.**

**DISTRICT OF COLUMBIA; <u>et al.,</u>**

        **Defendants.**


<u>**AFFIDAVIT**</u>

**WASHINGTON**
**District of Columbia**

      **I, Randolph J. Greene, being first duly affirmed, according to law, depose and say:**

      **1.  I have an A.A.S. degree from UDC in paralegal studies.  Plaintiff's Exhibit "D".**

      **2.  The University of the District of Columbia is not a facility of the UDC David A. Clark School of Law.**

      **3.  I did not abuse my access privileges to the UDC law school facility on 20 September 2004.**

4.  On information and belief, a sign is posted in the UDC law school computer lab indicating that the use of the computer lab is for law school students only.

5.  The first responder of any violation of the restriction referred to in the preceding paragraph are people hired to work in the law library.  That is one of their duties.

6.  People hired to work in the law library are authorized to settle disputes between authorized and non-authorized persons in the computer lab.

7.  On 20 September 2004, I was an authorized person to use the computer lab.

8.  On 20 September 2004, Ms. Mireille B. Tshiteya was not a law library employee and had not been authorized by any first responder to enforce any computer lab restrictions or limitations.

9.  Nevertheless, Ms. Tshiteya asked me was I a law school student and did I have law school ID.

10. On 20 September 2004, Ms. Tshiteya attempted to enforce a computer lab restriction rather than notify the first responder (viz., Mr. William Thomas) on duty after I informed Ms. Tshiteya that I had permission from a first responder to use the computer lab.

11. If Ms. Tshiteya had contacted the first responder on duty, this debacle would never have occurred.  Alternatively, if Ms. Tshiteya had came to me from the far end of the computer lab that she never left from throughout this episode and identified herself as a law school student and asked in any kind of a *half way* decent

manner could she use the computer terminal I found un-occupied, I would have gladly deferred to her need. After all, for filing purposes, the federal courthouse stays open all night long and is metro accessible.

12.  I have three (3) daughters, three (3) sisters, and a heap of nieces, great nieces, second and third female cousins. I always tell the female members in my family that if they want men to respect them as women (and young ladies) that they have to carry themselves as women (and young ladies);  that a lot of times, its not what you say, but rather how you say something that matters the most.  Ms. Tshiteya does not have clean hands in the 20 September 2004, debacle. Ms. Tshiteya did not have a legal right *ab inito* to say anything to me especially in the tone of voice she used.  Plaintiff's Exhibits "H", "I" and "J".

13.  Mr. Virgil Royal is the D.C. Government Police Officer that Ms. Tshiteya talked to when she called the campus police office. Because Officer Royal obviously did not express what Ms. Tshiteya thought was the requisite amount of empathy ("…The tone of his voice showed no concern whatsoever, even though it was late in the evening, I am a female calling, saying that there's an unknown man being belligerent with me on school property where it is become clear he is not authorized to be. This officer never asked if I was alone with the man, if anyone else was there to make sure that I was safe, nothing, his tone of voice showed annoyance at my call. I was agitated and he simply acted like I was reporting some unimportant trifling matter. Plaintiff's Exhibit "F" at 3-4), Officer Royal's superior, <u>viz.</u>, Mr. Robert T. Robinson, suspended Officer Royal for an x-amount of

days without pay, causing Officer Royal an economical hardship he is still rebounding from.

14.  Mr. Brian Baker *never instructed me* to apologize to Ms. Tshiteya.

15.  I never bragged to D.C. Government Police Officers that I cursed Ms. Tshiteya out.

16.  I never knew that Ms. Tshiteya was a foreign born person.  I never detected any foreign accent during our colloquy in the computer lab.

17.  On Tuesday 10, May 2005, I visited the law library twice.  The first time I came to the law library, I was granted access.  I stayed in the law library for at least thirty (30) minutes and then I left.  I came back within thirty (30) minutes of this departure.  After I entered the law library, a D.C. Government Police Officer was present and he told me that I could not enter because there was a ban on me.  Plaintiff's Exhibit "E", at 2,¶4.

18.  As such, I was denied the freedom to read legal literature and acquire legal information.

19.  I was not afforded *any* rudimentary due process and minimum procedural safeguards before I was banned from the law library.  Specifically, I was denied notice of the charge; a warning that anything I can could be used against me; a hearing before an impartial tribunal; representation at the hearing;  a written copy of the tribunal's findings of fact and reasons for the action taken; and the right to appeal.

Pursuant to Title 28, United States Codes §1746, I declare under penalty of perjury that the foregoing is true and correct.  Except for those matters stated upon my information and belief and as for those matters, I believe them to be true. Executed this 12th day of November 2005.

AFFIANT
RANDOLPH J. GREENE
P.O. Box 36303
Washington, D.C. 20020
(202) 561-4503
Plaintiff Pro Se

## PLAINTIFF'S EXHIBIT "D"

(Associate in Applied Science In Legal Assistant)

# University of the District of Columbia

## Be It Known That

By virtue of the authority vested in the Board of Trustees and upon recommendation of the faculty in recognition of the successful completion of the requisite course of study the Board of Trustees confers upon

### Randolph Joseph Greene II

the degree of

## Associate in Applied Science

in Legal Assistant

In testimony whereof, we have affixed our signatures this 28th day of July, nineteen hundred ninety-eight.



Chairman of the Board of Trustees

Acting President

**PLAINTIFF'S EXHIBIT "E"**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RANDOLPH J. GREENE                          :

      Plaintiff,                          :

        v.                              :       Civil Action # 05-1097 RWR

WASHINGTON, DC,                             :

WILLIAM L. POLLARD, President               :

CLEMMIE SOLOMON, Vice President             :

BRIAN BAKER, Professor                      :

and                                         :

WILLIAM THOMAS, Library Technician  :

      Defendants.                         :

## DECLARATION OF BRIAN BAKER

1.    I, Brian Baker, am an adult employed by the University of the District of Columbia David A. Clarke School of Law as Professor and Director of the Charles and Hilda Mason Law Library (hereinafter, "Law Library").

2.    While the Law Library is maintained and operated primarily for the School of Law students and faculty, it is generally open to the public so long as the public's use does not interfere with use by the law school students and faculty. Law Library rules are few and are based on the principles of courtesy, common sense and equity.

3.    On September 21, 2004, I was made aware of Randolph Greene's appalling behavior the night before in the Law Clinic Library and Resource Center, a facility operated by the Law Library exclusively for law school students three floors above the general Law Library reading room that is open to the public.

4.    I advised my staff that I did not want Randolph Greene in the Law Library again. Mr. William Thomas heard my instruction. I took no steps to formalize the instruction, such as writing and posting a memo. I did not ask University Campus Police to bar Mr. Greene, a step which could have resulted in his being arrested for trespass if he had returned.

5.    I did not know that Mr. Greene had ever returned to the Law Library until I was served with his summons and Amended Complaint herein.

6.    About five years ago, a homeless couple availed themselves of the Law Library general reading room for several hours every day. Gradually they started leaving piles of newspapers and other personal effects in the study carrels they used. I advised them they could not camp here and asked them to leave. They subsequently sued the University because they were ejected from a computer lab where they had tied up the network printer for hours and then trashed the output and started the run again while several students were waiting. The United States District Court agreed with the University that being a public university does not give the public access to its facilities. Use of University facilities is a privilege.

7.    We tend to be pretty tolerant at the University, and especially at the Law School. But we do not tolerate abuse of our students or our facilities by anybody. Mr. Greene took advantage of our good nature by presuming to use the clinic resource center and he was abusively rude to a female law student who legitimately challenged his right to be there.

2

8.     There is no procedure for a member of the public to appeal being banned from a
University facility.


I declare under penalty of perjury that the foregoing is true an correct to the best of my
knowledge and belief.

_9/14/05_____          Brian Baker_____
             Dated

# PLAINTIFF'S EXHIBIT "F"

**(Ms. Mireille B. Tshiteya's Statement)**

**THE UNIVERSITY OF THE DISTRICT OF COLUMBIA**
*Department of Public Safety and Emergency Management*
4200 Connecticut Avenue – Building 39, Room A-13
Washington, D.C. 20008
(202) 274-5050

## STATEMENT

| INCIDENT/OFFENSE | INCIDENT/OFFENSE NUMBER |
|---|---|

| STATEMENT OF: (LAST, FIRST, MIDDLE) | DATE, TIME AND LOCATION STATEMENT WAS TAKEN |
|---|---|

| INVOLVEMENT (COMPLAINANT, VICTIM, WITNESS, SUSPECT, OTHER) | STATEMENT DURATION |
|---|---|
| | START TIME:          END TIME: |

MIREILLE B. TSHITEYA

| HOME ADDRESS   MIREILLE TSHITEYA @ HOTMAIL.COM | HOME PHONE |
|---|---|
| 671  Audrey Lane  # 302  OXON Hill MD 20745 | 301-749-6627 |

| NAME AND ADDRESS OF EMPLOYER | WORK PHONE  Please do not call |
|---|---|
| The Honorable Judge Dixon, Sup Ct. | 202-879-9808 |

I HAVE READ THIS STATEMENT GIVEN BY ME OR I HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND I CERTIFY THAT THIS IS TRUE AND CORRECT STATEMENT, TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. *MAKING OF A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES (D.C. CODE SECTION 22.2214).*

| SIGNED: *Mireille Tshiteya* | DATE: |
|---|---|
| WITNESSED BY: | DATE: |
| INVESTIGATING OFFICER: | ASSIGNMENT: |

Form Revised:  11/10/03

Monday, September 20, 2004

From: Mireille Tshiteya, UDC-DCSL Class of 2006
301-749-6627

To:   Dean Shelley Broderick, Dean of the David A. Clarke School of Law
      Professor Brian Baker, Director of the Law Library
      Ms. Helen Frazier, Head of Public Services
      Mr. Ernest Jolly, Vice President of UDC
      Mr. Robert T. Robinson, Vice President for Public Safety & Emergency Management.

Re:   **Report of Incident in Clinic Library**
      **Complaint regarding the Security Officers handling of the Incident**

  I began recording the incident at 10:07 p.m. while waiting for the Metro, and I continued writing while I was riding the metro and bus home. I specifically did this because I wanted a record of this incident to be preserved. I was catching the Red line at the UDC Metro Stop, and then I switched to the green line to Branch Avenue, and caught the D12 or D14 bus to my home. I wrote the entire time continuously and only stopped to get on or off and to sit down and situate my book-bags. I resumed writing the account between 11:10 and 11:15 when I called UDC Security for the last time that evening to express my outrage and how upset I was with the way they handled the incident; and also to get the names of the security officers involved and to inquire as to whether any report had been made of the incident by either of the officers involved as of that time. I was told by Officer Larry Johnson that none had been made. He asked me if I would come on Tuesday morning to make the report then, because both he and Officer James Patterson, one of the other two Officers involved, would be present at that time. I advised him that I would send an email to all UDC and UDC-DCSL Officials that needed to be alerted about the incident and the security officers conducts, and that if these officials advised me to go down and make a report, I would do so then. I said more to this officer, but I will give further details after I've finished recounting the facts relating to the incident.

  The first part of the incident took place between 9:30 p.m. and 9:40 p.m. (I was monitoring the time on my laptop because I didn't want to miss the last bus home – I have to switch two Metro lines and catch a bus). I was doing research for my Moot Court Class and I began to experience problems trying to download the Maryland Court Rules for the MD Court of Appeals.

  As a matter of fact, at 9:25 pm I succeeded after several tries in printing the Listing of a selected range of Rules and the print out has the time on it. But when I tried to download those rules Rules 8-101-611, my laptop's system got stuck and I started to get a number of errors message. Prior to that time, a work study student had come in and was seated at one of the only two computers available to Law Students. I guess he was assigned to the area at the time, a fact that I confirmed with him later on, when the incident evolved. I'm not sure what his name was, but I have worked with him before, last year when I was a work-study employee for the Law Library. I had previously worked with him (the work study student) in the Clinic and Main Law Libraries. But I had never really spoken to him, except the first time he came in at the Clinic



Library last year, and I observed him using the computer while I was working there and I asked him for his ID because I didn't know him. We have worked in the past less than 5 times at the same locations, but we have never really talked so I never got to really know him nor did I retain his name, but I know his face. I think his name is Richard but I'm really not sure. He is a witness to part of the events that took place.

I decided to move to the only other computer available to students in the Clinic Library. But I didn't want to leave my two book-bags, lunch bag, and laptop with at least 5 accessories to detach and pack up unattended. So I began to pack up my belongings to move to the open computer so that I could get on LEXISNEXIS get the Rules, print them and leave before 10 p.m. so I wouldn't miss my bus.

Approximately between 9:25 p.m. and 9:30 p.m., while I was finishing my packing to go to the computer (located next to the exit of the Clinic Library that's closest to the ladies and gents bathrooms) an unknown man entered the clinic library and proceeded towards that computer. I instinctively realized that he was going to sit at the computer that I needed and also I noticed at the same time that he wasn't a familiar member of the student body. However, immediately after it became clear that he was indeed taking a seat at the only other computer that I could use on the premises, I asked him politely whether he was a law student. I did not recognize him as part of our student body. His answer to me was a loud and rude statement that it was "none of my damn business." He added, "You have no right to ask me that question." He also used other profanities, and at that point, I responded that only law students could use those computers, I read and pointed him to the signs that said so, and I told him that I needed to use the computer. I also told him that I was a former employee (I told him that I worked there last year as a work-study student) and I identified myself as a 2L and reiterated that I needed to use the computer. When he became more belligerent, he cursed me out, called me a "whore" among other things, he said that I thought that I was better than UDC Students, that he had a legal document due the next day, and who was I to ask him anything anyhow... and on and on... and on... then he added that all the law students, myself included, only get drunk and fornicate on the premises and no one stops them, so who was I to question his use of the computer. I told him to read the signs but he kept on cursing me out. I repeated one last time that I needed to use the computer and then I advised him that I would call security. He told me to go ahead, as though he knew nothing would be done about his behavior and what he was doing. Needless to say, I was first shocked and then angry and disturbed by the man's behavior.

Prior to 9:40 p.m., approximately 2 or three minutes into the incident (I'm guessing because I did not have a watch nor could I monitor time on my laptop because at that point I had already shut it down, and I don't wear a wrist-watch) I called security. An unidentified and totally unconcerned security officer answered the call. I identified myself and represented to him that I was a 2L, 2ND Year Law Student, I told him where I was (at the Clinic Library), I told him that I was also a former employee of the Law Library, and so on... then I recounted to him what had just happened. I was excited while I was recounting the incident, because I was understandably upset at what had just happened. His only response to me was "we'll send someone." The tone of his voice showed no concern whatsoever, even though it was late in the evening, I am a female calling, saying that there's an unknown man being belligerent with me on school property where it is become clear he is not authorize to be. This officer never asked if I

was alone with the man, if anyone else was there to make sure that I was safe, nothing, his tone of voice showed annoyance at my call. I was agitated and he simply acted like I was reporting some unimportant trifling matter.

At that point, I went to the work-study student, and I asked him if he was first working there tonight, and then I asked him if he could ask the man at the computer for his ID because if he wasn't a UDC-DCSL then I would need access to that computer. The work-study student went to the man and requested the man's ID, and also pointed out the notices on the wall that the computers were only for Law Students. The man refused to show his ID and said "William told me that I could come up here and use the computer." When the work-study student continued to insist that the man remove himself from the computer, the man started back cursing me out. He used the same obscenities and profanities he had used before. I was observing his mannerism and it just didn't appear to be safe to continue to pursue the matter directly with him, so I told the work-study student to discontinue his attempts to resolve the problem because I had called security and I was going to call them again. At that point the man became 10 times more belligerent towards me. He was cursing me out, he was getting louder and louder, and when he wasn't cursing me out, he was repeating his previous accusations and allegations against UDC-DCSL law school students, and myself included. I was so offended and frightened by his behavior at that point, I was so shaken that my next instinct and move was to call security again. I didn't want to leave the work-study student there alone and I didn't want the man to get away before a report of the incident was made by security officers either.

The security officers appeared to be taking a long time to get there, every minutes count when situations escalate and people become verbally abusive and physically agitated. The man kept on getting up and sitting down at that point. He was walking to book shelves, pulling books out angrily and putting them back. He kept on standing up, and then sitting back down, waiving his arms, he was acting very enraged. At that point, I called security for the second time. I advised the man that I was calling security again. He continued his cursing me out. He made no attempts to leave the premises, but simply continued cursing me out and then sat back down once more in complete and total defiance to the rules regarding the usage of the computers. When I called the second time, I asked for the officer's name, I think he repeated it twice, but I was so upset, shaken, and trembling that I couldn't catch his name. I asked him to spell it, and instead he cut me off and asked me what I wanted. I re-identified myself, stated that I was the law student who had called earlier. I asked very excitedly where was the officer he had said he would send? I stated that I needed security to get there quickly! His response to me was "you are not in charge of the police officers, you can't tell the police what to do!" He made that remark three times. He made it then, and when I told him specifically that I was afraid of the man, that the man was "verbally assaulting" me (I couldn't put it any other way at first, but then as the call continued, I did add that the man was verbally abusive and very belligerent to me), that the man was acting in a manner that was frightening to me, the officer repeated his comment about me trying to "order the police!" I asked him how long it would take for them to get there, and he repeated the aforesaid comment again! At that point, I said "I want to make a report of this incident." He then asked me my name and asked me to spell my name. Meanwhile the man is still at the computer and he can overhear my conversation because I am upset and my voice was loud enough for him to hear. I told the security officer on the phone that I did not feel comfortable spelling out my name out-loud in the presence of the belligerent man, and that my

name is so unique that it wouldn't be difficult for the man to find my address and possibly harm me, because at that point, the man was simply acting like he had lost is rational mind. The officer interrupted me while I was speaking, ignored what I said, and then insisted on me spelling my name. I complied, I spelled it 6 times, and the officer repeated it back to me wrong all 6 times! While this is going on, the man is still being belligerent towards me. I got tired of the nonsense and stated that I had my student ID and that I would make sure my identity was checked and confirmed when the officer would arrive at the scene... and at that point, I became more disturbed by the security officer's conduct towards me. I realized that I had a foreign accent (which intensifies when I'm frightened or upset or stressed out) and a name that he couldn't pronounce and after he asked me to spell my name the first time his entire behavior changed from rude to simply disrespectful and condescending. I then stopped and asked for his name again AND HE HUNG UP ON ME!

    I then realized that what was going on and reassessed the situation the best that I could under the circumstances, and I became more disturbed at the thought that in the event this man would turn violent I would have no protection. I certainly did not count on the work-study student to protect me, so I hurried up with my packing so that I could leave and go to the security office, the realization hit me like a tone of bricks, and my heart sunk in my chest because I'd just realize that I was in the Clinic Library without any real protection, frightened by an unknown man, calling security for help, and while I was attempting to make a report of the incident, during my second call for help, and after I had made it clear that I felt unsafe, the security officer HUNG UP ON ME! At that point, I still didn't know the officer's name and I wasn't sure anymore whether someone was really coming, and I never felt so distressed about carrying so many books, I didn't just want to run out and show the fear that I was feeling, but as I started towards the door to exit and see if the security officer was coming without my belongings, two officers show up. A tall older black male and a short and thin black male who appeared younger. The man at the computer was still cursing me out the whole time, he never stopped, and he was a short old black male, thin in built. I don't know if he was intoxicated, I didn't approach him, I wanted to keep a safe distance. Anyhow, the older tall black security officer approached me, while the younger one went straight to the man. I told the officer who approached me that I had an ID, I proceeded to look for it, I showed and gave it to him, and then I told him what was happening. He barely stopped to listen to what I had to say, gave me back my ID, never acknowledged the fact that I had said I wanted to make a report, never asked me not one question, didn't tell me to stay there while they handled the man, never told me to wait for him, never said anything whatsoever and gave no indication whatsoever that he was listening to me, going to take my report, or even acknowledge that he had heard anything I had said or that he would act on my request to make a report. I had specifically stated to that officer that the man had cursed me out (and he was still doing it in their presence), that the man was being "belligerent" and verbally abusive towards me, and the officers did nothing to stop him from cursing me out. I stood there feeling humiliated while that man called me an "F...ing whore" and other things, and observed these two officers only say "we know, we understand..." to the man who was cursing me out, as though he was right! He was also making comments about the Law School and UDC, that we take money from UDC, that we are not UDC students, and all the other things I described before, he repeated them over and over again in the presence of the officers. After 4 minutes of hearing that and seeing that the officers were not even attempting to ask him to be quiet and stop cursing me out I spoke out.

I stated "I am an elder at a church. I am not a whore. You, (the man) have been verbally abusive to me and you have insulted a church elder. God will repay you for what you have done." And then I told the officer, the older tall one "I want to make a report." That officer responded to me "for what?" I said something to the effect that the man had been belligerent with me, cursing me out, being verbally abusive and so on... and I emphasized that he was still doing it in their presence! Well, that officer NEVER acknowledged my request to make a report! He just turned around and continued to half-heartedly explain to the man why he had to leave. They were in fact "choosing sides" and sympathizing with him, that's what it looked like to me and that's what their behavior indicated to me: "JUST SHUT UP YOU DUMB FOREIGN WOMAN YOU DON'T HAVE THE RIGHT TO MISTREAT THIS POOR BLACK MAN" I was being treated like I was doing something wrong, not so much in words, but in the officers actions and the way they dealt with the man being patient, listening to his ramblings, and walking away while I would attempt to explain what had happened!

The man said something to the effect that a William downstairs had told him that he could use the computer. The younger officer responded, that "William was wrong" and explained the policy to the man, and pointed out the rules to him – the notices on the wall. The man continued to plead with them, and then in between his pleading with them, would resume his cursing me out! It got so bad, that after at least 8 minutes of his screaming obscenities at me, one officer, I don't recall which one, finally said something to the effect that "don't make accusations you can't prove" to the man, and only after I mentioned suing somebody and started using the terms defamation of character, libel, and so on... mind you that at that point the man switched his insults as being directed to "Law Students" in general, but made it clear that I fitted the category and then reverted back to cursing me out! I have never felt so humiliated, disrespected, dehumanized, and abused in my life! I got so stressed out I was shaking so bad, I couldn't stop my body from trembling. Finally, the younger officer told the man "let's discuss this downstairs" or something like that. They left, and I went up to the computer to see if by any chance there was any information left by the man there that I could use to identify his name. I found none, he had closed out the programs he was working on. I did check the time though, it was 9:50 p.m. The whole time that the officers were there, but I couldn't see him because of where the computer he was seated at was located. Anyhow, almost immediately after the officers left with the man, the work-study student got up to leave and I told him to wait for me, because I didn't feel safe and I didn't want to stay there by myself. I finished packing up and we both walked out together. We took the elevator together, he got off at the 'A' level and I got off at the 'B' level, because I wanted to go ask William who that man was, if he knew him, and go back to the Security Level A and make my report.

When I got there, I saw the two officers, the man and William. I got off the elevator that's actually immediately next to the entrance to the library. I entered the library and listened, because it did not appear to me that any report was being made. The man was cursing, saying the same thing he was saying upstairs, talking about African-Americans who were just UDC students being treated differently than the Law School students, and he began to make his offensive and obscene comments again. He was cursing like I have never heard it before. I stood there as long as I could silent, and then I became even more revolted, because as soon as he saw me standing there, he began cursing me out again! And the security officers made no

effort whatsoever to ask him to stop cursing me out, he was being so profane, I had to say something. I stated I pay for my education, that I was a "UDC" student, and that I was tired of him calling me a whore, that I was an elder at a church, and that I would take further action regarding his behavior towards me. At that point, the older tall security officer, who said nothing while I had been cursed out non-stopped, called an "F…ing B.tch" and other derogatory insults, for over 20 minutes at that point, he turns and says to me "why are you here, are you instigating?" he said it in a threatening manner as though he was saying, if I said another thing, I would be the one in trouble! I then stated loud and clear "I am here because I want to make a report!" Just like he had done upstairs, he turned his back to me, the other officer was already stepping out of the library, both of them saying something like 'c'mon man, let's discuss this somewhere else." But not before the man began to call me (please excuse my language, I don't curse, but this is what he said "you fucking fat bitch, you'll think twice next time before asking someone if they are a law student!", "you fucking fat bitch", "you ugly fat girl" and kept on until they stepped into the stairways, but not before he had cursed me out for at least 3 or more minutes. I was so humiliated and shaken that I said the only thing that I could think of saying, which was "you have just cursed an elder of a church, may the Lord repay you for what you have done!" Neither of the officer's bothered to say anything to me, not anything, nothing… not "mam, wait here while we deal with this man… or mam we will be back to take a report or anything at all!" I turned to William and I said I am going to report this, he told me "you are right, go home and report it in the morning" and he also stated several times something to the effect that "the man's behavior was uncalled for." At that point, I just felt sick to my stomach and fear gripped my heart again, because I realized that these security officers would do nothing, and if they released that man while I was still there, something worst could happen to me and the time of my last bus connection was approaching.

So I almost literally ran to the Metro, and while I did, I could hear the man cursing, I looked back and it appears that they had just taken him outside by the side of the building, and I don't know what they were doing, but it didn't look to me like they were going to do anything to him, at least not anything that would make me feel safe enough to remain in the area any longer. When I got down to Metro, I was so shaken up that I didn't even realize that I was expressing what had just happened verbally to myself, and two women were staring at me because I appeared so distraught. So then I told myself, take a piece of paper and write. At first I was so upset and shocked that I pulled two pens, a blue and a red one, and then I just held them in my hands while I was just telling myself I can't believe what just happened and still expressing what I was feeling orally. One of the two women who were starring at me when I first got there, and then were talking, stopped talking and kept on starring at me, because I was pacing nervously around my book-bag, expressing myself verbally (not cursing- just shocked at what had just happened to me. I was so angry and revolted that I was still shaking). I was rubbing my head, and then I realized that I had the pens in my hand and no paper. Anyhow, I got the paper from my book-bag and I started writing, because I was so angry, so humiliated, so distressed that at that point I had to do something, and writing what happened seemed to be the only thing I could do right then.

I didn't stop writing until I got home, at approximately 11:10 p.m. At that point my nerves were a wreck! I got so upset thinking about what had just happened that I couldn't just write anymore and then I realized that I didn't have any names! So I called the UDC Security,

and the same rude officer answered. I asked for his name, but it's almost as though he purposely said it so quickly that I couldn't catch it. I straightforwardly told him that I wanted to know the names of all of the officers involved, including him, in the incident that had taken place in the Clinic Library this evening, that I was the Law Student who had been involved, and that I wanted to know if any report had been made. He acted like he couldn't understand me, and without really acknowledging any of my inquiries, I just heard him say "Larry!" he walked away from the phone, and "Larry" got on the phone in his place. I re-identified myself, and I made my requests known. Larry stated first that no report had been made, and after I expressed my outrage, he gave me some lame excuse that the other officer had thought that I was going to wait for him to get back and take my report. I asked him what would make them think that I would know to wait when neither of them expressed or acknowledged my request to make a report, never said anything remotely resembling "please wait here mam, we will be back to make a report with you", but instead indicated by their conduct that they felt the situation was not worth reporting, as a matter of fact, the officer's threatening conduct towards me when I did attempt to make the report (I'm referring to the incident at the library downstairs, when the older tall officer moved towards me, leaned forward authoritatively with his hands on his hips as though he was getting ready to arrest me, while saying 'are you instigating' – it was an implied threat to me that if I said another word, I would be facing an arrest or something of that nature. He was absolutely threatening to me and NEVER used those words or body language towards the man who had been screaming obscenities at me in his presence for a significant period of time, at least 20-25 minutes at that point. That officer made that remark to me even though I was clearly within my rights to defend myself, my reputation, which I was attempting to do with words that were not obscene while the man was cursing me out like I have never been cursed out before in my entire life! **Neither officers made any efforts to chastise or even tell the man to be quiet, they didn't threaten him of "instigating," they did absolutely nothing. I repeat, these officers made no efforts to stop this man from being verbally abusive towards me).** Officer Larry then gave me the names of all involved, he was one of them, he was the one I referred to as the "younger officer" and his name is Larry Johnson. The older officer was named "James Patterson" and the officer who had answered the phone was named "Virgil Royal" according to officer Larry.

I reiterated to officer "Larry" that I was very upset, at that point I became very loud, I just exploded… , my voice was shaking, and I just expressed and pointed out the following:

I told him that I was extremely offended at the way I was treated both by that man and him and the other two officers. I told him that I was sending an email to a number of Officials at UDC and UDC-DCSL, that someone would loose their jobs over this incident, and that I had never in my entire life have experienced anything like this before. I told him that had it been his sister or mother or that of the other officers, I am certain they would have behaved differently. I made it clear that their inaction was just as offensive to me as that man cursing me out like he did. Their total disrespect of me as a student, as a black woman who is trying to better herself (and I only mentioned race and gender because they appear to be part of the reason why they treated me that way, along with my origin), was absolutely unacceptable. I said that I have paid over $100,000.00 for my education (undergrad, graduate, post-graduate, and law school) thus far, that I have been celibate for well over 9 years (since 1996 when my ex-husband abandoned me), that I had had no relations with any other man, that I had only known one man my entire life and

I was married to him, that I am an elder in a church, that my holiness to the Lord and vowel of holiness that I have with Christ means more to me than anything else, and to be called a "whore and bitch," especially in the presence of four men, and for not one of them to act as though this is wrong, their failure to acknowledge that sort of language is unacceptable, not once while the incident was going on, and then for one of them to turn around and tell me I'm going to get in trouble after I correct the belligerent man because the level of obscenities being thrown at me is escalating, and for the security officer to hang up on me while I'm making a distress call, I told him that for this someone needs to lose their job. I felt their behavior was so unprofessional! I'm sick to my stomach right now! He never apologized, he only expressed a fraction of an iota of concern when I recounted being hung up on, and that was for a "split-second!" No promises of redress, or a simple "I'm sorry, about the way we handled the situation" or even "Sorry you feel that way" however rude I think that comment normally is in the face of traumatic experiences, but something, ANYTHING remotely apologetic would have been better than NOTHING. Their conduct was shocking, wanton, willful, egregious, and they demonstrated a total disrespect or lack of respect or care for me or my best interest, period. This has been one of the most emotionally taxing, painful, infuriating, and mentally distressing events I have ever experienced.

I can't believe they just disrespected like that! My nerves are wrecked! I don't need that kind of treatment! I told the officer that I have struggled to rebuild my life over for the past 9 years, I had lost everything, I have been homeless, without food, lost my home, my car, everything that ever meant anything to me, I have suffered and continue to suffer to "better" myself, struggling to make ends meet, who on earth are they to simply take it upon themselves and assume that someone like me looks down on someone like them, and then disrespect me accordingly, as though they were justified for acting that way towards me? The irony is that they treated me without cause with the very lack of dignity and humanity that they wrongfully accused me of using against them (when I say they, the behavior of the security guard was not different than that of the belligerent man, his was simply verbally expressed at an unrestrained level – they were all in essence treating me like I was lesser than a female dog.) As far as I'm concerned they treated me like I aw the scum of the earth! For someone to call somebody like me "a whore" it's worst than calling me a "nigger" because there is nothing that I prize more than my chastity, nothing gives me more sense of worth, than my faith in Christ which I for one show through my chastity towards him. I am not a "prude," I am a broken soul to whom Christ gave back Dignity, Self-respect, and Self-Esteem, and I will die before I let anyone tear down what He has rebuilt in me. You take away my dignity AND I HAVE NOTHING… I know I AM WORTH something as a human being, I AM PRECIOUS and no one has the right to tear that part of me down, NO ONE.

I grew up with low self esteem and a father who called me "bitch" and a "whore" from the time I was 1 years old until I left his home. But even his cursing was nothing like what that man said to me! I had a mother who beat me until she drew blood from my nose and my mouth, from the age of 1 ½ to 17 years old. I had a husband who was abusive to me, took all that I could give, used me up until I was drained and then left me. After all of these experiences, I have never felt as revolted as feel tonight. I took abuse that most wouldn't dream about taking or talking about, you have no idea. But through it all the one thing I have consistently prized, especially when I couldn't love myself as God loved me, was the fact that I never was that

"whore" or that "bitch." I remained a virgin until marriage and I have only been intimate with my husband. I have never had any other relationship, EVER. Not because I have had the opportunity, but simply because I made a choice to live for Christ, and even nine years after my husband abandoned me, I have remained chaste, not for him, but for the Lord. I trust that if the Lord has someone for me, than I will be given to that husband, but if not I will remain the Lord's, either way, I cherished being kept *undefiled*.

I don't drink, I don't smoke, I don't fornicate, and I don't take part in many things, not because I'm judgmental of other peoples' actions, but simply because I neither desire to do it nor do I have to do those things. I understand that I am saved only through grace by faith in Christ and his grace and mercy make the only difference. I extend that kindness to anyone, I hate no one, but I do hate pure acts of hatred, disrespect, and abuse regardless to whom they are directed and for what reasons they are done. I know that I'm not saved because of what I don't so I don't walk around condemning anyone or trying to condemn any, we are all free moral beings. I don't expect special treatment because of the choices I've made in my life, my faith in Christ – religious belief, or hardships I have experienced. **But I do expect to be treated with human dignity and respect.** For someone, anyone to make any comments, or inferences that go to the heart of what I stand for, to simply humiliate me while others are watching and doing nothing to stop it, is... I don't even know how to express the distress that I am experiencing right at this moment! This is happening, this incident is happening, after I have undergone two surgical procedures, and have been injured during one procedure, so not only am I in physical pain, but then I get mental anguish and distress added to that!

I want something done about this! I want to be told what is going to be done about this! And even if I was wrong for telling the officer that someone was going to be fired over this, because in my heart I don't seek revenge, something still needs to be done! I want apologies, I want reassurances that this will never happen to me or to anyone else at this school again! I won't feel safe being there at night any longer, especially knowing that the belligerent man could return at any time, and I have no idea who he is or even if he could be stopped, because I doubt those officers took down his name! I want to know exactly what concrete steps are going to be used to remedy this situation. I demand verbal and written apologies from all of the officers involved. I want those apologies to be made in public, since I was verbally abused "publicly" and had to suffer that humiliation while they witnessed it and did nothing about it. **I don't ask that any of them be fired.** I've been without work, I have had to struggle for years, I don't have any children, thank God, but I don't want their wives and kids, if they have any, to suffer because of their conduct. I will do, that which only Christ in me allows me to do, which is show these men the human compassion, grace, mercy, and respect that somehow they were too blind to show me. But I want to make it clear that the dehumanizing, hateful, abusive, humiliating, mentally distressing, shocking behavior by the unknown man should have never been allowed to continue and go unpunished once these officers observed the behavior, not once, not twice, and not for short period of time, but repeatedly for close to or over 25 minutes altogether.

I told officer Johnson that they had chosen the wrong woman to do this to, because everyone in the law school knows my reputation as a devout Christian woman, and if nothing else indicates my "separation and holiness unto the Lord" the big white (sometimes black) prayer cloth on top of my head should indicate to any soul, whether Christian or not, that there is some

sort of religious observance taking place in my life. But even if I wasn't a Christian woman, even if I was, God forbid, a "prostitute on 14th street" that doesn't give anyone, I mean anyone the right to dehumanize, humiliate, abuse, and be belligerent towards me. All human beings are entitled to human dignity and respect by the sole virtue of their birth into the human race. This fact is not dependent on whether they know it or not, whether they acknowledge it or not, or whether others agree with it or not, THERE IS NO CHOICE INVOLVED IN THE MATTER, TREAT OTHERS THE WAY YOU WOULD WANT TO BE TREATED is the message, and dignity is something I have earn by virtue of being a member of the human race, period. I demand to be treated with respect and dignity, and I should not, cannot, shall not, will not settle for anything less, whether I am the one subjected to dehumanizing treatment or someone else is. It's not a matter of politic, religion, race, culture, social status, education, finances, or anything else. I will not stand for anything less. I don't look down on anyone, period. I hate abusive behavior, I have been victimized by it, and I am tired of sitting back and letting things of this nature happen to me without fighting back. I may not agree with every "wind and doctrine," with all the ways I observe, or everything that happens to me, but I don't take it upon myself to dehumanize, insult, abuse, disrespect, or mistreat people, and God knows, if I even get the inclination that I might have hurt someone, I will quickly apologize and try to correct it, "for the first fruit of Christ's spirit is love".

All this said, I find myself having to pray for the strength that I need at this moment to deal with this situation, and to forgive quickly as Christ forgave me.

May the Lord have mercy on that man's soul for what he did to me, and on those three officers for their conduct; but please don't mistake my expression of Christian forgiveness and love as a statement that everything is alright, because it isn't. **Words once uttered, cannot be unsaid.** Who will take up my cause and defend me? I spent my entire life seeking "protection" from my parents, from my ex-husband, from mean and evil people who just are so hateful they will harm anyone, and I decided to become a lawyer to make sure that there will be some justice and compassion in the administration of justice when I become a Judge, but tell me, how do I gain faith in the Law, when those who represent it, even if at a level not equal to others, act in ways that are so unjust, it's just beyond comprehension? How much would it have taken for any of these officers to simply tell the man to "be quiet?" or to "stop!" – what if it had been their sister, mother, niece, wife, daughter?

I just can't believe it! I simply just can't believe it!

Please do something about this. Thank you.

Respectfully,
Mireille Tshiteya

**PLAINTIFF'S EXHIBIT "G"**

# 2004 – 2005 STUDENT HANDBOOK
A University Information Guide



UNIVERSITY OF THE DISTRICT
OF COLUMBIA

# TABLE OF CONTENTS

**Message from the President**                                    iv
**Message from the Vice President for Student Affairs**      v
**Vision and Mission Statements**                               vi

## General Information    pages 2–8

Campus Directory and Map • Academic Departments Campus Directory • Frequently Used Student Services Offices • Campus Security • Smoking Restrictions • Inclement Weather • Lost & Found • Parking • University Book Store • Identification and Validation Card Services • Dining Services

## Academic Information    pages 10–16

Office of the Registrar • Academic Advising • Class Attendance Policy • Classification • Undergraduate Grading System • Graduate Grading System • Calculation of Grade Point Average • Academic Honors (Dean's List) • Transcripts

## Student Services    pages 18–34

Our Invitation to Students • Traditions • Alma Mater • Athletics • Student Life and Services • Student Support Services Program • Student Employment Program • Counseling Services • Peer Mentor Program • University Health Services • Health Insurance • General Services for Students With Disabilities • Placement Test Office • University Laboratory Resources • College of Arts and Sciences: Laboratory Resources • School of Business and Public Administration and School of Engineering and Applied Sciences: Laboratory Resources • All About Financial Aid • Financial Aid Information • Financial Aid Mission • What Is Financial Aid? • Financial Aid Programs • Financial Aid Eligibility • Scholarships • Learning Resources Division • International Affairs at UDC • International Advisory Council • Study Abroad Program • TRIO and College Preparatory Programs

## Student Involvement    pages 36–42

Student Life on Campus • Student Government Association • Clubs and Organizations • How to Join a Club or Organization • How to Charter a Club or Organization • Chartered Clubs and Organizations • Greek-Letter Fraternities and Sororities • Student Publications • Military Service (ROTC) • The Miss University of the District of Columbia Pageant

## Policies and Regulations   pages 44–65

The Charter of the Undergraduate Student Government Association • The Charter and By-Laws of the Graduate Student Government Association

## Code of Student Conduct   pages 68–81

Preamble • Article I: Academic Misconduct • Article II: Nonacademic Misconduct • Article III: Student Groups and Organizations • Article IV: Off-Campus Activities • Article V: Sanctions for Misconduct • Article VI: Initiating Actions • Article VII: Procedures • Article VIII: Committee Guidelines • Article IX: Appeal Process • Article X: Final Actions

## Appendix I   page 82

The University of the District of Columbia Drug and Alcohol Policy

## Appendix II   pages 82

Sexual Harassment and Racial Harassment Policy Statement



University of the District of Columbia   iii

# CODE OF STUDENT CONDUCT

Approved by The Board of Trustees of the
University of the District of Columbia
April 15, 2003
Resolution No. 2003-3

Charles J. Ogletree, Jr., Chairman of the Board
Dr. William L. Pollard, President

# University of District of Columbia
# Code of Student Conduct

## Preamble

The University of the District of Columbia is a community of scholars in which the ideas of freedom, inquiry, thought, expression and individuality are sustained and the rights of everyone are respected. Students who are admitted and attend the University shall take responsibility for conducting themselves in ways that continue the pursuit of the University's mission. To that end, the Code of Student Conduct emphasizes specific student responsibilities:

1. To recognize that the intellectual and educational climate of the University shall be maintained as the University's highest priority.

2. To protect the opportunity for each student to attain their educational objectives.

3. To protect the physical and mental health, safety and welfare of each member of the University community.

4. To protect the property rights of all.

5. To promote the human rights of all members of the University community.

The Code of Student Conduct (a) establishes student judicial system, (b) identifies misconduct as academic misconduct or nonacademic misconduct that results in sanctions as outlined herein, and (c) explains the step-by-step process and procedures for appeal of decisions. Violations of local ordinances, state or federal law on or off University's premises during University activities may subject a student to disciplinary action.

The University reserves the right to take appropriate actions to protect its interests and to secure its continuing operations. In cases of action by civil authorities, the University reserves the right to proceed with disciplinary action even if criminal proceedings are pending. The outcome of a disciplinary action will not be subject to challenge because criminal charges involving the same incident were dismissed or reduced.

Students are selected by the President of the University of the District of Columbia to assume positions of responsibility in the University's student judicial system so that they might contribute their skills and insight to the resolution of disciplinary cases.

The provisions of the Code of Student Conduct are not to be regarded as contractual covenants between the University and the student. The University reserves the right to change procedures herein at any time during the student's term of enrollment.

The Code of Student Conduct will be made available to all new students. In addition, the Code of Student Conduct will be made available for review in the following locations: Division of Student Affairs, Student Government offices, Deans' offices and the Learning Resource Center.

## Code of Student Conduct

The Code of Student Conduct identifies those behaviors considered unacceptable in academic and nonacademic settings and are not permitted by students of the University while on University properties, University sponsored activities or while representing the University in the community. The behaviors of academic and nonacademic misconduct are defined below:

## Article I: Academic Misconduct

**A.** Academic misconduct includes but is not limited to the following behavior:

**1. AIDING OR ABETTING ACADEMIC MISCONDUCT:** Knowingly helping, procuring or encouraging another person to engage in academic misconduct.

**2. CHEATING:** Any dishonesty or deception in fulfilling an academic requirement such as:

   **a.** Use or possession of unauthorized material or technology during an examination (any written or oral work submitted for evaluation and/or grade), such as tape cassettes, notes tests, calculations, or computer programs.

   **b.** Obtaining or furnishing assistance with or answers to questions during examinations or tests which are given in a classroom setting that is overseen by the instructor or proctor from another person with or without that person's knowledge.

   **c.** Representing as one's own examination taken by another person.

   **d.** Taking an examination in the place of another person.

   **e.** Obtaining unauthorized access to the computer files of another person or agency, or altering and/or destroying those files.

   **f.** Possession, use, distribution, or sale of unauthorized copies of an examination, or computer program.

**3. FABRICATON:** Falsification of any information or citation in an academic exercise.

**4. PLAGIARISM:** The use by paraphrase or direct quotation, of the published or unpublished work of another person without giving full and clear acknowledgment. It also includes the unacknowledged use of materials prepared by another person or agency engaged in the selling of term papers or other academic materials.

## Article II: Nonacademic Misconduct

**A.** Nonacademic misconduct includes but is not limited to the following behavior:

**1. AIDING AND ABETTING NONACADEMIC MISCONDUCT:** Helping, procuring, or encouraging another person to engage in nonacademic misconduct.

**2. ALCOHOL AND DRUG, UNAUTHORIZED USE:**

   **a.** Consuming or possessing alcoholic beverages on University premises to include failing to comply with local laws governing the transporting or sales of alcoholic beverages.

    **b.** Exhibiting behavior which indicates intoxication or drug use while on University owned or controlled property or while attending a University sponsored event.

    **c.** Using or possessing any controlled dangerous substance, illegal drugs or narcotics (except in the use of substances prescribed by a licensed physician).

    **d.** Knowingly violating the University of the District of Columbia Alcohol and Drug Abuse policy. (See Appendix I)

3. **ASSAULT:** Knowingly or recklessly causing or attempting to cause serious physical harm to another.

4. **DESTRUCTION OF PROPERTY:** Damaging, destroying, defacing, littering, or tampering with the property of the University or the property of another person or organization.

5. **DISHONESTY AND MISREPRESENTION:** Knowingly or recklessly furnishing false written or oral information including false identification to University officials, faculty or staff, forgery, alteration, or misuse of the University documents or records.

6. **DISRUPTION/OBSTRUCTION:** Disrupting, obstructing, or interfering with University functions or activities or the pursuit of the University mission, including but not limited to research, teaching, administration, disciplinary proceedings, or other University activities or events.

7. **DISTURBING THE PEACE:** Disturbing the peace of the University including but not limited to, disorderly conduct, failure to comply with an order to disperse, fighting, quarreling, and /or being in a state of intoxication or impairment due to drug usage.

8. **FAILURE TO COMPLY AND IDENTIFY:** Failing to comply with the directions of University officials, administrators, campus police, or the Judicial Board acting in the performance of their duties or with written rules when requested to do so.

9. **FAILURE TO COMPLY WITH SANCTIONS:** Failing to comply with sanctions imposed in accordance with the procedures described which, may result in additional sanctions.

10. **FALSE CHARGES OR STATEMENTS:** Knowingly furnishing false information, allegations or reports, including testimony at University judicial hearings, to any University official.

11. **GAMBLING:** Participating in illegal games of chance prohibited by law or applicable policy.

12. **HAZING:** Hazing, includes but is not limited to an act or a situation created by an individual, groups or organizations, that can possibly impart any form of physical or emotional distress (e.g. generally an act or situation which endangers the mental or physical health or safety of a student for the purpose of initiation, admission into, affiliation with, or as a condition of continued membership in a group or organization).

**13. IDENTIFICATION, MISUSE OF:** Unauthorized transferring, lending, presenting someone else's, borrowing or altering University identification or any record or instrument of identification.

**14. INFORMATION TECHNOLOGY, MISUSE OF:** Theft or abuse of information, e.g. computer, electronic mail, voice mail, telephone, fax, including but not limited to:

**a.** Authorized entry into a file to use, read or change the contents, or for any other purpose.

**b.** Unauthorized transfer or distribution of a file.

**c.** Unauthorized use of another individual's identification and password.

**d.** Use of information technology to send obscene or threatening messages.

**e.** Use of information technology to interfere with the work of another student, faculty member or University official

**f.** Use of information technology to interfere with normal operations of the University's systems.

**g.** Use of information technology to destroy data or files through tampering, creating viruses or other systems that impede access to the system.

**15. LAW, VIOLATION OF:** Violating criminal laws (federal, state and/or local) on campus where the foreseeable effect is to interfere with the University's organizational objectives, mission or responsibilities.

**16. MENACING:** Knowingly causing another person to believe that the offender will cause serious physical harm to another, a member of their immediate family or their property.

**17. PROPERTY OR SERVICES, UNAUTHORIZED USE:** Unauthorized use or possession of property or resources of the University or of a member of the University community or other person or entity.

**18. PROBATION, VIOLATION OF:** Violating the Code of Student Conduct while on University disciplinary probation or violating the specific term of that probation will be cause for additional sanctions.

**19. SAFETY EQUIPMENT, MISUSE OF:** Unauthorized use or alteration of fire fighting equipment, safety devices, fire alarms, fire extinguishers or other emergency devices.

**20. SMOKING POLICY, VIOLATION OF:** Violating the University's smoking policy.

**21. STOLEN PROPERTY:** Unauthorized possession of property that has been stolen or that may be identified as property of the University or any person or entity.

**22. THEFT:** Unauthorized possession of property or materials of the University, person or entity.

**23. TRESPASS OR FORCIBLE ENTRY:** Unauthorized trespass, or forcible entry into any University building, structure or facility or onto University property.

**24. UNIVERSITY KEYS, MISUSE OF:** Unauthorized use, distribution, duplication or possession of any keys issued for any University building, laboratory, facility, or room.

**25. UNIVERSITY POLICIES OR RULES, VIOLATION OF:** Any violation of published University of the District of Columbia policies or rules is a violation of the Code of Student Conduct.

**26. WEAPONS:** Unauthorized possession or use of a firearm or explosive device of any description and anything used to threaten or harm including but not limited to firecrackers, compressed air guns, pellet guns, BB guns, paint guns and water guns.

## ARTICLE III: STUDENT GROUPS AND ORGANIZATIONS

**A.** A student group or organization and its officers may be held collectively or individually responsible when violations of this Code by those associated with the group or organization have received the tacit or overt consent or encouragement of the group or organization or of the group's or organization's leader(s), officers or spokesperson(s).

**B.** The officers or leaders or any identifiable spokespersons for a student group or organization acting on the group's or organization's behalf may be directed by the Vice President for Student Affairs or a designee to take appropriate action designed to prevent or end violations of the Code. Failure to make reasonable efforts to comply with the Vice President's directives shall be considered a violation of the Code by the officers, leaders, or spokesperson for the group or organization and by the group or organization itself.

## ARTICLE IV: OFF-CAMPUS ACTIVITIES

**A.** The Code of Student Conduct shall apply to all lands leased or owned by the University, as well as to any location where students are engaged in University activities. Examples of such coverage include but are not limited to:

1. University athletic and academic teams traveling to off-campus events;
2. student government associations off-campus activities;
3. student clubs and/or organizations engaging in off-campus events or activities;
4. off-campus student internships;
5. community service and/or student teaching programs;
6. study abroad programs; and
7. participation in Consortium Program of Colleges and Universities.

## ARTICLE V: SANCTIONS FOR MISCONDUCT

**A.** Students found to be in violation of the Code of Student Conduct based on preponderance of evidence will be subject to University sanctions. Sanctions shall be imposed according to the severity of the misconduct. In all cases, the University shall reserve the right to require counseling and/or testing of students as deemed appropriate. The

University may proceed through the disciplinary process as outlined below in Article VII: Procedures, regardless of any action by civil authorities.

**B. Definition of Sanctions:** The following sanctions as defined below may be consequences of a violation of the Code of Student Conduct. Each sanction may be separately or cumulatively applied should the behavior call for the imposition of a more severe penalty.

**1. Administrative Hold:** A status documented in the Registrar's official file which precludes the student from registering, from receiving transcripts or from graduating until clearance has been received from the Vice President for Student Affairs in accordance with University rules.

**2. Disciplinary Reprimand:** The student is warned in writing that his or her behavior is unacceptable and further misconduct may result in further sanctions or disciplinary action.

**3. Disciplinary Probation:** A student may receive specified restrictions and/or extra requirement for a specified period of time. The student may be restricted from participating in intercollegiate activities, extracurricular events, or other activities not academic in nature but consistent with the mission of the University. During the probationary period, the student shall not represent the University in any extracurricular activity, run for, or hold office in any student group or organization. Additional restrictions or conditions may also be imposed. A student may be required to meet periodically with designated persons. Notification will be sent to appropriate University offices. Failure to comply with the conditions of probation may result in disciplinary suspension or dismissal from the University.

**4. Suspension:** The student shall be prohibited from attending the University and from being present without the permission of the sanctioning officer or his or her designee on University property for a specified period. The appropriate hearing authority shall determine the effective beginning and ending dates of the suspension. A suspended student will be withdrawn from all divisions of the University for at least the remainder of the semester or session in progress. A student who is suspended from the University is not eligible for return of tuition or fees paid to the University. The student shall be required to apply for readmission to the University.

**5. Expulsion:** The student shall be permanently separated from the University. A notation will appear on the student's transcript. The student will also be barred from being on any University property, except by permission of the President of the University. A student who is expelled from the University is ineligible for the return of tuition and fees, paid or owed to the University. Expulsion requires administrative review and approval by the President of the University.

**6. Interim suspension:** The student shall begin the interim suspension immediately upon receipt of notice from the President, College Dean or the Vice President for Academic Affairs or Vice President for Student Affairs or a designee.

**(a).** An interim suspension restricts the student's physical access to campus if deemed necessary in order to:

**(i)** protect the safety and health of any person;

**(ii)** maintain order on University property;

**(iii)** stop interference in any manner with the rights of citizens while on University owned or controlled property, while on professional practice assignment or while representing the University;

**(iv)** preserve the orderly functioning of the University and the pursuit of its mission; or

**(v)** protect University property and the property of members of the University community.

**(b).** An interim suspension is effective immediately without prior notice whenever there is evidence that the continued presence of the student on the University campus or property poses a substantial threat to himself or herself, to others, or to the stability and continuance of normal University functions.

**(c).** The interim suspension may be imposed pending the application of the disciplinary process.

**(d).** Students on interim suspension are barred from University premises and University sponsored activities.

**(e).** The suspending officer shall schedule a hearing within 5 days of the interim suspension notice for the purpose of determining if the interim suspension shall remain in effect, be modified, or be revoked pending a disciplinary hearing.

**(f).** A student suspended on an interim basis shall be given an opportunity to appear before the Vice President for Student Affairs to discuss the following issues:

**(i)** The reliability of the information concerning the student's conduct;  or

**(ii)** whether the conduct and surrounding circumstances reasonably indicate that the continued presence of the student on the University campus or property poses a substantial threat to himself or herself, to others, or to the stability and continuance or normal University functions.

**(g).** As such this shall be a temporary suspension, which may be imposed pending the application of the disciplinary process. The suspending official shall schedule a hearing within 7 days of the interim suspension notice. The purpose of the hearing will be to determine if the interim suspension shall remain in effect, be modified, or be revoked pending a disciplinary hearing.

**7. Other Disciplinary Sanctions:** Other sanctions may be imposed by the Hearing authorities with or without disciplinary probation including but are not limited to:

**1.** monetary payments for restitution because of damage to or misappropriation of University or a University community member's property;

    **2.** service to the University and/or University community;

    **3.** restrict access to campus facilities; and/or

    **4.** referral for psychological and/or psychiatric evaluation.

**8.** Sanctions on Student Organizations and Groups: Student organizations and groups in violation of University policy shall be subject to a maximum sanction of termination of registration with the University, or any lesser sanction including but not limited to restriction or suspension of the use of facilities and services of the University, suspension of the privilege to sponsor fund raising events, the loss of funds allocated by the University, or restitution of damages.

## ARTICLE VI: INITIATING ACTIONS

**A. Pending Actions.** The University reserves the right to proceed through the disciplinary process outlined below even if other actions are pending (e.g. city/state police) under the laws of any jurisdiction.

**B. Notice.** Students will be issued a written notice for a judicial conference to the student's local address on record with the University, by U.S. mail or hand-delivered and such notice will be deemed delivered within the time limits of standard business days. This notice of action shall be adequate, unless the student can show just cause as to why the receipt of notice did not allow sufficient time to prepare for the hearing.

**C. Former Student.** In cases where a student leaves the University and/or is not registered as a student when charged, a bar to future registration will be issued and placed on the student's record. The Office of the Registrar will be notified to remove the bar after the disciplinary action has been resolved.

**D. Reporting Misconduct.** All instances of alleged misconduct shall be reported without unnecessary delay from the date of the discovery of the alleged offense to the appropriate offices. Alleged academic misconduct should be reported to the Dean of the respective college or school. Alleged nonacademic misconduct should be reported to the Vice President for Student Affairs or designee. In cases, where the misconduct cannot be immediately determined, the Office of the Vice President for Student Affairs or designee and the Dean's Office or designee shall confer to ascertain how to handle the matter and subsequently notify all parties.

## ARTICLE VII: PROCEDURES

### A. Academic Misconduct

    **1.** First Level Resolution

      **a. Jurisdiction.** Cases involving academic misconduct should first be with the faculty member in whose course the alleged academic misconduct occurred.

      **b. Notice.** If a faculty member suspects a student of academic misconduct, he/she must inform the student without unnecessary delay and provide the student with an opportunity to respond before taking any action.

**c. Status.** Student suspected of academic misconduct whether or not they acknowledge the matter shall be permitted to continue in the course without prejudice pending the disciplinary action.

**d. Action.** If proper notice to the student has been given, the faculty member may take one or more of the following actions:

    **(i)** alter a grade;

    **(ii)** assign a failing grade in the assignment, examination or the course; or

    **(iii)** recommend additional sanction (s) to the Dean or Dean's designee.

**e. Time lines.** If any of the actions are taken, the faculty member must notify the student in writing of the action taken with a copy to the Dean of the college in which the misconduct occurred and the student's "home" college generally within 5 days of informing the student.

**f.** Within 5 days of receipt of the faculty member's notice of action, the Dean or designee of the student's home college shall determine whether the matter was resolved and inform the student and the faculty member as follows:

    **(i)** If the matter is resolved and the appropriate sanction accepted, the matter shall be recorded with a copy to the Vice President of Student Affairs and the matter closed.

    **(ii)** If the matter is not resolved, either party may request that the matter go before the Vice President for Academic Affairs for action. Any such request shall be made to the Dean or designee within 7 days of receipt of notice.

**g.** Failure on the part of the faculty to either (1) notify the Dean of the sanction or (2) notify the student of rights to appeal a sanction is not grounds for voiding the sanction.

**2.** Second Level Resolution

**a.** When the first level of resolution is not possible, a College Hearing Committee shall be convened without unnecessary delay from the date of notification to the Dean.

**b.** The charge of the Committee shall be to investigate the alleged violations and to recommend appropriate sanction(s).

**c.** The jurisdiction shall reside in the "home" college of student against whom the charge has been brought.

**d.** The committee shall consist of the Hearing Officer, two representatives selected by the college faculty who shall hear the case, and two student representatives selected by the President.

**e.** The Hearing Officer shall be the Dean or designee of the student home college.

**f.** A quorum is present when the Hearing Officer and at least one faculty representative and one student representative are present. The Hearing Officer shall vote only in the event of a tie.

**76    Student Handbook 2004–2005**

g. Either party may challenge for cause a specific member's presence on the committee by notifying the Hearing Officer of the challenge. The Hearing Officer shall decide whether the member is unbiased. If the challenge is granted, a substitute will be appointed and the same option to challenge will exist.

h. The Hearing Officer shall send the committee's final recommendation to the Dean and to the student generally within 5 days after the hearing.

i. If more than one student is charged with the same academic misconduct, the Vice President for Academic Affairs will serve as the Hearing Officer along with a representative (Dean) from each student's college, and two students selected by President.

j. The quorum is composed of the Hearing Officer, one student representative, a Dean from each college.

k. The Hearing Officer will only vote in case of a tie by the committee. Any party may challenge for cause a specific member's presence on the committee by notifying the Hearing Officer of the challenge. The Hearing Officer shall decide whether the member is unbiased. If the challenge is granted, a substitute will be appointed and the same option to challenge will exist.

l. The Hearing Officer shall send the committee's final recommendation to the Dean and to each student within 5 days after the hearing.

3. Action on Committee Recommendations

a. Actions by the Dean on College Hearing Committee recommendations shall be within 5 days after receipt of the committee's recommendations.

b. The Dean shall take one of the following actions and notify all parties in writing: (1) concur, (2) modify sanction, or (3) send back to the Hearing Committee for further review and recommendation.

c. The student shall be notified in writing of the Dean's decision and of the appeal process.

d. If the student does not appeal the Dean's decision within 5 days, the sanction(s) approved by the Dean shall be in effect.

e. The Dean shall submit recommendations for University suspension or dismissal to the Vice President for Academic Affairs who can (1) concur, (2) modify sanction, or (3) send back to the Hearing Committee for further review and recommendation.

## B. Nonacademic Misconduct

1. First Level Resolution

a. First level resolution shall be attempted. University faculty and staff may act as facilitator, mediator, and/or observer as requested. Without unnecessary delay from the date of receipt of misconduct report, the Vice President for Student Affairs or designee shall inform the student in writing of the alleged misconduct.

b. If the Vice President for Student Affairs and student resolves the allegation with no penalty to the student, the matter is closed.

c. If the allegation is resolved by the Vice President for Student Affairs and the student with penalty, a record of the resolution shall be maintained by the Office of the Vice President for Student Affairs and the Dean's Office of the student's major, and the matter closed.

d. If the matter is not resolved, a second level review committee shall be convened.

2. Second Level Resolution

a. When the first level, administrative resolution is not possible due to the nature and/or severity of the misconduct as determined by the Vice President for Student Affairs or the Dean or designee, an Administrative Review Committee shall be convened without unnecessary delay.

b. The committee's charge is to hear the reported allegations, to submit a report and to recommend appropriate sanctions to the Vice President for Student Affairs.

c. Administrative Review Committee: The committee shall consist of the Hearing Officer, a representative of the charged student's college/school designated by the Dean and two student representatives. When more than one college/school is involved, a nonvoting representative of the college/school in which the incident occurred should participate fully in the hearing.

d. The Hearing Officer shall be the Vice President for Student Affairs.

e. A quorum consists of the Hearing Officer, the Dean's representative (student's major) and at least one student representative.

f. The Hearing Officer will only vote in the case of a tie by the committee.

g. Any party may challenge for cause a specific member's presence on the committee by notifying the Vice President for Student Affairs of the challenge. The Hearing Officer shall decide whether the member is unbiased. If the challenge is granted, a substitute will be appointed and the same option to challenge shall exist.

h. The Hearing Officer shall send the committee's final recommendation to the college Dean and to the student within 5 days after the hearing.

i. Within 7 days, the Vice-President shall take one of the following actions and notify all parties in writing: (1) concur, (2) modify sanction, (3) send back to the Administrative Review Committee for further review and recommendation.

j. The student shall be notified in writing of the Vice President's decision and of the appeal process. If the student does not appeal the Vice President's decision within 5 days, the sanctions approved by the Vice President shall be in effect immediately.

## ARTICLE VIII: COMMITTEE GUIDELINES

### Academic and Nonacademic Misconduct

**A.** Hearings shall be restricted to those individuals involved except as otherwise noted.

**B.** The student may elect to have an advisor present who may counsel but not actively participate as a spokesperson or vocal advocate in the hearing.

**C.** A University representative may be present as an observer.

**D.** Witnesses are strongly encouraged to be present for hearings. However, if they are unable to attend, notarized statements may be submitted.

**E.** If the student, faculty or staff member chooses not to attend the hearing, his/her written statement shall be reviewed at that time and judged on the basis of the information available.

**F.** When more than one student is involved in the allegation of misconduct and they are in a different college, designees from each college Dean shall be present at the hearing.

**G.** When more than one student is involved in an allegation of misconduct, any involved student may request a separate hearing. Such request shall be made to the Hearing Officer at least two days (48 hours) prior to the scheduled hearing.

**H.** Hearings shall be tape-recorded. A copy of the taped record shall be available to the student at any time after the hearing. Upon permission of the Hearing Officer, the student may independently tape proceedings.

**I.** The Office of the Vice President for Student Affairs maintains records relating to a disciplinary action as educational records separate from a student's academic records.

**J.** Upon written requests, victims of violent crimes may be informed of the results of the campus disciplinary proceedings.

## ARTICLE IX: APPEAL PROCESS

**A.** A student found to have violated the Code of Student Conduct should have the right to appeal to the Student Appeals Committee (SAC).

**B.** All appeals shall be addressed to Student Appeals Committee and filed in writing to the Vice President for Student Affairs within 3 days of receipt of the sanction (s) decision letter from the Vice President for Student Affairs and shall set forth the specific grounds for the appeal.

**C.** Grounds for appeal are restricted to the following:

    **1. Discovery of new information** – embodies information not available at the time of the hearing to include substantiated bias on the part of the Hearing Officer.

    **2. Procedural error** – a substantial error was made in the Code of Conduct procedures as outlined in the Code of Student Conduct publication, which resulted in a fundamental change in the outcome.

    **3. Harshness of sanction** – the sanction imposed is not commensurate with the violation.

**D.** Appeals will be granted and heard solely on the basis of the written statements of the individuals involved in the action taken by the Vice President for Student Affairs except for appeals based on the discovery of new information. In such cases, limited hearings will be held to present new information.

**E.** SAC shall be composed of an Appeals Hearing Officer appointed by the President, one student (from a pool of students annually appointed by the President) and one University college representative appointed by the Dean of the college in which the student is matriculated or registered.

**F.** The University's Student Appeals Committee pool shall consist of four faculty members selected annually by the University Senate, three undergraduate students and three graduate students named annually by the President.

**G.** The Appeals Hearing Officer shall be responsible for selecting one faculty and one undergraduate student for an undergraduate case or one graduate student for a graduate case.

**H.** The Student Appeals Committee may not review the factual findings of the disciplinary committees, including any finding that the student violated the Code of Student Conduct, except as related to the provision of new information, fair process or harshness of sanction.

**I.** The burden of persuasion before the Student Appeals Committee is the sole responsibility of the student.

**J.** The Appeals Hearing Officer shall chair the committee and vote only in the case of a tie vote by the Committee.

**K.** A student may waive his/her right to appeal to the Student Appeals Committee and instead submit to an expedited appeal before the Appeals Hearing Officer.

**L.** The taped record of the second level disciplinary hearings will be available to the appealing student and the Student Appeals Committee.

**M.** When an appeal is filed, the entire file will be forwarded to the Appeals Hearing Officer and will be available to the student for review.

**N.** If the student fails to file a written statement within the time limits specified by the Appeals Hearing Officer, the appeal will be dismissed.

**O.** After the student files a written statement, the Second Level Hearing Officer that heard the matter may file a written statement.

**P.** Taped records and notes pertaining to the appeal shall be separate from a student's academic record and maintained by the Office of the Vice President for Student Affairs.

## ARTICLE X:  FINAL ACTIONS

**A.** Within 5 days after the appeal hearing the Appeals Hearing Officer shall report the Committee's recommendations to the appropriate Vice President and notify all parties in writing.

**B.** The Student Appeals Committee may:

    **1.** Determine that there is no merit to the appeal and recommend dismissal of the appeal to the President. The original sanctions stand.

    **2.** Determine that the appeal has merit, and may recommend to the President reconsideration with recommendation for sanctions in light of the Committee's findings.

**C.** Action by the Vice President:

    **1.** Within 5 days of receipt of the Student Appeals Committee or Appeal Hearing Officer's decision, the Vice President may take one of the following actions and shall notify all parties in writing:

        **(a)** Concur with the decision.

        **(b)** Modify sanction (s)

**D.** Action by the President:

    Decisions by the President are final.

**PLAINTIFF'S EXHIBIT "H"**



**University of the District of Columbia**
**Department of Public Safety and Emergency Management Services**
Office of the Vice President
Building 39, Suite 301K
4200 Connecticut Avenue, N.W.
Washington, D.C. 20008
Office (202) 274-5148   Fax (202) 274-5344

## Report Supplemental

# FILE COPY

Reference UDC case # 04-0171 (Informative) filed on 09-20-04

Prepared by: Stephen M. Young, Lieutenant

Date Prepared: 10-19-04

Interview Location: Law Library B-level – Professor Brian Baker, Director
           Helen Frazer, Head of Public Services
           William Thomas, Employee
      Bldg. Room C-04 – Randolph Greene, Student
           Robert Patterson, Student
           Sergeant Larry Johnson
           Officer James Patterson
           Officer Virgil Royal
       Room 301K – Mireille Tshiteya

On September 30, 2004, I interviewed Mr. Robert Patterson from approximately 1330 hours until approximately 1413 hours, relative to the incident. During the interview of Mr. Patterson, the following statements were made, questions were asked and responses were received:

"What I heard first is a man come in and he was asked by the library clerk if he was a student of the Law Library. There was me and two other people there. There was a lady asking the man some questions. She asked him if he was a student of the Law School. After the lady asked him if he was a student, he said don't worry about it, none of your business, leave me alone, or something of that nature. She then asked him what he was doing there. He said he was doing pre-legal or something like that. She then told him that was no excuse if you don't belong here you gotta go. Then she said she was going to call security. Then she asked me to go and ask him for his ID and I go over there and he said something like he don't have to show it to me and he didn't show it to me. The library clerk wanted to get on the computer and connect with Nexus/Lexus so I offered her the computer that I was using. She then said no, she didn't want my computer, and she wanted that computer. It was just a bunch of arguing going on. The guy seemed like he just wanted to come in and do some work and at first she wanted to see his ID and then it changed to her using the computer where he was sitting. I didn't hear anybody call anybody anything out of their name or make threats. I was not threatened by this guy. I didn't feel like she seemed threatened by this guy and argued with him for how long before she called security. The dude seemed like he just wanted to get his work done. I didn't feel like it got to the point where I had to step in."

On October 1, 2004, I interviewed Mr. Randolph Greene, from approximately 1425 hours until approximately 1527 hours, relative to the incident. During the interview of Mr. Greene, the following statements were made, questions were asked and responses were received:

**PLAINTIFF'S EXHIBIT "I"**

**(Mr. William Thomas' Statement)**

Incident in the Law Clinic


On Monday Sept. 19, 2004 at about 10:00pm two University of the District of Columbia police officers escorted an undergraduate by the name of Randolph Green to the Law Library. The officers stated that Mr. Green and one of the second year law students had just had a confrontation in the law clinic. While the officers were trying to calm Mr. Green down the law student got off the elevator and entered the law library. As soon as these two seen each other it was on again both of the student were out control. The officer was trying to keep them apart. The law student just didn't want to let it go she continue to say that Mr. Green didn't belong there. The campus police finally got Mr. Green out of the building.


William T. Thomas

**PLAINTIFF'S EXHIBIT "J"**



**University of the District of Columbia**
**Department of Public Safety and Emergency Management Services**
Office of the Vice President
Building 39, Suite 301K
4200 Connecticut Avenue, N.W.
Washington, D.C. 20008
Office (202) 274-5148    Fax (202) 274-5344

**FILE COPY**

## Report Supplemental

Reference UDC case # 04-0171 (Informative) filed on 09-20-04

Prepared by: Stephen M. Young, Lieutenant

Date Prepared: 10-19-04

Interview Location: Law Library B-level – Professor Brian Baker, Director
Helen Frazer, Head of Public Services
William Thomas, Employee
Bldg. Room C-04 – Randolph Greene, Student
Robert Patterson, Student
Sergeant Larry Johnson
Officer James Patterson
Officer Virgil Royal
Room 301K – Mireille Tshiteya

On October 18, 2004, I interviewed Sergeant L. Johnson, from approximately 1702 hours until approximately 1815 hours, relative to the incident. During the interview of Sergeant Johnson, the following statements were made, questions were asked and responses were received:

"What time did you become aware of the incident involving Ms. Mireille B. Tshiteya and Mr. Randolph Greene which occurred in the Law Library on September 20, 2004?"

Sergeant Johnson's response was "I believe it was approximately 2131 hours".

"At what time did you respond to the scene of the incident?"

Sergeant Johnson's response was "At approximately 2145 hours".

"What did you observe upon your arrival to the scene of the incident?"

Sergeant Johnson's response was "When I arrived there the young lady was standing near the entrance of the little area where the computers are and Randolph Greene was sitting at the computer desk. After that, she stated that he was not a student and that he shouldn't be on the computer because a sign stated that only Law School students are to use the computers. That's when Officer Patterson and myself proceeded to talk to Mr. Greene."

"What did Mr. Greene state in your presence?"

Sergeant Johnson's response was "He stated that Mr. William Thomas gave him permission to go upstairs and use the computers and stated that he had used the computers before and no one asked him for an ID."

"Was Mr. Greene profane and abusive toward Ms. Tshiteya in your presence?"

Sergeant Johnson's response was "There were some words passed between both of them."

"Did Mr. Greene appear to be hostile in your observation?"

Sergeant Johnson's response was "He appeared to be agitated because he only needed a few more minutes to complete his work."

**PLAINTIFF'S EXHIBIT "K"**



**University of the District of Columbia**
**Department of Public Safety and Emergency Management Services**
Office of the Vice President
Building 39, Suite 301K
4200 Connecticut Avenue, N.W.
Washington, D.C. 20008
Office (202) 274-5148   Fax (202) 274-5344

# FILE COPY

## Report Supplemental

Reference UDC case # 04-0171 (Informative) filed on 09-20-04

Prepared by: Stephen M. Young, Lieutenant

Date Prepared: 10-19-04

Interview Location: Law Library B-level – Professor Brian Baker, Director
                    Helen Frazer, Head of Public Services
                    William Thomas, Employee
          Bldg. Room C-04 –Randolph Greene, Student
                    Robert Patterson, Student
                    Sergeant Larry Johnson
                    Officer James Patterson
                    Officer Virgil Royal
          Room 301K – Mireille Tshiteya

This memorandum shall serve as a supplemental investigative report to the above referenced Incident Report. In the aforementioned report submitted by Officer James Patterson, it is indicated that on September 20, 2004 at approximately 2139 hours, that he and Sergeant Larry Johnson were dispatched to respond to the Law Library on the 2nd floor of Building 39 to a report of disorderly conduct. Upon their arrival at the scene of the incident, Sergeant Johnson and Officer Patterson ascertained from Ms. Mireille Tshiteya, a law student that another student, who was not authorized, was using the computer in the aforementioned location. This student was identified as Mr. Randolph Greene, who was not a law student. It is additionally indicated that Mr. Greene became verbally upset and began shouting obscenities, at which time he was warned with regard to the use of his offensive language and was escorted from the campus.

**PLAINTIFF'S EXHIBIT "L"**

103 Personal Data                          GREENE, RANDOLPH

Screen: ___ SID: 579585629  Course: _____  Term: 04F

Name: GREENE, RANDOLPH                    Spec Name Flag: _ Suppress Name Roll: _
Str Line 1: 4203 4TH STREET SE #9              *** Permanent Address ***
Str Line 2: _____      Address Usage: P
        City: WASHINGTON          State: DC Foreign Prov: _____
  Postal Cd: 20032        Rte: ____ Country: US Phone: 202-561-4503
Residence Dates - From: _____ To: _____ Addr Status: A Phone Pref: _

Str Line 1: _____      *** Local Address ***
Str Line 2: _____      Address Usage:
        City: _____ State: __ Foreign Prov: _____
  Postal Cd: _____ Rte: ____ Country: __ Phone: _____
Residence Dates - From: _____ To: _____ Addr Status: _ Phone Pref: _
--------------------------------------------------------------------------------
Birthdate  Sex  Ethnicity │ Marital  Disability  Rel Alum  Religion
03-17-1947  M      B         _         _         _       __
Previous Name: _____
              State   County   ---- VISA ----   -- VETERAN --   CWID         PIN
Citizenship  Origin   Origin   Type  Exp Date   Code  Benefit   Notify  PIN  Asg
  US Fgn: __    DC       ____    __   _____   __     _         _    031747  _

**PLAINTIFF'S EXHIBIT "M"**

109 Student Schedule    SR    BPA BBA  BSMG   GREENE, RANDOLPH

Screen: ___  SID: 579585629  Course: _____   Term: 04F  Printer Code: __

```
S                          FALL 2004
T Course        Cred GT Title                    Days    Times      Bldg Room
  MAIN CAMPUS           NORMAL ACADEMIC TERM      08-25-04 to 12-17-04
E 2227-304-02   3.00    INTRO. TO MKTG. MGMT.     MW      0530-0650PM 52  000315
                3.00 Total Registered Hours
```