UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

RANDOLPH J. GREENE,

   Plaintiff                                  Civil Action #05-1097(RWR)

   v.

DISTRICT OF COLUMBIA; et al.                        **RECEIVED**

   Defendants.                                  APR 1 8 2006

                                        NANCY MAYER WHITTINGTON, CLERK
                                            U.S. DISTRICT COURT

### PLAINTIFF'S MOTION TO RECONSIDER
### AND VACATE THE COURT'S 11 APRIL 2006, ORDER

AND NOW COMES Randolph J. Greene, plaintiff, pro se, and pursuant to
Rule 52(a), Rule 59(e) and Rule 60(b), of the Federal Rules of Civil Procedure,
respectfully request this Court to reconsider and vacate its 11 April 2006, Order for
the following, but not limited reasons:

1. The defendants have filed dispositive motions in this case twice.

2. The first dispositive was denied.

3. The Minute Order denying the first dispositive motion did not specify that
the defendants could renew their dispositive motion.

4. On information and belief, omission of permission to renew any denied
motion means that the motion denied was denied *with prejudice*.

5. A motion denied with prejudice means that it is an exercise in futility to
renew the motion.

6. A motion denied with prejudice, renewed, is filed in bad faith.

7. A motion denied with prejudice, renewed, is vexatious.

8. This Court's discretion.


The grounds in support of this motion are set forth with particularity in the accompanying memorandum of law on points and authorities.

Respectfully submitted,

RANDOLPH J. GREENE P.O. Box 36303
Washington, D.C. 20020
(202) 561-4503
Plaintiff Pro se

TUNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

RANDOLPH J. GREENE

          Plaintiff

   v.

DISTRICT OF COLUMBIA; et al.

          Defendants.

Civil Action #05-1097(RWR)

## PLAINTIFF'S MEMORANDUM OF LAW ON POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO RECONSIDER OR VACATE

### I. STATEMENT

This is a *pro se* civil rights action pursuant to Article III, §2, clause 1, of the Constitution of the United States of America, Title 28, United States Codes §§1331, 1332, 1343(a)(3),(b), 2201-02, and Title 42, United States Codes §1983, for declaratory and injunctive relief and damages against the defendants in both their individual and official capacities for i) banning plaintiff from a public facility; and ii) denying plaintiff rudimentary due process and minimum procedural safeguards prior to imposing their ban on plaintiff from the public facility.

The plaintiff was granted permission to file a relation-back amended complaint. (Docket Report at 4, eleventh entry, at 5, eighth entry ). In response thereto, the defendants filed a second motion to dismiss, or in the alternative, for summary judgment. (Documents# #32,33,36). The plaintiff countered with a response thereto (Document #38 ) and a motion to strike (Document#45) the second

motion to dismiss, or in the alternative, for summary judgment.  On 11 April 2006, this Honorable Court denied the plaintiff's motion to strike.  This pleading is submitted in support of the plaintiff's motion to reconsider and vacate the Court's 11 April 2006 Order.

## II.  ARGUMENT

### THE MOTION TO RECONSIDER AND VACATE

In its 11 April 2006, Minute Order, this Honorable Court stated "It is hereby ORDERED that plaintiff's motion to strike defendants' motion [citation omitted] is DENIED, *for the reasons stated in defendants opposition...*"

Defendants opposition, in relevant part states:

> "Further, Plaintiff filed an opposition to the defendants motion on February 6, 2006, and then, on February 22, 2006, filed further, superfluous papers seeking to amend his responses to Defendandants' Reply memorandum to the previous dispositive motion which the court had ruled moot, prompting defendants to file further reply protesting plaintiff's continuous agitation of the matter, harassment of the parties, interference with the administration of justice by refusing to allow the court to address the issues presented by defendants' motion".
> (Document#47 at 2, ¶3).

Frankly speaking, the Court's co-signing of the above portion of defendants' opposition causes the plaintiff great consternation.  There has been no pretrial discovery and inspection in this case.  If the plaintiff served:  i) a request for discovery and production of documents;  ii)  plaintiff's first set of interrogatories;  iii)  requests for admission on the defendants, the defendants could well file a protective order arguing *harassment of the parties, interference with the administration of justice, refusing to allow the court to address the issues presented by*

*defendants motion* and so forth and so on.  How will this Court react?  Rule 56 appears to envision that pretrial discovery will be conducted *prior to,* not *subsequent to* a court's ruling on a motion for summary judgment.  (Document 34 at 1-2).  The defendants do not want to be in court and will truncate plaintiff's day in court if they can.

### (i)  Rule 52(a)

In its discretion, a district court may relieve a party from an otherwise final judgment, order or proceeding under certain circumstances.  For rationale, Muwekma Tribe v. Norton, 206 F. Supp. 2d 1 (DC2002).  A court's decision whether to grant relief from a judgment is ultimately committed to its discretion.  For rationale, Canady v. Erbe Elekromedizin GmbH, 99 F. Supp.2d 37 (DC2000); Independent Petroleum Ass'n of America v. Babbitt, 178 F.R.D. 323 (DC1998).

### (ii)  Rule 59(e)

Court's may treat motions for reconsideration as motion to alter or amend judgment when they are filed within ten (10) days of the entry of the judgment at issue.  For rationale, Zyko v. Dept. of Defense, 180 F. Supp. 2d 89 (DC2001); Niedermeier v. Office of Baucus, 153 F. Supp. 2d 23 (DC2001);  W.C. & A.N. Miller Companies v. United States, 173 F.R.D. 1 (DC1997);  Armstrong v. Executive Office of the President, 897 F. Supp. 10 (DC1995).

### (iii)  Rule 60(b)(6)

Although proffered claim or defense need not be "iron clad", party moving for relief from judgment must at least establish that it possesses a potentially meritorious claim or defense which, if proven, will bring success in its wake.  For

rationale, <u>Murry v. District of Columbia,</u> 52 F.3d 353 at 355 (CADC1995);  also see <u>Davis v. Magnolia Lady, Inc.,</u> 178 F.R.D. 473 at 475 (Miss.1998); <u>Whitmore</u> V. <u>Avery,</u> 179 F.R.D. 252 at 259 (Neb.1998);  <u>Unitede States v. Brown,</u> 179 F.R.D. 323 at 325 (Kan.1998);  <u>Clarendon Nat. Ins. Co. v. TIG Reinsurance Co.,</u> 183 F.R.D. 112 at 118 (NY1998).  And with this reasoning in mind, plaintiff now digresses to the motion to strike.

## THE MOTION TO STRIKE

Although it is well established that a plaintiff, as well as a defendant, may avail himself of a motion to strike, <u>Dysart v. Remington Rand,</u> 31 F.Supp. 296 (Conn.1939), plaintiff concedes that his motion to strike defendants' second dispositive motion in its entirety was not well taken.  <u>E.E.O.C. v. Admiral Maintenance Service, L.P.,</u> 174 F.R.D. 643 at 645 (Ill.1997).  It also appears that the plaintiff was not  entitled to strike contents within a dispositive motion.  <u>Id.</u> At 647.

Nevertheless, plaintiff submits that a change in the cirumstances of this case occurred when the Court denied the university defendants first dispositive motion and that the defendants second dispositive motion triggered the doctrine of *res judicata* investing the Court with discretionary authority to either:  i)  summarily deny the second dispositive motion; or ii)  order defendants to adduce fresh evidence in support of the second motion to dismiss, or in the alternative, for summary judgment.

## POINTS AND AUTHORITIES

## THE POINTS

1. Circumstances in this case include, but are not limited to:

(a) The filing of the defendants' first dispositive motion. (Document ##16-18);

(b) Plaintiff's response (accompanied by Exhibits "C"-"M") to defendants' first dispsotive motion. (Document #30) and relation-back amended complaint (Document #26);

© Defendants reply to plaintiff's (Document #30) response arguing in relevant part that the plaintiff had failed to cite the source of his constitutional rights;

(d) Plaintiff's 3 December 2005, 9:03, p.m. response (incorrectly bearing Civil Action #05-1031, rather than Civil Action #05-1097) to the defendants' reply, accompanied by Plaintiff's Exhibit "N", the source of plaintiff's constitutional rights;

(e) On 3 January 06, the Court denied the university defendants first dispositive motion. (Docket Report at 5, first entry thereof);

2. There has been a change in the *cirumstances of this case* since it arose.

3. The change in circumstances includes, but is not limited to, the denial of the university defendants first dispositive motion on the grounds of *mootness.*

4. The defendants have filed a second dispsotive motion. (Documents ##32-33,36 ). By reference thereto, the defendants have incorporated stale evidence

which was attached to the university defendants first dispositive motion, denied by this Court. (Docket Report at 5, first entry thereof).

## THE AUTHORITIES

In the 1993, unabridged edition of the Websters Third International Dictionary, the word *circumstances* has the following, but not limited definitions:

> "a. a specific part, phase, or attribute of the surroundings or background of an event, fact, or thing of the prevailing conditions in which it exists or takes place: a condition, fact, or event accompanying, conditioning, or determining another; b. a subordinate detail..."

With the above definition in mind, Point #1 adequately describes circumstances in this case. Points ##2-3 adequately describes some *changes* in the circumstances in this case.

The plaintiff was not arguing that the defendants should provide the court with copies of the same documents attached to their first dispositive motion in support of their second dispositive motion . No sir. That would be petty.

The plaintiff is not disputing what (Document #47 at 2, ¶2) the rules *state* either . Plaintiff is disputing the university defendants stretching of those rules almost beyond recognition to support their blatant non-compliance with Local Rule 7(h). Our argument is not disingenuous. The Court's denial is a *denial*. And a denial represents *something*.

Moreover, the term *mootness* deserves more attention than the defendants have given it. Professors Kates and Barker argued that mootness should be narrowly construed:

> "...We shall, however, restrict the term to its
> Narrow technical meaning and will describe as moot
> Only those cases in which a justiciable controversy once
> Existing between the parties is no longer at issue due to
> Some change in circumstances after the case arose".
> *"Mootness in Judicial Proceedings:  Toward a Coherent
> Theory"*, 62 Calif. L. Rev. 1385 at 1387 (1974).

The university defendants got up on a soap box and split hairs about Plaintiff's Exhibit "N" (Document #36 at 4). But a cursory perusal of Plaintiff's Exhibit "N" reveals Exhibit "N" is no fly-by-nighter. Plaintiff's Exhibit "N" was like the Sword of Damocles hanging over the university defendants' heads until the Court mercifully denied the defendants first dispositive motion on the grounds of *mootness.*

An opinion which has more than one common denominator with this case worth mentioning is <u>United States v. Munsingwear, Inc.,</u> 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950):

i)  a sovereign power is the adverse party in both cases;

ii)  a federal tribunal issued a mootness ruling in both cases;

iii)  the sovereign power failed to challenge the mootness ruling in either case;

iv)  the failure to challenge the  mootness disposition in either case is tantamount to acquiescing to it.

In <u>Munsingwear, Inc., supra,</u> the sovereign power's actions or inactions triggered the doctrine of *res judicata.* <u>Id.</u> At 40-41. If the sovereign powers actions or inactions delineated (i)-(iv) above triggered the doctrine of *res judicata* in <u>Munsingwear, Inc., supra,</u> plaintiff respectfully submit that the common denominators referred to above argues for application of *res judicata* principles instanter. The university defendants first dispositive motion was denied. That is a fact. The Minute Order denying the university defendants first dispositive motion, makes no reference that the denial was *without prejudice.* Why in the world should this layman presume that this Honorable Court denied the university defendants first dispositive motion without prejudice? (Document#25).

The defendants should, at least under the circumstances be required to produce *fresh* evidence in support of their second dispositive motion because the first dispositive motion was *denied and a denial represents something.* If the defendants cannot produce any fresh evidence, the Court can summarily deny the second dispositive motion.

## MISCELLANEOUS

### (a)

In some countries, the government may summarily ban a person from entering a public facility. America is not one of those countries. <u>Lederman v. United States,</u>89 F. Supp. 29 (DC2000); <u>Lederman v. United States</u>, 131 F.Supp. 2d 46 (DC20001). This case involves fundamental constitutional rights that the university defendants and their counsel act like they do not even know exist:

> "...However, Plaintiff still has not alleged a credible injury. Without an injury there is no cause of action, no subject matter jurisdiction..." (Second Dispositive Motion at 3,¶4).

> "...Plaintiff refuses to recognize the distinction between student discipline and revocation of library privileges to a member of the public.***. They merely revoked his privileges, as a member of the public, to use the law library, something he had been granted as a member of the public..."(Second Dispositive Motion at 5, ¶2).

> "...Nonetheless, University officials, including the director of the UDC law library, were aware of the rulings and have every reason to believe that they have the authority and the right to exclude from university facilities any person who abuses those facilities or the students and faculty for whom those facilities are maintained..." (Second Dispositive Motion at 10,¶2).

The defendants imposed a lifetime banishment on the plaintiff's access to the UDC law library. The plaintiff did not go looking for defendant Tshitieye to start an argument with . Defendant Tshiteya started the argument. Plaintiff's Exhibits "H" and "P". But under the defendants' *gift of plaintiff's dual status*: i) student; and ii) member of the public, their banishment is not supposed to hurt, not supposed to be as onerous because the banishment was under plaintiff's status

as a member of the general public. Balderdash!!!  From olden times, banishment

was always a severe punishment. (Plaintiff's Exhibit "T"). If the government

choses to ban someone from a public facility nowadays, it must do so in accordance

with due process principles.  There is no dispute, that in this case, a banishment was

imposed on the plaintiff, concerning access to the UDC law library, *without due*

*process principles.*

     When the Irish lost control of their homeland to the British and began to

resettle here in America, they made good and sure, in the Declaration of

Independence, Constitution, Federalist Papers and elsewhere in their writings, that

never again would government be allowed to run roughshod *over the people.*

America is a nation of laws, not men.  <u>Marbury v. Madison,</u>5 U.S. (1 Cranch) 137,

163 [2 L.Ed.60].  A banishment is a banishment, i.e., it is punishment.

**(b)**

> "Further, Plaintiff filed an opposition to the
> Defendants' motion on February 6, 2006, and then, on
> February 22, 2006, filed further, superfluous papers seeking
> To amend his responses to Defendants' Reply memorandum
> To the previous dispositive motion which the court had ruled
> Moot... ". (Docket #47 at 2,¶3).

     The above statement is true, but redundant.  (Document #41 at 1,¶3)  Why

did the plaintiff do what the university defendants claim plaintiff did?  To correct a

typographical error.  The plaintiff did not know that the defendants first dispositive

motion referred to on the Docket Report at 5, first entry had been denied.  The

plaintiff does not have a copy of the Minute Order and does not have a clear

recollection of receiving it.  When defense counsel first made reference to the denial

of their first dispositive motion, the plaintiff reviewed the copies of court orders in plaintiff's position and thought that defense counsel was erroneously referring to the 3 January 06, Minute Order which further confused the plaintiff. However, since that time the plaintiff has visited the Clerk's Office more frequently just to review the Docket Report to see if any papers have been filed with the court but not received by the plaintiff.

WHEREFORE, the above premises considered, plaintiff requests the Court: i) to alter or amend its 11 April 2006, order co-signing the defendants opposition in its entirety as found objectionable by the plaintiff; and to ii) require defendants to adduce *fresh* evidence in support of their second motion to dismiss, or in the alternative, for summary judgment or DENY same.

Respectfully submitted,

RANDOLPH J. GREENE
P.O. Box 36303
Washington, D.C. 20020
(202) 561-4503
Plaintiff Pro se

**PLAINTIFF'S EXHIBIT "T"**

# Publius Ovidius Naso

March 20, 43 B.C. - 17 A.D.

On March 20, 43 B.C., Publius Ovidius Naso was born at Sulmo (now Sulmona). The family was an old landowing class of equestrian rank. His father was wealthy and was able to elude the confiscation of his property during the struggles of civil war.

Ovid's father took both he and his older brother to Rome so they could receive and education fromthe best teachers. Their father's desire was for both boys to be trained for careers in law and public office.

The brother proved to be proficient in the oratorical delivery while Ovid found hisdelight in the writing and composing of verse. His training in public speaking benefited him well. Evidence of this training is seen in his writing skills.

Ovid did try to practice the skill he had learned and studied and he did make efforts to direct his career as such. He held several minor public offices but simply did not have the ambition to make a successful run.

He found himself at the heart of the glittering, attractive however immoral societal life of Rome. This lifestyle went hand in hand with his creative personality. The leader of this giddy society was Julia, the beautiful and witty daughter of Augustus.

Julia was eventually banished and disinherited by her father for an affair she conducted openly with Iulus Antonius. He was the son of Mark Antony, an old enemy of Augustus. Julia defied her father's moral reform crusade as well as insulted him by flaunting the affair with a family member of his enemy. Augustus was outraged.

At this time Ovid published the cruel, brilliant *Ars Amatoria*. This ingrained Ovid's name into the already furious Augustus. Ovid wrote an apology of sorts, Remedy of Love, and redirected his attention to the *Metamorphoses* and the *Fasti*. By this time he had met and married Livia, his third wife. Livia was to be his last and truest love.

In A.D. 8, Ovid was banished by Augustus to the town of Tomi. Ovid was implicated in the overly active promotion of Germanicus (Livia's choice), the rival of Tiberius. He was not deprived of property or civil rights, but the quiet life in Tomi was no replacement for the glittering life in Rome. The unpleasant weather, the restlessness of the Goths and the lack of fellow Romans contributed to Ovid's despair and disgrace.

As he lived in Tomi, he wrote with the focus on trying to get his sentence of banishment lifted. The works included the *Tristia,* which was addressed to important and influential people in Rome, and the *Epistulae ex Ponta*.

Sadly, Augustus died in A.D. 14 and Tiberius succeeded him. Tiberius was determined that Ovid would remain in banishment. Ovid began to feel hopeless and his despair deepened.

Ovid died in A.D. 17, three years after Augustus' death and Tiberius' succession in the city of Tomi and was buried in the area.



Copyright © 2006, KET

# Banishment and Repentance of Adam and Every Christian

## Saint Simeon the New Theologian

Being banished from Paradise, Adam and Eve immediately began to thirst and hunger, to freeze and shiver, to have labors and sweat, and to endure all those difficulties and griefs that we even now endure. Therefore, they soon felt into what a bitter condition they had descended, and to what a great misfortune they had become subject. Then they realized both their own hardness of heart and their lack of repentance, as well as God's unutterable condescension and compassion towards them. Therefore, even walking and sitting outside Paradise, they repented and shed tears, beat themselves in the face and tore out the hair of their head, lamenting over their former hardness of heart.

And this they did not for one day or two, or for ten days, but for their whole lifetime. For how can one not weep, remembering their meek and condescending Master, that unutterable delight of Paradise, those indescribable good things and beauties of the flowers of Paradise, that care-free life without labor, and that communion with angels? In worldly life, when servants are appointed by an eminent master in order to serve him, as long as they preserve attention, respect, and obedience towards their lord they have boldness before him, enjoy his favor and love, and live with him in peace and satisfaction. But when they become proud and begin to step away from the will of their master and despise their fellow servants, they lose not only their boldness before him, but even his favor and love; and at his order they are banished into a far country where they are subjected to innumerable necessities and sorrows, and the more they suffer and are in misfortunes, the more they feel the bitterness of their condition, remembering the peaceful and satisfied life that they have lost.

This same thing was experienced by our first ancestors also, who lived in Paradise and took sweet delight in its great good things. They acknowledged the greatness and value of these good things after they had lost them, being banished from Paradise; then they recognized also the whole greatness of the evil which they had done. Therefore they ceaselessly grieved and wept, calling on God's compassion.

And what did God do, being quick and ready to mercy, and slow to punishment? He foresaw that they would finally become humble and repent, and therefore He foreordained a special means for abolishing His righteous sentence upon them. But, He did not immediately bring into execution this foreordained decree, but assigned for this His own place and time and fashion, so as to teach us to love wisdom and not to rise up against our Creator and God.

Just as He foreordained, so later did He do: for those whom He banished from Paradise for their brazenness before Him and their unrepentant heart, since they had humbled themselves and wept over themselves, He arranged a way for the restoration of what had been lost.

And this is what it was: The Only-begotten Son and Word of the Unoriginate Father descended from the heavens to earth, and not only became man like them, but even was pleased to endure a violent and shameful death; then He descended into hades, brought them up from there and restored them. And thus, since Christ so suffered for them, as you hear every day, that He returned them from such a distant exile, would He not have had pity on them, if they had repented then in Paradise? How could he not have had pity on them, when He by nature is the Lover of mankind and compassionate, and He created them in order that they might take sweet delight of the good things of Paradise and might glorify their Benefactor?

But so that you might the better understand this and believe my words, hear yet more: If they had repented then, when they were still in Paradise, they would have received again only Paradise and nothing more.

But inasmuch as, being banished from Paradise for their lack of repentance, they then repented, wept much and were in great misfortunes, therefore God the Master of all, for their labors and sweat, for the misfortunes which they endured and for their good repentance, was pleased again to honor them and to glorify them so as to cause them to forget the whole evil that they had caused.

And what did He do? Behold how great is God's Love of mankind! Descending to hades and bringing

them out, He did not bring them again into the same Paradise from which they had been banished, but He raised them up to the heaven of heavens; and when He sat down at the right hand of His God and Father, He sat them down together with Him. Just think what great honor He gave to Adam who by nature was His slave, and vouchsafed him to be God's own father according to His grace-given dispensation. See to what a height our Master Christ raised him up for his repentance, humility, lamentation and tears! O the power of repentance and tears! O the ocean of Love of mankind which is beyond words, and mercy which cannot be traced out!

And not only Adam did God honor and glorify, but also us his sons--those, that is, who have begun to please him by repentance, tears, lamentation and by all of which we have spoken; and even up to now He glorifies and honors like Adam those who repent well and do what Adam did. Further, those who up until now and in the future will do this and repent, whether they be laymen or monks, He will glorify like Adam, as He Himself, our true God, has said: *Truly I say to you, I will not leave them ever, but show them to be My brethren and friends, fathers and mothers, kinsmen and co-inheritors. I have glorified them and will glorify them, both in the heavens on high and on the earth below; and of their life and rejoicing and glory there shall be no end.*

Tell me, then, my brother: What profit was there for our first ancestors in that laborless and carefree life which they had in Paradise, when they were careless, disdained God by not believing Him, and transgressed His commandment? For if they had believed Him, Eve would not have considered the serpent to be more trustworthy than God, Adam would not have believed Eve rather than God, and they would have refrained from eating of the forbidden tree. But they ate and did not repent, and for this they were banished from Paradise.

Moreover, from banishment also they received no harm, but great benefit. This is by power of the dispensation of our salvation. For our Master Christ descended from the heavens, by His death loosed the bonds of our death, and took away the condemnation that came down to us from the transgression of our first parents; by the power of holy Baptism He regenerated us, recreated us and delivered us from every condemnation and made us in this world completely free, so that our enemy the devil might no longer act in us and against us by violence and force. He honored us with the same autonomy which was given us in the beginning, and He gave us more power against the enemy than all the saints had who lived before the dispensation of Christ, so that those who desire might easily conquer the enemy. And when such ones die they do not descend to hades like the ancients, but ascend to the heavens and are vouchsafed to receive the repose and eternal joy which are there--only to a certain degree at the present time, but completely and entirely after the resurrection.

And so let no one invent excuses for his sins and say that we, by virtue of the transgression of Adam, are entirely subject to the action of the devil and are dragged by force into sin. They who think and speak thus consider that the dispensation of the Incarnation of our Master and Savior Jesus Christ was useless and in vain. Such an opinion is the opinion of heretics and not of the Orthodox. For what other reason did Christ descend and become Incarnate, and for what else did He suffer if not in order to loose the condemnation which proceeded from sin, and to deliver our race from slavery to the devil and from the activity in us of this our enemy? This is true autonomy: in no way to be subject to someone else. We are all born sinners from our forefather Adam who sinned; we are all criminals from a criminal, slaves of sin from a slave of sin, subject to the curse and death from him who was subject to the curse and death.

And because of Adam who received the action of the cunning devil, and by his counsel was moved to sin, and enslaved himself to him and lost his autonomy--we also, as his children, are subject to the action and the compulsory dominion of the devil and are his slaves. But our Lord came down from the heavens, was Incarnate and became man like us in everything except sin, in order to annihilate sin. He was conceived and born so as to sanctify the conception and birth of men. He was raised up and grew little by little so as to bless every age of life. He began to preach at the age of thirty, having become a full-grown man, so as to teach us not to jump out of line and go before those who are greater than us in mind and virtue, that is, are more intelligent and virtuous than we, especially if we are still young and not perfect in understanding and virtue. He preserved all the commandments of His God and Father so as to loose every transgression and to deliver us criminals from condemnation. He became a slave, took the form of a slave, in order to raise us, the slaves of the devil, once more into the condition of masters and to make us masters and possessors over the devil himself, our former tyrant.

(This is confirmed by the saints who have cast out the devil, as a weak and infirm one, as well as his servants, not only in their lifetime but also after their death.). He was hung upon a Cross and became a curse, as the prophet says: Cursed is everyone that hangeth upon a tree (Deut. 21:23), in order to loose the whole curse of Adam. He died in order to put death to death, and He rose in order to annihilate the power and activity of the devil who had authority over us by means of death and sin.

Thus out Lord, having cast into the midst of the death-dealing poison of sin the unutterable and life-giving activity of His Divinity and His Flesh, has liberated our race from the working of the devil; and purifying us by holy Baptism and bringing us to life by the communion of the most pure Mysteries of His precious Body and Blood, He makes us holy and sinless. But He then leaves us again to have autonomy, so that it might not seem that we serve our Master by compulsion, but rather by our own free will. Therefore, as in the beginning Adam in Paradise was free and sinless, and by his free will obeyed the enemy, was deceived and transgressed the commandment of God--so on the contrary we, being regenerated by holy Baptism, delivered from slavery and becoming free, if we do not obey by our own free will our enemy the devil, this cunning one will in no way be able to place in us any kind of evil.

Now, before the law and the coming of Christ, without the aid of those means of which we have spoken, many and very many pleased God and manifested themselves as irreproachable; among their number the righteous Enoch was honored by God by being translated, and Elias was raised to heaven in a fiery chariot. Therefore, what kind of justification can we give, if after the manifestation of grace, after such and so great benefactions, after the annihilation of death and sin, we do nor manifest ourselves as holy; if after being regenerated by the holy Baptism which we have received, standing under the protection of the holy angels by whom we are surrounded, and under the action of the grace of the Holy Spirit which we have been vouchsafed to receive--we do not become even like those who were before grace, that is, before Christ, but we remain in carelessness, and disdain and transgress the commandments of God?

And that we, if we are careless about our salvation, will be punished more than those who sinned before Christ, the Apostle Paul indicates when he says: If the word spoken through angels proved steadfast, and every transgression and disobedience received a just recompense of reward, how shall we escape, if we neglect so great a salvation (Hebrews 2:2-3).

And thus, each one of us, no matter what transgression he might have fallen into--let him not accuse Adam, but let him reproach himself. And let him show true and worthy repentance like Adam, if he desires to be vouchsafed the Kingdom of Heaven. Amen.

Case 1:05-cv-01097-RWR   Document 6   Filed 04/18/2006   Page 19 of 31

Words Without Borders    The Online Magazine for International Literature

SEARCH
SUITCASE OF BOOKS
FORUMS
WWB BLOG
SUBSCRIBE TO NEWSLETTER
WRITERS-IN-RESIDENCE
MEDIA
BACK ISSUES
LINKS
ABOUT US
CONTACT US

ABOUT THE AUTHOR
ABOUT THE TRANSLATOR

**GET NEW
ISSUES
BY E-MAIL**

AFRICA | AMERICAS | ASIA | EUROPE | MIDDLE EAST | PACIFIC RIM
CITIES | COASTS | MOUNTAINS | PLAINS | DESERTS | FORESTS | VILLAGES

## Najem Wali   Homeland as Exile, Exile as Homeland

Translated from the Arabic by Jennifer Kaplan

**Iocasta**: What is an exile's life? Is it great misery?
**Polyneices**: The greatest; worse in reality than in report.
**Iocasta**: Worse in what way? What chiefly galls an exile's heart?
**Polyneices**: The worst is this: right of free speech does not exist.
**Iocasta**: That's a slave's life-to be forbidden to speak one's mind.

(Euripides, *The Phoenician Women;* author's translation)

Writers in exile often face the question of why they left their
countries, and whether this departure has not resulted in a loss of
memory, a vagueness about those cherished places where they lived-
-whether it hasn't made their writing lose the heat and immediacy of
those who are still living inside, made their positions lose the same
degree of credibility. It would not be an exaggeration to say that from
ancient times until now, there has not been a period in which this
question has not been put to a writer or an artist without regard to
his nationality or the motives for his departure. For how many artists
are there who have been accused of being traitors because they left
their homelands, from Dante to Joseph Conrad and Joyce, García
Marquez and Gunther Grass and Vargas Llosa? And whatever the
explanation that those posing the question--usually more interested
in politics than they are in literature--claim to have arrived at, in the
end they don't look at the writer by what he writes, but rather
evaluate him by where he lives, or by the location of "the room" from
which he writes, as the Peruvian writer Vargas Llosa noted in his
commentary on the issue in one of his articles.

This narrow view drives some of those who cast a suspicious glance
at the writer living outside of his country to end up with the naïve
idea that it must be hard for writers in exile to write about their home
countries: it must be too difficult for them to grasp the core of the
historical events about which they would write, which need a period of
intellectual and emotional maturation to be properly understood. For
this and other superficial reasons, these people say it should satisfy
writers to write about exile, even though some writers have spent
close to twenty years in expatriation and their exile has itself begun
to become part of history as well. Statements such as these only
come out of ignorance. No one can impose on a writer his own
personal problems related to his own fear of the idea of exile, of
distance from the homeland, and ask writers to stop writing about
their home countries and to write automatically about exile simply
because they are outside of those countries. Naturally when I say this
I don't mean those who talk about the subject idly or with bad
intentions, but rather those serious journalists who ask the question
when interviewing writers in exile.

READ 1
OUR BI

On Ja
Dutch
Jane I
piece
on Ap
Dutch

In Mei
Salam
by Tar
the Sy
cultura

The In
Fictior
We're
that th
shortli
Indepe

Over I
There
well kr
circles
kno...

*Blog*

WHC
CITY



The E
Sosa
Mexic
The A
acclai
Creati
"Mexi

~ *Hist*
definii
view -

It is every human being's right to go to any place he or she wishes, for any reason at all, but these people's minds are too narrow to see that. The most important question of all eludes them: Does going into exile necessarily mean the end of the writer's memory and imagination in writing about "over there," and must the writer now write only about exile? I answer simply and unabashedly: NO. First of all, because effective writing will be about the exiled person even if he or she is living in what can be called "the homeland," which is more a political term than a creative one. For in the end, the writer's homeland is the language in which he writes, and his house is the world which he constructs through his work, just as the homeland of the traveler is wherever his feet may fall. There is no powerful relationship between the place where I sit and write and the creative imagination, which knows no specific place or boundaries. For someone who believes in the value of literature, it is not the place where he writes that is important, but rather the nature of the creative work that he produces. For what is the value of work that doesn't breathe free air, that is not written in freedom but under the power of a dictator or of social taboos? Does such work serve anyone? Will it form a document for the culture of the country, or for all humanity? Vargas Llosa knows that he would not have been able to write *The Time of the Hero* or *Conversation in the Cathedral* or *The Green House* if he had not been living in exile in Paris at that time. It is the same with García Marquez, who declared not long ago that he would leave Colombia again because he didn't have the tranquility he needed–not only for writing, but even for "singing," for living with peace of mind: "exile" once again. And he is not the first to seek his country outside of it: before him, Joyce searched for Dublin, which he passionately hated, outside of Dublin. Did Joyce betray his country, as the fanatics accused him? And did the Iraqi Al-Jawahiri betray his country by leaving it as well? It is not important to answer the question here, since there is no doubt that these men served their countries precisely by leaving: they were then able to write what they were not able to write "on the inside." Furthermore the value comes from the text they created; we do not evaluate them on the basis of the place they were living when they wrote it. What is the use of an artist staying in what is called his or her "homeland" if he can't complete the text he wants to write? An artist leaves in order to write freely and to speak up with a louder and more effective voice than the "brave" underground writer, or the writer living with closed mouth and dry pen. The issue for the writer, therefore, is not geographic exile.

It is true that there are many writers and artists in geographic exile. I believe, however, that it would be more exact to say that they were in exile in "the homeland" ever since their first painful stirrings of consciousness in the countries where they were born and lived; or let's say since they first felt the headache and heartache that have accompanied them ever since they became aware of the injustice of the state, and their rejection of the societal oppression which gives state terror the legitimacy it needs to crush beauty. And when "mere survival" becomes the principle way of life in a given country, then the beauty of that country becomes pain, and the country itself becomes exile. Even that small band of writers who belong to a political "opposition" party feel estranged. To make it clear: Exile knows no borders, and emotional attachment is not measured by distance. It is internal and deadly. Estrangement and exile begin when a person realizes that he is alone and abandoned, when his feet

Case 1:03-cv-01099-RWR    Document 48    Filed 04/18/2006

go in search of earth that will support him and that earth flees from him. Estrangement begins when the heart begins its weeping. Exile is too big to be defined by borders; it is the heart that leaps from the ribcage. It tears down friendship with others and with the world. This is how exile can begin, starting with the person's consciousness of creativity, or consciousness of pain, not only when a person is exiled geographically.

When we talk about our own condition, it is no secret that some members of my generation and the one before it--even the one after it--always wanted to leave, even before the pursuits of the dictatorial powers got worse and people began to be arrested. They were not cowards, nor were they "traitors" (as some heroes like to shout to the wind)--they simply wanted to withdraw from the bloody scene without incurring calamitous losses.

As far as I know, not one of them took up an official post, nor did they write about the glorious battles of Qaadisiyya or Umm al-Ma'aarak. They were simply excluded from the "paradise" of the good graces of the regime and its allies. But despite that--I say--those paradises they constructed out of the small freedoms which they seized for themselves, in addition to the desire to free themselves from the grip of the suffocating, constricting cities in which they were no longer able to breathe pure air, were greater. Maybe their thinking about getting out was like the thinking of our forefathers the Sumerians, our original ancestors, who called the lands that extended outside their walls "paradise," showing that they looked at their cities essentially as suffocation, like prisoners look at their prisons. It is possible to say that some of us were looking for our paradise outside of "the homeland" (an ideological prison in which they wanted to incarcerate us), and that we felt there as though we were already "exiles" (this time those same people want to fence in our exile, ideologically!). Within this interpretation it's true to say that every piece of creative writing is in the end a creative performance of "exile," the eternal exile of man and his alienation both "here" and "there."

When I studied German literature at the University of Hamburg, I specialized in the beginning in "literature of exile," and I found that I could count the number of novels written about geographic "exile" on two hands. It is the same with novels written in other languages, or at least those novels which I can read now in the original (Spanish and German, and to a certain extent English). Most of the great works were written in exile (but not about "geographic" exile), and they talk about the idea of man's eternal sense of exile and alienation from his society. The great writer taps into the intangible, and his characters translate a human language that surpasses all borders and scorns narrow, nationalistic definitions. As the ages have passed, writers have known that where there is power there will be exile. The idea of exile is bound to our first father Adam and first mother Eve. All of the prophets and messengers were exiled, and all great literature came from exiles, though not necessarily written about lives in (geographic) exile. And the situation is not specific to literature but extends to other forms of artistic expression, so that the list includes musicians, artists--even Hollywood triumphs are based on the work of artists in exile . . . just as the artists who left Syria because of Ottoman oppression were the basis of theater and music and printing in Cairo at the beginning of the century. And need I still mention the American writers of the "lost generation" who chose of their own free will to go

Case 1:05-cv-01097-RWR-DAR  Document 3  Filed

to Paris during the 1920s?

Many writers did not choose their banishment willingly, but were chased out of "their countries." I wonder if they would have added anything to humanity if they had but sat down and written nothing but laments. Many of them felt that it was precisely their distance from their countries that broadened their outlook. For do we see the lofty towers, the lighthouses, the minarets, the mosque domes and church steeples, when we are sitting under them? Even a person who is not a specialist in literature will answer "Of course not--on the contrary, if we sit far away, we will see them much better and they will look more beautiful!"

In every situation it is preferable for a person to refuse to stay in the shadow of a government which does not allow him to express himself. That is what Euripides was talking about in *The Phoenician Women*, which I quoted at the opening of this article. On this basis, "exile"--in the sense meant by those more concerned about politics more than literature--is not necessarily a negative thing for an artist. On the contrary, it gives him more--purer--air, which keeps him from being a slave to both official and social prohibition (which includes self-denial as well). I say "artist" because not every writer in exile is necessarily a great artist, but every great artist is necessarily an exile, and therefore "beautiful writing is revolutionary writing," as García Marquez said (he who writes about exile, and who wrote his enduring work *One Hundred Years of Solitude* while in exile, who in fact wrote his first novel ever--*No One Writes to the Colonel*--in exile in Paris.)

García Marquez's novel and others like it are the works of great young artists who began their creative work on the "inside," then left when they felt a need to breathe fresher air, and finished their paths in "exile." I say in exile, because maybe that is the reason they were able to create out of their pain and suffering what they wanted to do when they were in the geographic homeland. In this way exile becomes the completion of the experience which the writer began "over there," for the artist is the one who feels at bottom that his experience is not complete and will never be complete, as the horizons of creativity are always open. Added to that are his feelings of being estranged from the "homeland" whether he is here or there. This temporal and spatial "here" and "there" are interchangeable according to the power of the artist's passion and perseverance in making his art, as well as his eternal alliance with the higher power that he recognizes and his refusal to bow down to temporary authority. Only those who leave their countries not to escape persecution or to rebel but for other reasons--the number of expatriates, for example, who maintain allegiances to a dictatorship or regime, who live outside their countries but write within the official sense of power--will be unable to accomplish any truly creative work. This is because they won't have thought about doing this work in the first place, even when they were there, due to the chauvinistic partisan upbringing which they received and according to whose deadly principles they developed--principles that don't allow for variety or newness in life. Those who don't experience injustice and oppression "over there" will find it difficult to escape their shadow and write with freedom "here," and they will occupy themselves with superficial issues that have no relationship to creativity. It is impossible for writing to have this background without getting embroiled in ridiculing the present, and it is only natural that the writer won't be bold enough to take on this adventure without a

decent amount of freedom at his disposal--internal freedom before all else, which is a condition of creativity, and which knows no specific location: it knows no "inside" or "outside" or "homeland" or "exile," and any restriction on this freedom from outside the writer or within him will hinder his imagination and divert his creativity.

It is strange that most well-known writers who are celebrated worldwide were rejected and attacked in their own countries. I don't say this out of self-pity. Rather, what I want to say is that for a writer, thinking about an "inside" and an "outside" has no importance. What is more important is thinking about the necessary conditions for creativity. In the end, the artist is an exile even when he is in his own country, and writers in exile who write in Arabic (especially those from Iraq) are able to present their "homelands" through their creative accomplishments. It follows that the most beautiful homelands are not those determined by an ideological regime (as happened in Iraq, where the regime persisted in imposing itself through death and bullets and destruction and chemical weapons both inside and outside the country). Rather it is what we find in every beautiful novel and every beautiful poem and every beautiful song. And this applies to creative works from every place and time.

This is what the Gypsies learned, they tell me, for ever since they stole the nails intended to nail Christ to the cross--ever since that day when they were attacked and chased out, they have paid the price for keeping the nails and refusing to give them to anyone by wandering from one place to the next. One time, at a convention in Bucharest, I asked the president of the World Romany Congress the following question: "All minority groups, when they talk about their rights, aspire to belong to a bigger national group which speaks its own language in a neighboring country. What do the Gypsies aspire to?" He looked at me, smiled, and thumped his heart: "This is the nation we belong to." An answer not lacking in romanticism, but this is nothing strange, for there is no connotation of homeland or exile to the words "homeland" and "exile" in the gypsy language. Maybe this outlook is one of the sources of creativity; and maybe this enriches the arteries through which the blood of writing flows.

---

**Words Without Borders - The Online Magazine for International Literature**

copyright © 2005

HOME | SEARCH | SUITCASE OF BOOKS | LINKS | ABOUT US | CONTACT US | SIGN UP
AFRICA | AMERICAS | ASIA | EUROPE | MIDDLE EAST | PACIFIC RIM
CITIES | COASTS | MOUNTAINS | PLAINS | DESERTS | FORESTS | VILLAGES

# Banishment Act of the State of Massachusetts

**An Act to prevent the return to this state of certain persons therein named and others who have left this state or either of the United States, and joined the enemies thereof.**

## Whereas

Thomas **Hutchinson**, Esq., late governor of this state,
Francis **Bernard**, Esq., formerly governor of this state,
Thomas **Oliver**, Esq., late lieutenant governor of this state,
Timothy **Ruggles**, Esq., of Hardwick, in the county of Worcester,
William **Apthorp**, merchant,
Gibbs **Atkins**, cabinet maker,
John **Atkinson**,
John **Amory**,
James **Anderson**,
Thomas **Apthorp**,
David **Black**,
William **Burton**,
William **Bowes**,
George **Brindley**,
Robert **Blair**,
Thomas **Brindley**,
James **Barrick**, merchant,
Thomas **Brattle**, Esq.,
Sampson Salter **Blowers**, Esq.,
James **Bruce**, merchant,
Ebenezer **Bridgham**, merchant,
Alexander **Brymer**, merchant,
Edward **Berry**, merchant,
William **Burch**, Esq., late commissioner of the customs,
Mather **Byles**, Jun., clerk,
William **Codner**, book-keeper,
Edward **Cox**, merchant,
Andrew **Cazneau**, Esq., barrister at law,
Henry **Canner**, clerk,
Thomas **Courtney**, tailor,
Richard **Clark**, Esq.,
Isaac **Clark**, physician,
Benjamin **Church**, physician,
John **Coffin**, distiller,
John **Clark**, physician,
William **Coffin**, Esq.,
Nathaniel **Coffin**, Esq.,
Jonathan **Clark**, merchant,
Archibald **Cunningham**, shop-keeper,

Gilbert **Deblois**, merchant,
Lewis **Deblois**, merchant,
Philip **Dumaresque**, merchant,
Benjamin **Davis**, merchant,
John **Erving**, Jun., Esq.,
George **Erving**, Esq.,
Edward **Foster**,
Edward **Foster**, Jun., blacksmiths,
Benjamin **Faneuil** Jun., merchant,
Thomas **Flucker**, Esq., late secretary for Massachusetts Bay,
Samuel **Fitch**, Esq.,
Wilfret **Fisher**, carter,
James **Forrest**, merchant,
Lewis **Gray**, merchant,
Francis **Green**, merchant,
Joseph **Green**, Esq.,
Sylvester **Gardiner**, Esq.,
Harrison **Gray**, Esq., late treasurer of Massachusetts Bay,
Harrison **Gray**, Jun., clerk to the treasurer,
Joseph **Goldthwait**, Esq.,
Martin **Gay**, founder,
John **Gore**, Esq.,
Benjamin **Hallowell**, Esq.,
Robert **Hallowell**, Esq.,
Thomas **Hutchinson**, Jun., Esq.,
Benjamin **Gridley**, Esq.,
Frederick William **Geyer**, merchant,
John **Greenlaw**, shop-keeper,
David **Green**, merchant,
Elisha **Hutchinson**, Esq.,
James **Hall**, mariner,
Foster **Hutchinson**, Esq.,
Benjamin Mulbury **Holmes**, distiller,
Samuel **Hodges**, book-keeper,
Henry **Halson**, Esq.,
Hawes **Hatch**, wharfinger,
John **Joy**, housewright,
Peter **Johonnot**, distiller,
William **Jackson**, merchant,
John **Jeffries**, physician,
Henry **Laughton**, merchant,
James **Henderson**, trader,
John **Hinston**, yeoman,
Christopher **Hatch**, mariner,
Robert **Jarvis**, mariner,
Richard **Lechmere**, Esq.,
Edward **Lyde**, merchant,
Henry **Lloyd** Esq.,
George **Leonard**, miller,
Henry **Leddle**, book-keeper,
Archibald **McNeil**, baker,

Christopher **Minot**, tide-waiter,
James **Murray**, Esq.,
William **McAlpine**, bookbinder,
Thomas **Mitchell**, mariner,
William **Martin**, Esq,.
John **Knutton**, tallow-chandler,
Thomas **Knight**, shop-keeper,
Samuel **Prince**, merchant,
Adino **Paddock**, Esq.,
Charles **Paxon**, Esq.,
Sir William **Pepperell**, baronet,
John **Powell**, Esq.,
William Lee **Perkins**, physician,
Nathaniel **Perkins**, Esq.,
Samuel **Quincy**, Esq.,
Owen **Richards**, tide-waiter,
Samuel **Rogers**, merchant,
Jonathan **Simpson**, Esq.,
George **Spooner**, merchant,
Edward **Stowe**, mariner,
Richard **Smith**, merchant,
Jonathan **Snelling**, Esq,
David **Silsby**, trader,
Samuel **Sewall**, Esq.,
Abraham **Savage**, tax-gatherer,
Joseph **Scott**, Esq.,
Francis **Skinner**, clerk to the late council,
William **Simpson**, merchant,
Richard **Sherwin**, saddler,
Henry **Smith**, merchant,
John **Semple**, merchant,
Robert **Semple**, merchant,
Thomas **Selkrig**, merchant,
James **Selkrig**, merchant,
Robert **Service**, trader,
Simon **Tufts**, trader,
Arodi **Thayer**, late marshall to the admiralty court,
Nathaniel **Taylor**, deputy naval officer,
John **Troutbeck**, clerk,
Gregory **Townsend**, Esq.,
William **Taylor**, merchant,
William **Vassal**, Esq.,
Joseph **Taylor**, merchant,
Joshua **Upham**, Esq.,
William **Walter**, clerk,
Samuel **Waterhouse**, merchant,
Isaac **Winslow**, jr., merchant,
David **Willis**, mariner,
Obadiah **Whiston**, blacksmith,
Archibald **Wilson**, trader,
John **White**, mariner,

William **Warden**, peruke-maker,
Nathaniel **Mills**,
John **Hicks**,
John **Howe**,
John **Fleming**, printers, all of Boston, in the county of Suffolk,
Robert **Auchmuty**, Esq.,
Joshua **Loring**, Esq., both of Roxbury, in the same county,
Samuel **Goldsbury**, yeoman, of Wrentham, in the county of Suffolk,
Joshua **Loring**, jr., merchant,
Nathaniel **Hatch**, Esq., of Dorchester, in the same county,
William **Brown**, Esq.,
Benjamin **Pickman**, Esq.,
Samuel **Porter** Esq.,
John **Sargeant**, trader, all of Salem, in the county of Essex,
Richard **Saltonstall**, Esq., of Haverhill, in the same county,
Thomas **Robie**, trader,
Benjamin **Marston**, merchant, of Marblehead, in said county of Essex,
Moses **Badger**, clerk, of Haverhill, aforesaid,
Jonathan **Sewall**, Esq.,
John **Vassal**, Esq.,
David **Phipps**, Esq.,
John **Nutting**, carpenter, all of Cambridge, in the county of Middlesex,
Isaac **Royall**, Esq., of Medford, in the same county,
Henry **Barnes**, merchant, of Marlborough, in the same county of Middlesex,
Jeremiah Dummer **Rogers**, of Littleton in the same county, Esq.,
Daniel **Bliss**, of Concord, in the said county of Middlesex, Esq.,
Charles **Russell**, of Lincoln, in the same county, physician,
Joseph **Adams**, of Townsend, in the said county of Middlesex,
Thomas **Danforth**, of Charlestown, in said county, Esq.,
Joshua **Smith**, trader, of Townsend, in said county,
Joseph **Ashley**, jr., gentleman, of Sunderland,
Nathaniel **Dickenson**, gentleman of Deerfield,
Samuel **Bliss**, shopkeeper, of Greenfield,
Roger **Dickenson**, yeoman,
Joshah **Pomroy**, physician, and
Thomas **Cutler**, gentleman, of Hatfield,
Jonathan **Bliss**, Esq., of Springfield,
William **Galway**, yeoman, of Conway,
Elijah **Williams**, attorney at law, of Deerfield,
James **Oliver**, gentleman, of Conway, all in the county of Hampshire,
Pelham **Winslow**, Esq.,
Cornelius **White**, mariner,
Edward **Winslow**, jr., Esq., all of Plymouth, in the county of Plymouth,
Peter **Oliver**, Esq.,
Peter **Oliver**, jr., physician, both of Middleborough, in the county of Plymouth,
Josiah **Edson**, Esq., of Bridgewater, in the said county of Plymouth,
Lieutenant Daniel **Dunbar**, of Halifax, in the same county,
Charles **Curtis**, of Scituate, in the said county of Plymouth, gentleman,
Nathaniel Ray **Thomas**, Esq.,
Israel **Tilden**,
Caleb **Carver**,

Seth **Bryant**,
Benjamin **Walker**,
Gideon **Walker**,
Zera **Walker**,
Adam **Hall**, tertius,
Isaac **Joice**,
Joseph **Phillips**,
Daniel **White**, jr.,
Cornelius **White**, tertius,
Melzar **Carver**,
Luke **Hall**,
Thomas **Decrow**,
John **Baker**, jr., all of Marshfield, in the said county of Plymouth,
Gideon **White**, jr.,
Daniel **Leonard**, Esq.,
Seth **Williams**, jr., gentleman,
Solomon **Smith**, boatman, all of Taunton, in the county of Bristol,
Thomas **Gilbert**, Esq.,
Ebenezer **Hathaway**, jr.,
Lot **Strange**, the third,
Zebedee **Terree**,
Bradford **Gilbert**, all of Freetown, in the same county,
Joshua **Broomer**,
Shadrach **Hathaway**,
Calvin **Hathaway**,
Luther **Hathaway**,
Henry **Tisdel**,
William **Burden**,
Levi **Chase**,
Shadrach **Chase**,
Richard **Holland**,
Ebenezer **Phillips**,
Samuel **Gilbert**, gentleman,
Thomas **Gilbert**, jr., yeoman, both of Berkley, in the said county of Bristol,
Ammi **Chace**,
Caleb **Wheaton**,
Joshua **Wilborne**,
Lemuel **Bourn**, gentleman,
Thomas **Perry**, yeoman,
David **Atkins**, laborer,
Samuel **Perry**, mariner,
Stephen **Perry**, laborer,
John **Blackwell**, jr., laborer,
Francis **Finney**, laborer,
Nehemiah **Webb**, mariner, all of Sandwich, in the county of Barnstable,
Eldad **Tupper**, laborer, of Dartmouth, in the county of Bristol,
Silas **Perry**, laborer,
Seth **Perry**, mariner,
Elisha **Bourn**, gentleman,
Thomas **Bumpus**, yeoman,
Ephraim **Ellis**, jr., yeoman,

Edward **Bourn**, gentleman,
Nicholas **Cobb**, laborer,
William **Bourn**, cordwainer, all of Sandwich, in the county of Barnstable, and
Seth **Bangs**, of Harwich, in the county of Barnstable, mariner,
John **Chandler**, Esq.,
James **Putnam**, Esq.,
Rufus **Chandler**, gentleman,
William **Paine**, physician,
Adam **Walker**, blacksmith,
William **Chandler**, gentleman, all of Worcester, in the county of Worcester,
John **Walker**, gentleman,
David **Bush**, yeoman, both of Shrewsbury, in the same county,
Abijah **Willard**, Esq.,
Abel **Willard**, Esq.,
Joseph **House**, yeoman, all of Lancaster, in the said county of Worcester,
Ebenezer **Cutler**, trader,
James **Edgar**, yeoman, both of Northbury, in the same county,
Daniel **Oliver**, Esq.,
Richard **Ruggles**, yeoman,
Gardner **Chandler**, trader,
Joseph **Ruggles**, gentleman,
Nathaniel **Ruggles**, yeoman, all of Hardwick, in the said county of Worcester,
John **Ruggles**, yeoman, of said Hardwick,
John **Eager**, yeoman,
Ebenezer **Whipple**,
Israel **Conkay**,
John **Murray**, Esq., of Rutland, in said county of Worcester,
Daniel **Murray**, gentleman,
Samuel **Murray**, gentleman,
Michael **Martin**, trader, of Brookfield, in the said county of Worcester,
Thomas **Beaman**, gentleman, of Petersham, in the same county,
Nathaniel **Chandler**, gentleman,
John **Bowen**, gentleman, of Princeton, in the said county of Worcester,
James **Crage**, gentleman, of Oakham, in the same county,
Thomas **Mullins**, blacksmith, of Leominster, in the said county of Worcester,
Francis **Waldo**, Esq.,
Arthur **Savage**, Esq.,
Jeremiah **Pote**, mariner,
Thomas **Ross**, mariner,
James **Wildridge**, mariner,
George **Lyde**, custom house officer,
Robert **Pagan**, merchant,
Thomas **Wyer**, mariner,
Thomas **Coulson**, merchant,
John **Wiswall**, clerk,
Joshua **Eldridge**, mariner,
Thomas **Oxnard**, merchant,
Edward **Oxnard**, merchant,
William **Tyng**, Esq.,
John **Wright**, merchant,
Samuel **Longfellow**, mariner, all of Falmouth, in the county of Cumberland,

Charles **Callahan**, of Pownalborough, in the county of Lincoln, mariner,
Jonas **Jones**, of East Hoosuck, in the county of Berkshire,
David **Ingersol**, of Great Barrington, in the same county,
Jonathan **Prindall**,
Benjamin **Noble**,
Francis **Noble**,
Elisha **Jones**, of Pittsfield, in the said county of Berkshire,
John **Graves**, yeoman,
Daniel **Brewer**, yeoman, both of Pittsfield, aforesaid,
Richard **Square**, of Lanesborough, in the said county of Berkshire,
Ephraim **Jones**, of East Hoosuck, in the same county,
Lewis **Hubbel**

and many others have left this state, or some other of the United States of America, and joined the enemies thereof and of the United States of America, thereby not only depriving these states of their personal services at a time when they ought to have afforded the utmost aid in defending the said states, against the invasions of a cruel enemy, but manifesting an inimical disposition to the said states, and a design, to aid and abet the enemies thereof in their wicked purposes, whereas many dangers may accrue to this state and the United States, if such persons should again reside in this state:

**Sect. 1**. Be it therefore enacted by the Council and House of Representatives, in general court assembled, and by the authority of the same, that if either of the said persons, or any other person, though not specifically named in this act, who have left this state or either of said states, and joined the enemies thereof as aforesaid, shall, after the passing of this act, voluntarily return to this state, it shall be the duty of the sheriff of the county, and of the selectmen, committees of correspondence, safety and inspection, grand jurors, constables, and tythingmen, and other inhabitants of the town wherein such person or persons may presume to come, and they are hereby respectively empowered and directed forthwith to apprehend and carry such person or persons before some justice of the peace within the county, who is hereby required to commit him or them to the common gaol within the county, there in close custody to remain until he shall be sent out of the state, as is hereinafter directed; and such justice is hereby directed to give immediate information thereof to the board of war of this state: and the said board of war are hereby empowered and directed to cause such person or persons so committed, to be transported to some part or place within the dominions, or in the possession of the forces of the king of Great Britain, as soon as may be after receiving such information; those who are able, at their own expense, and others at the expense of this state, and for this purpose to hire a vessel or vessels, if need be.

**Sect. 2**. And be it further enacted by the authority aforesaid, that if any person or persons, who shall be transported as aforesaid, shall voluntarily return to this state, without liberty first had and obtained from the general court, he shall, on conviction thereof before the superior court of judicature, court of assize and general gaol delivery, suffer the pain of death without benefit of clergy.

**Passed, September, 1778.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certify that he served a copy of Plaintiff's

## MOTION TO RECONSIDER AND
## VACATE THE COURT'S 11 APRIL 2006 ORDER

on defendants attorney of record, Robin C. Alexander, University Counsel,

University of the District of Columbia, Washington, D.C. 20008, and a courtesy

Robert J. Spagnoletti, Attorney General of the District of Columbia, 441 Fourth

Street, N.W., Washington, D.C. 20001, by hand delivery, this 19th day of April 2006.

UNDERSIGNED,
RANDOLPH J. GREENE
P.O. Box 36303
Washington, D.C. 20020
(202) 561-4503
Plaintiff Pro Se